# EXHIBIT A

1  FELICIA Y SZE (State Bar No. 233441)
   LONG X. DO (State Bar No. 211439)
2  **ATHENE LAW, LLP**
   5432 GEARY BLVD., #200
3  SAN FRANCISCO, CA 94121-2307
   Telephone: (415) 686-7531
4  Facsimile: (844) 619-8022
   E-Mail: felicia@athenelaw.com
5
   Attorneys for Dignity Health and Dignity Community Care
6

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**12/09/2019**
**Clerk of the Court**
BY: KALENE APOLONIO
Deputy Clerk

7

8

9                **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10                          **COUNTY OF SAN FRANCISCO**

11  DIGNITY HEALTH, a California non-profit        Case No. CPF-19-516909
    corporation; and DIGNITY COMMUNITY
12  CARE, a Colorado non-profit corporation,       **FIRST AMENDED VERIFIED PETITION
                                                   FOR WRIT OF MANDATE (CCP §§ 1085,**
13                 Petitioners and Plaintiffs,     **1094.5), AND COMPLAINT (42 U.S.C. §
                                                   1983, DECLARATORY RELIEF)**
14         vs.

15  RICHARD FIGUEROA, in his official
    capacity as the acting Director of the
16  California Department of Health Care
    Services; RAUL RAMIREZ, in his official
17  capacity as the Director of the California
    Department of Health Care Services Office of
18  Health Information Technology; BRUCE
    LIM, in his official capacity as the Deputy
19  Director of California Department of Health
    Care Services Audits and Investigations; the
20  CALIFORNIA DEPARTMENT OF HEALTH
    CARE SERVICES, and DOES 1-20,
21
                 Respondents and Defendants.
22

23

24

25

26

27

28

FIRST AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

1    Petitioners and Plaintiffs DIGNITY HEALTH and DIGNITY COMMUNITY CARE
2  (collectively, "Dignity") respectfully petition this Court for a writ of mandate under Code of Civil
3  Procedure sections 1085 and/or 1094.5 and for injunctive relief pursuant to 42 U.S.C. section
4  1983, directed to Respondents and Defendants RICHARD FIGUEROA, in his official capacity as
5  the acting Director of the California Department of Health Care Services; RAUL RAMIREZ, in
6  his official capacity as the Director of the California Department of Health Care Services Office of
7  Health Information Technology; BRUCE LIM, in his official capacity as the Deputy Director of
8  California Department of Health Care Services Audits and Investigations; and the CALIFORNIA
9  DEPARTMENT OF HEALTH CARE SERVICES and by this verified Petition and Complaint
10  alleges as follows:

11  **I.    INTRODUCTION**

12    1.    In the midst of the Great Recession of the late 2000s, Congress enacted the Health
13  Information Technology for Economic and Clinical Health ("HITECH") Act of 2009, as a key part
14  of a broad stimulus package to jumpstart the American economy. Healthcare providers were
15  encouraged to adopt and use new, government-certified electronic health records ("EHR")
16  infrastructures to increase much-needed economic spending while also potentially improving
17  patient care and outcomes. Specifically, the HITECH Act created an "incentive payment"
18  program, by which health care providers, including hospitals, could earn incentive payments from
19  the federal and state governments to defray a portion of the major expenditures that would be
20  required to upgrade their EHR systems. While there was an EHR incentive program run through
21  the federally-implemented Medicare program, states were given flexibility under the HITECH Act
22  to establish the particular procedures and rules for participation through their existing Medicaid
23  programs, including the precise methodologies to calculate the amount of incentive payments a
24  program participant could receive – subject to federal approval. The HITECH Act program
25  developed for California became known as the Medi-Cal EHR Incentive Program and was devised
26  and implemented by the Department through its State Medicaid Health Information Technology
27  Plan ("State Plan").

28    2.    Dignity was an early implementer in California's Medi-Cal EHR incentive

1

1  program, devised and implemented by the Department through its State Medicaid Health

2  Information Technology Plan ("State Plan"). Dignity recognized the benefits to its operations and

3  the quality of patient care provided at its hospitals and facilities by upgrading its EHR

4  infrastructures. Equally important, participation was a good means for Dignity to do its part in the

5  efforts to rebuild the country after one of the darkest moments in our nation's

6  economic history. Dignity thus expended substantial resources, including millions of dollars, to

7  adopt and to meaningfully use new EHR systems that met the requirements of California's EHR

8  incentive program.  For its efforts, as contemplated by the HITECH Act, Dignity qualified for and

9  received incentive payments from the California Department of Health Care Services.

10       3.       The Department pulled the rug out from under Dignity many years after Dignity

11  made its capital commitments to the EHR incentive program and received incentive payments for

12  various of its hospitals.  Through audit adjustments determined in mid-2017 and on, the

13  Department has sought to reclaim over $8 million of incentive payments made to Dignity,

14  including the specious claim that every single dollar that had been paid to two hospitals, Marian

15  Medical Center ("Marian") and Arroyo Grande Hospital ("Arroyo Grande"), through the EHR

16  incentive program was an overpayment.  By these actions, the Department seeks to force Dignity

17  to pay back funds that had been received and absorbed into its accounts many years earlier.

18       4.       The shocking and unfair nature of the Department's audit actions are laid bare in

19  the dubious bases underlying its audit adjustments. The Department never claimed that Dignity's

20  EHR upgrades did not satisfy the requirements for adoption and meaningful use of certified EHR

21  systems under the HITECH Act. Nor did the Department ever claim that the incentive payments

22  paid to Dignity run afoul of any written rule or formula that the Department had developed to

23  implement California's Medi-Cal EHR incentive payment program.

24       5.       Instead, the Department's audit adjustments are entirely focused on the source of

25  data used in the methodology that the Department used to calculate incentive payments. Following

26  the express written instructions and guidance issued by the Department, Dignity had submitted

27  data related to discharges and care to Medi-Cal and other patients from its cost report – a reliable

28  report on a form mandated by the Centers for Medicare and Medicaid Services ("CMS") used to

FIRST AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

1  determine reimbursement under Medicare and Medicaid programs. Dignity provided the exact

2  data elements pursuant to the Department's express instructions. Those data elements, which were

3  submitted to and reviewed by the Department, yielded the incentive payments originally paid to

4  Dignity for its various hospitals.  Yet, contrary to its own prior written guidance and instructions,

5  the Department in its audit adjustments several years later claimed that a different type of data

6  should have been used – even though the Department had never previously communicated such a

7  change in formulation to Dignity or any other participating hospital.

8        6.      Moreover, rather than try to gauge the appropriate quantity of discharge and Medi-

9  Cal services for Marian and Arroyo Grande under the Department's *post hoc* formulation, the

10  Department simply zeroed out data elements entirely. Such audit adjustments yielded the patently

11  false position that Marian and Arroyo Grande performed absolutely no services to patients (Medi-

12  Cal or otherwise) in the relevant period, and on that absurd basis, the Department determined that

13  these two hospitals were entitled to no EHR incentive payment whatsoever.

14       7.      Compounding the injustice to Dignity, the Department refused to accept, much less

15  to visit the merits of, Dignity's administrative appeal of the audit adjustments for Marian. Relying

16  on a statutory deadline that applied to a different type of audit altogether, the Department claimed

17  that Dignity's administrative appeal was untimely and lacked good cause.

18       8.      Dignity has no other avenue now but to come to this Court to seek an end to the

19  Departments' Kafkaesque treatment of Dignity in its implementation of the Medi-Cal EHR

20  incentive payment program pursuant to the HITECH Act. By this Complaint, pursuant to 42

21  U.S.C. section 1983, Dignity challenges the Department's audit adjustments and related actions on

22  the basis that (1) they constitute a retroactive impairment of contract in violation of the U.S.

23  Constitution, article I, section 10, and (2) they violate Dignity's due process rights under the

24  Fourteenth Amendment.  Dignity also brings this Petition for Writ of Mandate pursuant to

25  California Code of Civil Procedure sections 1085 and, in the alternative, 1094.5 to compel the

26  Department to comply with its ministerial duties in implementing the HITECT Act's EHR

27  incentive payment program in a manner that conforms to federal and state law and the

28  Department's own written rules and guidance.

FIRST AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

II.    **PARTIES**

9.      Dignity Health is a California nonprofit public benefit corporation which operates a health care system serving California, Arizona and Nevada. Dignity has corporate offices located in San Francisco, California. It is licensed to operate the following hospitals:

| Hospital Name | Address |
|---|---|
| Marian Regional Medical Center, Arroyo Grande | 345 S. Halcyon Rd., Arroyo Grande, CA 93420 |
| Marian Regional Medical Center | 1400 E. Church St., Santa Maria, CA 93454 |
| Mercy General Hospital | 4001 J Street, Sacramento, CA 95819 |
| Mercy San Juan Medical Center | 6501 Coyle Ave., Carmichael, CA 95608 |
| St. Bernardine Medical Center | 2101 N. Waterman Ave., San Bernardino, CA 92404 |
| St. John's Pleasant Valley Hospital | 2309 Antonio Ave., Camarillo, CA 93010 |
| St. Mary's Medical Center | 450 Stanyan St., San Francisco, CA 94117 |

10.     Dignity Community Care is a California nonprofit public benefit corporation which operates a health care system serving California, Arizona and Nevada. It is licensed to operate the following hospitals:

| Hospital Name | Address |
|---|---|
| California Hospital Medical Center | 1401 S. Grand Ave., Los Angeles, CA 90015 |
| French Hospital Medical Center | 1911 Johnson Ave., San Luis Obispo, CA 93401 |
| Glendale Memorial Hospital and Health Center | 1420 S. Central Ave., Glendale, CA 91204 |
| Methodist Hospital of Sacramento | 7500 Hospital Drive, Sacramento, CA 95823 |

11.     Together, Dignity Health and Dignity Community Care ("Dignity") provide more inpatient bed days to Medi-Cal beneficiaries than any other health system in the State of California.

12.     Respondent and Defendant Richard Figueroa is the acting Director of the Department of Health Care Services, the agency charged with administering and enforcing the provisions of the Medi-Cal program and is named in his official capacity only.

13.     Respondent and Defendant Raul Ramirez is the Chief of the Department of Health Care Services Office of Health Information Technology.  The Office of Health Information

FIRST AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

1   Technology is the office of the Department of Health Care Services charged with administering

2   the Medi-Cal EHR Incentive Program. Mr. Ramirez is named in his official capacity only.

3          14.     Respondent and Defendant Bruce Lim is the Deputy Director of the Department of

4   Health Care Services Audits and Investigations Branch, the branch within the Department of

5   Health Care Services charged with performing financial audits related to payments to healthcare

6   providers of Medi-Cal or other State or federally funded healthcare programs. Mr. Lim is named

7   in his official capacity only.

8          15.     Respondent and Defendant California Department of Health Care Services

9   administers a number of healthcare programs, including the Medi-Cal EHR Incentive Program.

10          16.     Respondents Figueroa, Ramirez and Lim are referred to herein as "Official

11   Respondents/Defendants," collectively. All Respondents and Defendants are referred to herein as

12   the "Department," collectively.

13   **III.     JURISDICTION AND VENUE**

14          17.     The Court has jurisdiction over this writ action pursuant to Code of Civil Procedure

15   sections 410.10 and 1085. The Court has jurisdiction over Dignity's claims arising under 42

16   U.S.C. section 1983 actions. (*Chavez v. Keat* (1995) 34 Cal.App.4th 1406, 1413 [state court

17   jurisdiction over claims arising under 42 U.S.C. § 1983].)

18          18.     Venue is proper in San Francisco County for two independent reasons. First, the

19   cause arose in part in San Francisco County where Petitioners have their corporate offices and

20   where St. Mary's Medical Center, one of the affected hospitals, is located (Code Civ. Proc. §

21   393(b)). Second, the California Attorney General maintains an office in the County of San

22   Francisco and the cause arose in part in Sacramento County where (a) the Respondent Department

23   of Health Care Services is located and from which it spent and allocated to Dignity Health the

24   public funds at issue herein, and (b) Dignity Health would have to return the funds at issue herein

25   pursuant to the Department of Health Care Services' audit conclusions (Code Civ. Proc. §§

26   393(b), 395 and 401).

27   / / /

28   / / /

FIRST AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

IV.   **CALIFORNIA'S IMPLEMENTATION OF ITS MEDICAID EHR INCENTIVE PAYMENT PROGRAM**

    A.   <u>The HITECH Act</u>

19.   The Medicaid Act, 42 U.S.C. section 1396, et seq., authorizes federal financial support to states for medical assistance provided to certain low-income persons. (*Orthopaedic Hospital v. Belshe* (9th Cir. 1997) 103 F.3d 1491, 1493.)  The program is jointly financed by the federal and state governments and administered by the states. (*Ibid.*; 42 C.F.R. § 430.0.)  In order to receive matching federal financial participation, states must agree to comply with the applicable federal Medicaid law and regulations. (*See Alexander v. Choate* (1985) 469 U.S. 287, 289, fn. 1.)  California's Medicaid program ("Medi-Cal") is administered by the Department. (*See* Cal. Code Regs., tit. 22, § 50004.)

20.   On February 17, 2009, the American Recovery and Reinvestment Act of 2009 (ARRA) was enacted.  The HITECH Act is part of the ARRA sections that adopted 42 U.S.C. section 1396b(t), which authorized states to establish incentive payment programs to encourage the voluntary adoption and use of certified electronic health record ("EHR") technology by Medicaid healthcare providers, including certain eligible hospitals.  Hospitals are eligible for Medicaid EHR incentive payments if "at least 10 percent of the hospital's patient volume [is] attributable to individuals who are receiving medical assistance under [a state Medicaid program]." (42 U.S.C. § 1396b(t)(2)(B)(ii).)

21.   CMS implemented the Medicare and Medicaid EHR programs through a rulemaking process, culminating in parts 412, 414, 422 and 495 of title 42 of the Code of Federal Regulations.  The regulations governing the Medicaid EHR incentive programs are located at 42 C.F.R. sections 495.300, et seq.  The implementing regulations clarify that in most instances, the role of a state in the implementation of a Medicaid EHR program is to "determine[] the provider's eligibility for the EHR incentive payment under subparts A and D of this part and approve[], process[], and make[] timely payments using a process approved by CMS." (42 C.F.R. § 495.312(c).) States carry out such functions through a comprehensive state plan that must be approved by CMS. Although administered by states, the federal government funds entirely the

FIRST AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

1  Medicaid EHR incentive payments "to Medicaid providers… to encourage the adoption and use of

2  certified EHR technology." (42 U.S.C. § 1396b(a)(3)(F).)

3      B.   The Legislature's Authorization of the Medi-Cal EHR Incentive Program

4      22.   On October 2, 2011, the California Legislature directed the Department to

5  "establish and administer the Medi-Cal Electronic Health Records Incentive Program ("Medi-Cal

6  EHR Incentive Program") for the purpose of providing federal incentive payments to Medi-Cal

7  providers for the implementation and use of electronic health record systems." (Welf. & Inst.

8  Code, §§ 14046-14046.8.) Welfare and Institutions Code section 14046.1 requires the Medi-Cal

9  EHR Incentive Program to "be administered in accordance with the State Medicaid Health

10  Information Technology Plan, as developed by the department and approved by the federal

11  Centers for Medicare and Medicaid Services." Likewise, Welfare and Institutions Code section

12  14046.2 states that "[u]pon receipt of all necessary federal approvals, and in accordance with the

13  State Medicaid Health Information Technology Plan, the department shall accept applications

14  from, and make incentive payments to, eligible professionals and facilities."

15      23.   On December 3, 2010, the Department submitted its first draft of the State Plan to

16  CMS. After substantial discussions and several revisions of the State Plan, CMS ultimately

17  approved the State Plan on September 30, 2011, and it went into effect the next day on October 1,

18  2011.

19      C.   Eligibility Requirements for Incentive Payments

20      24.   Medicaid EHR incentive payments were made available starting in 2011 and

21  annually thereafter through 2021. To receive each year's EHR incentive payment, eligible

22  hospitals must attest that they meet the requirements specified under the HITECH Act and any

23  other applicable state laws or rules. Eligibility for payment in the first year of the program requires

24  a hospital to adopt, implement, or upgrade to a certified EHR technology system. To be eligible

25  for payments in later years of the program, a hospital must meet meaningful use requirements set

26  forth by CMS. For each individual year, CMS specified the "stage" of meaningful use a hospital

27  was required to meet and also revised the criteria for meeting each "stage" of meaningful use.

28  Those standards were set forth in sections 495.20 and 495.22 of title 42 of the Code of Federal

FIRST AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

1  Regulations.

2      25.    Upon attestations by Medicaid providers of meeting the eligibility for the Medicaid

3  EHR incentive payments, states issue payments to qualifying providers.  (*See generally* 42 U.S.C.

4  § 1396b(t).)  Each state must assure the Secretary of the U.S. Department of Health and Human

5  Services that Medicaid EHR incentive payments to a provider are paid "directly to such

6  provider… without any deduction or rebate." (42 U.S.C. § 1396b(t)(6)(A).)

7      D.    <u>Methodology to Calculate Incentive Payments</u>

8      26.    Under the provisions of the Medi-Cal EHR Incentive Program, payment incentives

9  awarded to eligible hospitals are an aggregate of two components: the Overall EHR Amount and

10  the Medicaid Share. The formula for calculating the aggregate incentive payment amounts is

11  governed by federal law.  (*See* 42 U.S.C. § 1396b(t)(5); 42 C.F.R. § 495.310(g).)  The calculation

12  of the aggregate payment amount is unrelated to the actual costs that a hospital may expend in

13  order to qualify for the Medi-Cal EHR program. The aggregate payment amount is equal to the

14  product of the Overall EHR Amount and the Medicaid Share.

15      27.    The Overall EHR Amount is a dollar amount calculated based on a hospital's

16  estimated total number of inpatient acute care discharges over a theoretical 4-year period.  (42

17  C.F.R. § 495.310(g)(1).)  This is considered a theoretical 4-year period because it is calculated

18  once, based on how much a hospital might be paid over 4 years.  Essentially, based on historical

19  discharges over a 4-year period, the State calculated an average annual growth rate over 3 years of

20  historical data and then applied that to the number of discharges in the last year of available data to

21  project theoretical discharges for a 4-year period.

22      28.    The two primary factors of the Overall EHR Amount are the Initial Amount and the

23  Transition Factor.  The Initial Amount is equal to $2 million plus a discharge-related amount

24  based on the number of discharges calculated for each of the 4 theoretical years described above.

25  (42 U.S.C. § 1395ww(n)(2); 42 C.F.R. § 495.310(g)(1)(i).)  The Transition Factor is a diminishing

26  percentage that is applied to the Initial Amount calculated for each of the 4 theoretical years.

27  Once the Transition Factor is applied to each of the Initial Amounts calculated for each of the 4

28  theoretical years, the resulting products for each of the 4 theoretical years are totaled to determine

the Overall EHR Amount.

29.     The Medicaid Share essentially acts as a proxy for the percentage of Medicaid inpatients that a hospital serves.  The formula for the Medicaid Share is based on the estimates of various factors, as follows:

$$\frac{\text{\# of Medicaid Acute Inpatient Days} + \text{\# of Acute Inpatient Managed Care days}}{\text{Total Acute Inpatient Hospital Days} \times \left[\frac{\text{Total Charges} - \text{Charges attributable to Charity Care}}{\text{Total Charges}}\right]}$$

30.     One of the distinctions between CMS' regulation for calculating *Medicaid* EHR incentive payments versus *Medicare* EHR incentive payments is that the Medicare EHR incentive payments are subject to a reconciliation to actual data (42 C.F.R. section 495.102(a)(2)).  No parallel provision exists for the Medicaid EHR incentive program.  (*See generally* 42 C.F.R. § 495.310(g).)

E.     <u>Express Reference to Cost Report Data Elements to Calculate Incentive Payments</u>

31.     As part of the approval process of the Department's State Plan, CMS required the Department to include a detailed description of the methodology, including data sources, from which the Department would calculate the components of the Medi-Cal EHR incentive payments. The final State Plan describes the following steps for calculating the Overall EHR Amount:

Calculation of the Overall EHR Amount is a one-time calculation based on the following steps:

- Calculate the average annual growth rate over three years using the Medicare/Medicaid Cost Reports prior to the most current Cost Report….

- Calculate the total Medicaid discharges using the Medicaid discharges in the Medicare/Medicare Cost Reports plus the discharges where Medicaid is the secondary payer.  Only discharges between 1149 and 23,000 per [hospital] will be allowable discharges.

- Calculate each of the next four year's total discharges by multiplying the previous year's discharges times the average computed growth rate.

- Calculate the Aggregate EHR Amount for each year by multiplying (total discharges times $200) plus the $2,000,000 base.

9

- Apply the appropriate transition factor to each year's Aggregate EHR Amount. (Year One – 100%, Year Two – 75%, Year Three – 50%, Year Four – 25%).

- Calculate the total Overall EHR Amount by adding the total of each year with the transition factor applied.

- Apply the Medicaid Share percentage to the Overall EHR Amount… This is the hospital's Medicaid Aggregate EHR Incentive amount.

Calculation of the Medicaid Share percentage:

- Total Medicaid days includes both the total Medicaid Days and total Medicaid HMO days from the Medicare/Medicaid Cost Report.

- Calculate the non-charity percentage. Divide the (total hospital charges less uncompensated care) by the total hospital charges.

- Calculate the non-charity days by multiplying the non-charity percentage times the total hospital days.

- Calculate the Medicare Share [sic] percentage by dividing the Medicaid days by the non-charity days.

32.    Between December 3, 2010, and September 30, 2011, CMS issued a Frequently Asked Questions ("FAQ") response, number 3471, that stated:

> **Based on the Medicare cost report guidance, Form CMS 2552-96 [i.e., the CMS form for Medicaid cost reports] will be used** until the implementation of the new Medicare cost report, Form CMS 2552-10. Although the State may choose to use the following data elements, it is the States' and hospitals' responsibility to ensure the integrity and regulatory compliance of the data. **The CMS 2552-96 data elements are as follows: Total Discharges – Worksheet S-3 Part 1, Column 15, Line 12 Medicaid Days** - Worksheet S-3, Part I, Column 5, Line 1 + Lines 6-10 Medicaid HMO Days - Worksheet S-3, Part I, Column 5, Line 2-Total Inpatient Days - Worksheet S-3 Part 1, Column 6, Line 1, 2 + Lines 6 -10-Total Hospital Charges - Worksheet C Part 1, Column 8, Line 101 - Charity Care Charges - Worksheet S-10, Column 1, Line 30. The CMS 2552-10 data elements are as follows:- Total Discharges - Worksheet S-3 Part 1, Column 15, Line 14 -Medicaid Days - Worksheet S-3, Part I, Column 7, Line 1 + Lines 8-12 -Medicaid HMO Days - Worksheet S-3, Part I, Column 7, Line 2-Total Inpatient Days - Worksheet S-3 Part 1, Column 8, Line 1, 2 + Lines 8 - 12-Total Hospital Charges - Worksheet C Part 1, Column 8, Line 200 Charity Care Charges - Worksheet S-10, Column 3,

10

FIRST AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

1          Line 20.

2   (Emphasis added.)

3          33.     As a result, section 3.4.2 of the Department's State Plan included these same cost

4   report data elements as the source of the "one-time calculation" of the Medi-Cal EHR incentive

5   payments.  As described in section 3.2.6 of the State Plan, the State requested that the hospitals

6   use their most recently filed Medi-Cal cost reports for the data elements described CMS guidance

7   and the Department's State Plan.

8          34.     Appendix 14 to the State Plan was a State Level Registry User Manual.  Text of the

9   User Manual are copied nearly identically from the SLR website that hospitals used for attestation.

10  For example, section 4.6.3 of the User Manual instructs:

11      Follow the steps below to complete the Hospital Information page.

12      1.  Input **Total Discharges** for the previous four years.

13  CCR Yr-3 = [          ]    CCR Yr-2 = [          ]    CCR Yr-1 = [          ]    CCR Yr = [          ]

14          Total Discharges are calculated from the CMS Cost report 2552. See the below help text
            from the CA EH Eligibility Workbook to calculate the value.

15          Use CMS Cost Reports (CMS 2552-96 or CMS 2552-10) to acquire data.

16          If using CMS 2552-96: Worksheet S-3, part I, column 15, sum of lines 1, 6-10.
            If using CMS 2552-10: Worksheet S-3, part I, column 15, sum of lines 1, 2, 8-12, 16, 17.

17      2.  Input **Total Medicaid Inpatient Bed Days.**

18      **Total Medicaid Inpatient    **= [          ]
        **Bed Days**

19          **Total Medicaid Inpatient Bed Days** are calculated from the CMS Cost report 2552. See the
            below help text from the SLR to calculate the value.

20          Use CMS Cost Reports (CMS 2552-96 or CMS 2552-10) to acquire data.

21          If using CMS 2552-96: Worksheet S-3, part I, column 5, sum of lines 1, 2, 6-10.
            If using CMS 2552-10: Worksheet S-3, part I, column 7, sum of lines 1, 2, 8-12, 16, 17.

22  Consistent with other written guidance, the User Manual instructs providers to use the same

23  specified data elements from a provider's CMS cost report.

24          35.     In its implementation of the Medi-Cal EHR Incentive Program, the Department

25  created a State Level Registry ("SLR").  The SLR is an on-line portal that allows providers to

26  register for the Medi-Cal EHR Incentive Program and prepare the attestations for application to

27  the program.

28          36.     On the SLR website, the Department posted several informational documents,

                                            11

1   including the SLR User Manual, a fillable Excel Workbook, a checklist and a frequently asked

2   question document.  These documents instructed hospitals that they would need to upload the

3   relevant pages from the hospital's most recent CMS Medicare cost reports.  Based on this

4   information, the Department informed hospitals that the Excel Workbook would "show you your

5   hospital's payment calculations[.]"  The Excel Workbook instructed hospitals that the "CMS

6   Annual Cost Reports (2552-96 or 2552-10) should be used."

7         37.    The SLR User Manual and the Excel Workbook referenced the same cost report

8   cells that were identified by CMS in FAQ 3471 and the Department's State Plan and related

9   written instructions as the data sources from which the Medi-Cal EHR Incentive Program

10  payments would be calculated.

11        38.    As described in the SLR User Manual, once a hospital submitted its application, the

12  SLR displayed a pop-up window, which stated: "Congratulations.  Your hospital's application has

13  been successfully submitted to the state.  Your application will be validated by the state and then

14  sent to CMS for review prior to payment.  Please note that the validation process may take up to

15  10 weeks.  You will receive an email notification when your payment has been issued."

16      F.    The Department's Audits and Appeals Policies

17        39.    CMS' implementing regulations for the Medicaid EHR incentive program focus on

18  a state's responsibilities to validate Medicaid EHR incentive payments prior to payment, but not

19  on after-the-fact audits.  Specifically, 42 C.F.R. section 495.316 requires each state to submit a

20  "detailed plan for monitoring, verifying and periodic auditing of the requirements for receiving

21  incentive payments, as described in § 495.314[.]"  However, 42 C.F.R. section 495.314 only

22  describes those activities required to be eligible to receive a Medicaid EHR incentive payment.

23        40.    Nothing in the implementing regulations mentions the use of post-payment audits

24  as a mechanism to replace data pulled from cost reports used as the basis for calculating incentive

25  payments.  (*Cf* 42 C.F.R. § 495.104(a)(2).)

26        41.    However, Dignity is informed and believes and thereupon alleges that the

27  Department performed an audit/validation process with respect to each hospital attestation for the

28  Medi-Cal EHR Incentive Program that it received.  Specifically, the Department compared the

FIRST AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

1   data submitted by hospitals as to historical discharges, inpatient bed days, and charges against

2   various sources, including the hospital's cost reports, files within the Department's control (e.g.,

3   summaries of claims paid by the State of California for Medi-Cal services), and hospital

4   submissions to the Office of Statewide Health Planning and Development.  Dignity believes the

5   Department underwent this process because during this prepayment audit/validation process for

6   some hospitals, the Department provided explicit instruction to Dignity hospitals as to what

7   specific data from cost reports should be submitted in attestations for particular cells..  At no point

8   during these audits/validation did the Department notify Dignity that it would substitute the data

9   from as-filed cost reports with different, audited data. With respect to the appeal process, the

10  implementing federal regulations at 42 C.F.R. section 495.370 requires each State to establish an

11  appeals process to appeal: (1) incentive payments; (2) incentive payment amounts; (3) provider

12  eligibility determinations; and (4) the demonstration of adopting, implementing, and upgrading,

13  and meaningful use eligibility for incentives."  That section further requires that the State must

14  ensure that "the provider… has an opportunity to challenge the State's determination under this

15  part by submitting documents or data or both to support the provider's claim" and that "such

16  process employs methods for conducting an appeal that are consistent with the State's

17  Administrative Procedure law(s)."  (42 C.F.R. § 495.370(b).)  Such process must be "consistent

18  with the requirements established in [42 C.F.R.] § 447.253(e)."  (42 C.F.R. § 495.370(a).)

19          42.      Section 447.253(e) of title 42 of the Code of Federal Regulations governs the

20  requirement that state Medicaid programs provide an appeals procedure that "allows individual

21  providers an opportunity to submit additional evidence and receive prompt administrative review,

22  with respect to such issues as the agency determines appropriate, of payment rates."

23          43.      The Legislature provided general guidance to the Department regarding the audits

24  and appeals processes that should apply in the Medi-Cal EHR Incentive Program.  First, the

25  Legislature mandated that the Department the State Plan "[e]stablish the audit and appeals

26  processes."  (Welf. & Inst. Code § 14046.1(b)(5).)  Second, in a section governing the acceptance

27  of applications from and the making of incentive payments to eligible professionals and facilities,

28  the Legislature provided that appeals under article 1.5 of chapter 6 of part 3 of division 9 of the

FIRST AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

1 Welfare and Institutions Code "shall be conducted pursuant to" Welfare and Institutions Code

2 section 14043.65.  (Welf. & Inst. Code § 14046.2(c).)  Welfare and Institutions Code section

3 14043.65 establishes a procedure that does *not* include a "formal administrative hearing under the

4 Administrative Procedure Act[.]"  (Welf. & Inst. Code § 14043.65(a).)  Third, as discussed above,

5 the Legislature authorized the Department to implement the Medi-Cal EHR Incentive Program

6 through provider bulletins or similar instructions without taking regulatory action.  (Welf. & Inst.

7 Code § 14046.4.)

8     44.    Dignity is informed and believes that the Department has issued no provider

9 bulletins or similar instructions regarding the audits and appeals of Medi-Cal EHR Incentive

10 Program payments.

11     45.    The only publicly available documentation from the Department suggesting a post-

12 payment audit is in the State Plan.  The State Plan includes a section on audits of eligible hospital

13 payments in section 4.3.  It described Pre-Payment Reviews/Audits, through which the

14 Department "manually review[ed] all [eligible hospital] eligibility and payment data against

15 hospital cost reports uploaded" with the attestation.  It also outlined Post Payment

16 Reviews/Audits, intended to review "patient volume and payment data[.]"  Nothing in the State

17 Plan discusses using non-cost report-derived data for calculating hospital Medi-Cal EHR Incentive

18 Program payments.

19     46.    Section 3.6 of the 2011 State Plan limits the applicability of the appeal process in

20 Welfare and Institutions Code section 14043.65 to appeals upon attestation.  By contrast, section

21 4.3 of the 2011 State Plan states that in response to an adverse overpayment finding in a post-

22 payment audit, the hospital "is allowed appeal rights through an administrative hearing process

23 under Welfare and Institutions Code (W&I Code) Section 14171."

24     47.    In October 2018, CMS approved an amended State Plan, which read:

25     For audit appeals, DHCS has an established administrative hearing
    process referenced in the WIC, Section 14171, and California Code
26     of Regulations, Title 22, Section 51016. Audit appeals are referred
    to the Office of Administrative Hearings and Appeals (OAHA), an
27     independent office within DHCS, which handles Medi-Cal provider
    appeals for the Department. The EH or EP has 45 days from the date
28

the EHR audit report is issued to file for an appeal with OAHA.
OAHA affords providers an administrative hearing.   If the provider
wishes to appeal further, the appeal must be filed through Superior
Court.

## V.      DIGNITY'S PARTICIPATION IN THE MEDI-CAL EHR PROGRAM

48.      While Dignity had an EHR product at some of its hospitals prior to 2012, the offer of Medi-Cal EHR incentive payments enticed Dignity to upgrade to certified EHR technology at its hospitals, and to participate in the Medi-Cal EHR Incentive Program.  The federal government only began to certify EHR products in late 2010.  The upgrade to certified EHR technology cost significantly more than Dignity received in incentive payments, including, without limitation, costs for new software, costs associated with software maintenance, hiring consultants and/or personnel, and training for staff to make the systems usable.  The process of participation in the Medi-Cal EHR Incentive Program included numerous steps, including registering for the Program through the SLR, taking all necessary steps to qualify and to demonstrate qualification for the program, gathering and uploading documents to support the attestation, including supporting documentation from its cost reports.  For later years, Dignity had to actually implement the certified EHR product at its hospitals and take all the necessary steps to achieve the meaningful use goals.

49.      Dignity submitted attestations on behalf of its hospitals to participate in the Medi-Cal EHR program for the first year, called a "Program Year."  Included in the attestation were the data elements required to determine the amount of the Medi-Cal EHR incentive payment to Dignity's hospitals.  Specifically, consistent with the instructions from the Department, Dignity attested to: (1) the discharges, Medicaid inpatient bed days, total inpatient bed days, total hospital charges and total charity charges from the as-filed Medicare cost report for a recent fiscal year; and (2) the discharges for three years from the three prior as-filed Medicare cost reports.  In response to the attestation, the Department calculated the Medi-Cal EHR Incentive Program payment to each of these follows, as follows:

FIRST AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

| Hospital | Date of Year 1 Attestation | Program Year | Aggregate 4 Year Payment Calculated by the Department |
|---|---|---|---|
| Marian Regional Medical Center, Arroyo Grande | 6/27/2012 | PY 2012 | 619,565 |
| California Hospital Medical Center | 8/5/2015 | PY 2015 | 10,427,741 |
| Glendale Memorial Hospital and Health Center | 6/27/2012 | PY 2012 | 4,016,140 |
| Marian Regional Medical Center | 6/27/2012 | PY 2011 | 3,382,041 |
| Mercy General Hospital | 11/23/2011 | PY 2011 | 4,205,131 |
| Mercy San Juan Medical Center | 11/23/2011 | PY 2011 | 5,249,141 |
| Methodist Hospital of Sacramento | 11/23/2011 | PY 2011 | 3,542,725 |
| San Luis Obispo/French Hospital | 6/27/2012 | PY 2012 | 1,068,149 |
| St. Bernardine Medical Center | 7/24/2015 | PY 2015 | 5,093,852 |
| St. John's Pleasant Valley Hospital | 1/5/2015 | PY 2014 | 268,931 |
| St. Mary's Medical Center | 11/30/2011 | PY 2011 | 827,051 |

The Department allocated the above-mentioned funds constituting EHR incentive payments to Dignity Health from Sacramento County, where the Department is located and spends public moneys.

50.     Dignity continued to submit attestations to participate in later years of the Medi-Cal EHR Incentive Program.  Dignity continued to receive Medi-Cal EHR Incentive Program payments based on its attestations for many of these later program years consistent with the calculation of its Medi-Cal EHR Incentive Program payments in Program Year 1.

51.     Dignity continued to submit attestations to participate in later years of the Medi-Cal EHR Incentive Program.  The Department continued to spend and allocate public moneys from Sacramento County to Dignity constituting Medi-Cal EHR Incentive Program payments based on Dignity's attestations for many of these later program years consistent with the calculation of its

FIRST AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

1  Medi-Cal EHR Incentive Program payments in Program Year 1.

2      52.    In some instances after 2016, including sometimes prior to the performance of any

3  audits and in the absence of any notice to Dignity, Dignity submitted attestations to participate in

4  the Medi-Cal EHR Incentive Program for a program year, but received no response or payment

5  from the Department.

6      53.    For at least one hospital, Marian, the Department barred the Dignity from

7  attestation for future year(s) of the Medi-Cal EHR Incentive Program by locking its electronic

8  website from accepting an attestation for that hospital.

9      54.    At no point prior to 2016 did the Department inform Dignity that it intended to

10  replace the data from which it calculated Dignity's Medi-Cal EHR Incentive Program payments.

11  **VI.    DIGNITY'S COST REPORTS**

12      55.    As alleged herein, under the Medi-Cal EHR Incentive Program, the State Plan, the

13  SLR User Manual and the Excel Workbook instructed that required data elements for the

14  calculation of Medi-Cal EHR Incentive Program payments were to be derived from Medicare Cost

15  Reports.  These resources that certain data elements for necessary for Medi-Cal EHR Incentive

16  Program payments for hospitals should be taken verbatim from certain cells in CMS Form 2552-

17  96 or CMS Form 2552-10.

18      56.    These cost reports were not created specifically for the EHR Program, but are used

19  by hospitals generally to furnish information to the Medi-Cal and Medicare programs and are used

20  for multiple purposes outside of the EHR Program.  These forms, which are required to be

21  submitted on an annual basis, and the rules governing these forms are issued by CMS.  In 1996,

22  CMS issued a form for Medicare cost reports called 2552-96; this was updated in 2010 with the

23  cost report form 2552-10.

24      57.    The Medicare fiscal intermediary routinely audits each hospital's cost reports.

25  Upon the final settlement of a hospital's cost report for a year, any re-opening of that cost report

26  must occur within three years after the issuance of the audit on such cost report in the absence of

27  fraud.  (42 C.F.R. § 405.1885(b)(1).)  These Medicare cost report audits are accessible to the

28

1 | public.

2 |         58.     Likewise, Medi-Cal routinely audits each hospital's cost reports.  The information

3 | in a hospital's Medi-Cal cost report is considered true and correct unless audited or reviewed

4 | within three years of submission of the cost report.  (Welf. & Inst. Code § 14170(a).)  These Medi-

5 | Cal cost report audits are accessible to the public.

6 |         59.     Prior to the Department's unlawful and untimely audit of Dignity's Medi-Cal EHR

7 | Incentive Program attestations for the hospitals listed in paragraphs 9 and 10, the Medicare and

8 | Medi-Cal cost reports underlying their Program Year attestations for those hospitals were no

9 | longer subject to adjustment in the regular course of business.

**VII.  THE DEPARTMENT'S UNLAWFUL AND UNTIMELY AUDIT OF DIGNITY'S**

**MEDI-CAL EHR INCENTIVE PAYMENTS**

12 |         60.     Beginning in mid-2017, the Department began to audit various Dignity hospitals'

13 | Program Year 1 Medi-Cal EHR Incentive Program "workbooks."  As part of this process, the

14 | Department requested substantial amounts of documentation, including, without limitation,

15 | documentation supporting historical discharges, charges and patient days sometimes dating back

16 | ten years – despite those Medicare cost reports having been closed for years.  While Dignity

17 | attempted to respond to these requests, in some situations, Dignity was unable to provide all the

18 | information, in part due to the age of the requested information (in several cases, more than ten

19 | years old) and in part due to logistical issues (retrieving documentation from long term storage or

20 | the movement of documentation from one office to another).

21 |         61.     Dignity is informed and believes that the Department issued audit findings reducing

22 | Medi-Cal EHR Incentive Program payments to Dignity hospitals, as follows:

| Hospital | Program Year | Audit Issue Date | Amount of Overpayment |
|---|---|---|---|
| Marian Regional Medical Center, Arroyo Grande | PY 2012 | 5/23/2019 | $309,782.57 |
| California Hospital Medical Center | PY 2015 | 6/17/2019 | $1,397,699.04 |
| Glendale Memorial Hospital and Health Center | PY 2012 | 6/29/2017 | $686,340 |
| Marian Medical Center | PY 2011 | 12/27/2018 | $3,065,633 |
| Mercy General Hospital | PY 2011 | 6/30/2017 | $1,004,436 |

FIRST AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

| Hospital | Program Year | Audit Issue Date | Amount of Overpayment |
|---|---|---|---|
| Mercy San Juan Medical Center | PY 2011 | 6/30/2017 | $1,246,400 |
| Methodist Hospital of Sacramento | PY 2011 | 5/8/2019 | $368,673 |
| San Luis Obispo/French Hospital | PY 2012 | 6/28/2019 | $283,850 |
| St. Bernardine Medical Center | PY 2015 | 6/27/2019 | $76,855 |
| St. John's Pleasant Valley Hospital | PY 2014 | 6/28/2019 | $45,982 |
| St. Mary's Medical Center | PY 2011 | 1/29/2019 | $26,293 |

To arrive at these audit findings, Dignity is informed and believes that the Department reconciled days, discharges and charges based on the documentation received, and re-calculated the aggregate Medi-Cal EHR Incentive Program payment for all 4 years.  Dignity is further informed and believes that the Department neither considered the finalized Medicare or Medi-Cal cost reports for the above-referenced hospitals nor their own audits of the Medi-Cal cost reports for the above-referenced hospitals to determine days, discharges, and charges.  Pursuant to these flawed audit findings, Dignity would have to return the EHR incentive payments to the Department in Sacramento County.

62.     The Department's audit findings for Arroyo Grande and Marian represented a 100% reduction of the Medi-Cal EHR Incentive Program payments received to date by those two hospitals.

63.     Dignity is unaware of any challenge from the Department that the Dignity hospitals had not acquired, implemented or upgraded to a certified EHR system in Program Year 1.

64.     Each of the audit finding letters announced that the Department had conducted its examination "under the authority of Section 14170 of the Welfare and Institutions Code[.]"  Each of the audit finding letters further informed Dignity that "Welfare and Institutions Code, Section 14171 contains the procedures that govern an appeal."

## VIII.   DIGNITY'S ATTEMPTS TO UTILIZE THE AUDIT MECHANISM OUTLINED IN THE DEPARTMENT'S AUDIT LETTERS

65.     Dignity has submitted appeals to the Department's Office of Administrative Hearings and Appeals ("OAHA") for Arroyo Grande, California Hospital Medical Center, Glendale Memorial Hospital, Marian, Mercy General Hospital, Mercy San Juan, and San Luis

19

1   Obispo/French Hospital.  Of these, all the appeals except those for Glendale Memorial Hospital

2   and Marian are currently pending.

3        66.     OAHA denied Dignity's request to file an appeal for Marian.  Dignity did not

4   become aware of the adverse audit findings for Marian until April 19, 2019, and received a copy

5   of the audit findings on April 24, 2019.  Dignity diligently submitted a request for an appeal on or

6   around May 16, 2019.  On June 4, 2019, the Chief of the OAHA sent a letter denying Dignity's

7   request for a hearing as the letter requesting an appeal was received more than 60 days after the

8   date on the audit report, citing California Code of Regulations, title 22, section 51022(a).

9   However, the letter permitted Dignity to request good cause for late filing within 15 calendar days

10  from the date of the notice.

11       67.     On June 17, 2019, Dignity requested to leave to file its appeal because: (1) it

12  contended that the 60-day deadline did not apply to its appeal; and (2) based on declarations,

13  Dignity did not become aware of the audit findings until April 2019.

14       68.     On August 27, 2019, the Department's Office of Administrative Hearings and

15  Appeals denied Dignity's request to submit its appeal.  In that letter, without analysis, OAHA

16  stated: "The [Medi-Cal EHR Incentive] Program is administered in accordance with the State

17  Medicaid Health Information Technology Plan (Plan), which is required to establish, inter alia,

18  audit and appeals processes.  The Plan adopts the administrative hearing process referenced in

19  Welfare and Institutions Code section 14171 and its implementing regulations at California Code

20  of Regulations, title 22, section 51016 *et sequentes* for appeals of EHR overpayment

21  determinations arising from an audit."  (Exh. 3[footnotes removed].)  The letter further determines

22  that Dignity failed to establish good cause based on its failure to offer any reason why there was a

23  significant delay between the certified return receipt date of January 8, 2019, based on an illegible

24  signature, and April 19, 2019.

25       69.     In the context of the administrative appeals for Mercy General Hospital, Mercy San

26  Juan and Glendale Memorial, the Department agreed to reduce the overpayment findings for these

27  hospitals to $926,200, $944,503, and $451,004, respectively.

28  / / /

FIRST AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

## IX.   THE DEPARTMENT'S ACTIONS HAVE VIOLATED NUMEROUS LAWS AND DIGNITY'S CONSTITUTIONAL RIGHTS

70.     The Department's audits and attempts to recoup Medi-Cal EHR Incentive Program payments properly received by Dignity are unlawful, as follows, without limitation:

    a.   The data for discharges and charges used to calculate the Medi-Cal EHR Incentive Program payments made to Dignity were derived from each respective hospital's most recently filed cost reports consistent with the instructions provided by the Department and as approved by CMS. No law authorizes the Department to substitute the cost report data with non-cost report-derived data, as the Department did in these audits. Instead, Welfare and Institutions Code sections 14046.1, 14046.2, and 14046.4 and 42 C.F.R. part 495 require the Department to follow the State Plan and utilize cost report-derived data to calculate the Medi-Cal EHR Incentive Program payments for Dignity hospitals, consistent with the Department's posted notices on its website. The Department's flawed audits resulted in a calculation of Medi-Cal EHR Incentive Program payments that is inconsistent with 42 U.S.C. section 1396b(t)(5) and 42 C.F.R. section 495.310.

    b.   The Department further violated 42 U.S.C. section 1396b(t)(5) and 42 C.F.R. section 495.310 by recalculating the Medi-Cal EHR Incentive Program payments to Dignity by reconciling to actual data, instead of estimates.

    c.   The Department further violated 42 U.S.C. section 1396b(t)(5) and 42 C.F.R. section 495.310 by excluding Medi-Cal eligible but unpaid inpatient bed days from total Medi-Cal inpatient bed days.

    d.   Dignity relied on the Department's representations as to how its Medi-Cal EHR Incentive Program payments would be calculated when it decided to participate in the Medi-Cal EHR Incentive Program. The Department's

1    audit undermines the terms of a contract that arose between the Department

2    and Dignity, infringing on the vested interests of Dignity.  Specifically, the

3    actions of the parties (an offer by the Department in the form of the State

4    Plan and other instructional notices on its website, as well as

5    communications with Dignity, among other hospital providers; acceptance

6    by Dignity by meeting the eligibility requirements and attesting to

7    participate in the Medi-Cal EHR Incentive Program; and payment by the

8    Department consistent with its offer) give rise to an implied contract

9    between the Department and Dignity.  The Department's audit violates the

10   terms of this contract by changing the methodology and data sources upon

11   which the Medi-Cal EHR Incentive Program payments to Dignity are based.

12   These violations infringe on the protections in the Federal and State

13   Constitutions against the state retroactively impairing contracts it has made

14   with private entities and due process generally.  (U.S. Const., art. I, § 10;

15   Cal. Const., art. I, § 9; *California Teachers Assn., v. Cory* (1984) 155

16   Cal.App.3d 494, 512; *see also United States Trust Co. v. New Jersey* (1977)

17   431 U.S. 1.)

18       e.    The audit findings for Marian and Arroyo Grande result in a forfeiture, for

19             which relief may be granted pursuant to Civil Code section 3275.  Dignity's

20             omissions in responding to the audit were not grossly negligent, willful, or

21             fraudulent, in light of the short time periods given for the audit and the age

22             of the documentation requested.

23       f.    The Department cannot apply its audit findings because the identified

24             authority, Welfare and Institutions Code section 14170, does not authorize

25             audits of Medi-Cal EHR Incentive Program payments.  Welfare and

26             Institutions Code section 14170 only authorizes the Department to audit for

27             "amounts paid for services provided to Medi-Cal beneficiaries[.]"

28             Payments made pursuant to the Medi-Cal EHR Incentive Program are *not*

---

22

FIRST AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

1     amounts paid for services provided to Medi-Cal beneficiaries.

2   g.    It is well established under due process that the State must give notice of the

3        authority of its actions. The Department's audit findings are invalid for

4        failing to provide procedural due process.  The Department has further

5        violated Dignity's rights to due process when it gave notice of an audit of

6        Program Year 1 payments, but then, without notice, sought to recoup

7        payments made to Dignity for payments other than for Program Year 1.

8   h.    The Department's audit is further barred by the doctrine of laches, due to

9        the long delay between the Department's calculation of the aggregate Medi-

10        Cal EHR Incentive Program payments to Dignity and these untimely audits.

11        (*See generally Fountain Valley Regional Hospital & Medical Center v.*

12        *Bonta* (1999) 75 Cal.App.4th 316.)  The Department waited between 3 and

13        7 years to issue the contested audit findings.  The Department has no excuse

14        to justify its delayed action.

15   i.    In addition, the Department should be estopped from using in its audit any

16        data elements other than the cost report data elements that it instructed and

17        permitted Dignity hospitals to use to calculate their EHR Incentive Program

18        payments. The Department knew that it instructed and permitted Dignity to

19        use specific cells in the cost reports as described *supra*.  The Department

20        intended that Dignity use these cost report cells in calculating their Medi-

21        Cal Incentive Program payments and Dignity had a right to believe that the

22        Department so intended. Dignity was ignorant of the fact that the

23        Department would evaluate its Medi-Cal EHR Incentive Program payment

24        calculation using data elements different from the specified cost report data

25        elements. Dignity relied on the Department's instruction and permission to

26        use the specified data elements to its detriment, when the Department

27        audited the EHR Incentive payments using different data elements and

28        reduced Dignity's incentive payments. Dignity has been injured by the

23

FIRST AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

1    reduction of the Medi-Cal EHR Incentive Program payments and the

2    potential of having to repay said payments and by having to incur far more

3    than the incentive payments received in order to implement a certified EHR

4    system. Dignity is informed and believes that the Department's current

5    position is based on information that at all times was available to the

6    Department. Failure to uphold the estoppel would result in a grave injustice

7    to Dignity. Upholding an estoppel, on the other hand, would have little to

8    no impact on California public policy or California public interest, as the

9    Medi-Cal EHR Incentive Program payments, which were entirely federal

10   funds, were intended to stimulate the economy. Retention of the payments

11   that were calculated according to the Department's own instruction and

12   guidance, is in the public interest.

13   j.   The Department's audit was arbitrary and capricious for the reasons set

14       forth above, as well as because it adjusted the data for Dignity hospitals

15       without regard to the cost report data.  Without limitation, the Department

16       also failed to consider other documentation or information in its possession

17       or in the public domain, *e.g.*, the documentation or information Department

18       would have collected or confirmed during its cost report audit for Dignity

19       hospitals.

20   k.   The Department's audit is arbitrary and capricious for the reasons set forth

21       above, as well as because the Department was fully aware that both Marian

22       and Arroyo Grande were functioning hospitals with discharges, inpatient

23       bed days and/or charges for the relevant fiscal years.  Accordingly, it was

24       arbitrary for the Department to assign zero discharges, inpatient bed days

25       and/or charges for Marian and Arroyo Grande for the relevant fiscal years in

26       its Medi-Cal EHR Incentive Program audits.

27   l.   Finally, the Department violated Welfare and Institutions Code section

28       14046.4 by performing audits without providing any provider bulletin or

24

FIRST AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

1  similar instruction to Dignity of its intent to do so or the process of such

2  audits.

3  **X.      THE TENETS OF ADMINISTRATIVE EXHAUSTION PERMIT THIS PETITION**

4       72.     Dignity alleges that it is permitted to request a writ of mandate from this tribunal,

5  notwithstanding whether it has concluded the administrative appeal process.

6       73.     First, "the exhaustion requirement is not applicable where an effective remedy is

7  wholly lacking." (*Unfair Fire Tax Com. v. City of Oakland* (2006) 136 Cal. App. 4th 1424, 1429,

8  quoting 3 Witkin, Cal. Procedure (4th ed. 1996) Actions, § 314, p. 404.)  In order to be effective,

9  the "statute or regulation under which that power is exercised establishes clearly defined

10  machinery for the submission, evaluation and resolution of complaints by aggrieved parties."

11  (*Ibid.*, quoting *Rosenfield v. Malcolm* (1967) 65 Cal.2d 559, 566.)  In this case, there is no clearly

12  defined machinery for any appeal from the Department's audit: (1) while Welfare and Institutions

13  Code section 14046.2 mentions an appeal mechanism under Welfare and Institutions Code section

14  14043.65, this appeal mechanism is neither mentioned in the audit letter nor does it meet the

15  requirements of 42 C.F.R. section 495.370(b); (2) the 2011 and 2014 State Plans reference appeals

16  pursuant to Welfare and Institutions Code section 14171, but does not reference the procedure that

17  should apply to any such appeal (i.e., the Government Code Administrative Procedure Act

18  procedures or the regulations in article 1.5 of chapter 3 of title 22 of the California Code of

19  Regulations); (3) the 2018 State Plan references Welfare and Institutions Code section 14171 and

20  a single section of article 1.5 of chapter 3 of title 22 of the California Code of Regulations, but

21  does not specify whether other procedural rules apply; (4) the Department's audit process and the

22  final audit letter gives instructions that are different from the State Plan, which further confounds

23  what procedures should apply; and (5) the Department's failure to issue any provider bulletins or

24  similar notices invalidates any attempt to mandate an administrative appeal mechanism.

25       74.     Second, an exception to exhaustion exists where the petitioner brings constitutional

26  claims as to the agency's ability to hear the appeal.  (*Unnamed Physician v. Bd. of Trustees of*

27  *Saint Agnes Med. Ctr.* (2001) 93 Cal. App. 4th 607, 621.)  Here, Dignity contends that the audit

28  violates the state and federal due process clauses and the prohibition against the retroactive

1    impairment of contracts.  First, the Department's cited authority, Welfare and Institutions Code

2    section 14170, does not authorize the audit.  Audits performed under Welfare and Institutions

3    Code section 14170 may rise to appeals under Welfare and Institutions Code section 14171 and

4    article 1.5 of chapter 3 of title 22 of the California Code of Regulations.  However, as this audit

5    cannot be justified pursuant to Welfare and Institutions Code section 14170, the audit procedures

6    from audits arising under Welfare and Institutions Code section 14170 are also unlawful and

7    invalid.  Second, any argument that exhaustion is required would attempt to validate an appeal

8    process that was established without following the Administrative Procedure Act or Welfare and

9    Institutions Code section 14046.4 and without clear procedures that comply with the

10   Administrative Procedure Act.  The conduct of an unlawfully constructed appeal process violates

11   Dignity's procedural due process rights.

12        75.    Third, an exception to exhaustion is recognized where the agency's decision is

13   virtually certain to be adverse.  (*See County of San Diego v. State* (1997) 15 Cal.4th 68, 89-90.)

14   The Department's Office of Administrative Hearings and Appeals has already considered three

15   sets of appeals on the Department's delayed Medi-Cal EHR Incentive Program audits and has

16   denied the appeals in each case.  These cases raise the same questions as to the Department's

17   authority to conduct these audits under the State Plan, whether the audits violate the contracts

18   between the Department and other hospital providers, whether by violating those contracts the

19   audits constitute unconstitutional retroactive impairments of contracts, and whether the delays in

20   conducting the audits invalidate the audits.  Two of those cases are currently pending at the San

21   Francisco Superior Court.

22        76.    Fourth, exhaustion is not required for Dignity's Constitutional claims under 42

23   U.S.C. section 1983.  (*Wilder v. Virginia Hosp. Ass'n* (1990) 496 U.S. 498, 523.)  Accordingly,

24   Dignity may pursue its claims under 42 U.S.C. section 1983 for the violation of is federal

25   Constitutional due process rights and for the violation of the federal Constitutional prohibition

26   against the retroactive impairment of contracts without exhausting administrative appeals.

27        77.    Last, a petition for writ of mandate is proper to appeal the agency's wrongful denial

28   of good cause.  (*See Morton v. Hollywood Park, Inc.* (1977) 73 Cal. App. 3d 248, 254.)  Here, in

FIRST AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

1  the alternative or in addition, Dignity challenges the Department's improper denial of its request

2  for good leave to file a late appeal for Marian.

### CAUSES OF ACTION

### First Cause of Action

### 42 U.S.C. § 1983

(U.S. Constitution, art. I, § 10 – Retroactive Impairment of Contracts against all Individual
Respondents/Defendants)

78.    Petitioners reallege and incorporate by reference each and every allegation
contained in the above paragraphs as though fully set forth herein.

79.    Section 10 of Article 1 of the United States Constitution provides that "[n]o State
shall enter into any... Law impairing the Obligation of Contracts[.]"  This Contract Clause "limits
the power of the States to modify their own contracts as well as to regulate those between private
parties." (*U.S. Trust Co. v. New Jersey* (1977) 431 U.S. 1, 17.)  The State is prohibited from
retroactively impairing its own contracts, except where such impairment is the minimum
necessary to achieve compelling interest.  (*California Teachers Assn., v. Cory, supra*, 155
Cal.App.3d 494, 511-512.)

80.    A contract arose between the Department and Dignity that the Medi-Cal EHR
Incentive Program payments to Dignity hospitals would be made based on the cost report fields
identified in the State Plan and instructional materials posted on the Department's website.  The
Department's audit unconstitutionally impairs those contracts retroactively by substituting the
basis of the payments with non-cost report-derived data.

81.    The Department has neither a compelling interest to impose its arbitrary,
capricious, and untimely audit findings, nor is a permanent forfeiture of over $8 million the
minimum necessary to accomplish such a compelling interest.

82.    Dignity is informed and believes that the acts of Respondent Department, its
employees and agents, were intentional and that, at a minimum, the Department was deliberately
indifferent to the likelihood that its unlawful and untimely audit results would retroactively impair

27

1  the contract between the State and Dignity.

2  **Second Cause of Action**

3  **42 U.S.C. § 1983**

4  (U.S. Constitution, amendment 14 –Due Process against all Individual Respondents/Defendants)

5  83.    Petitioners reallege and incorporate by reference each and every allegation

6  contained in the above paragraphs as though fully set forth herein.

7  84.    The 14th Amendment of the United States Constitution provides that "[n]o State

8  shall... deprive any person of life, liberty, or property, without due process of law..."

9  85.    Fundamental to the 14th Amendment's protection of due process is the requirement

10  for notice and a hearing on the deprivation of life, liberty, or property.  (*Mathews v. Eldridge*

11  (1976) 424 U.S. 319, 348.)  "The essence of due process is the requirement that 'a person in

12  jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it.'"

13  (*Ibid.*, quoting *Joint Anti-Fascist Comm. v. McGrath* (1951) 341 U.S. 123, 171-172 (Frankfurter,

14  J., concurring).)

15  86.    The Department violated the due process rights of Dignity by substituting non-cost

16  report-derived data in its re-calculation of Dignity's Medi-Cal EHR Incentive Program payments

17  by failing to issue any public notice (*e.g.*, regulations or provider bulletins) that it would seek to

18  change the payment calculation and source data.

19  87.    The notice given to Dignity with respect to the reduction of Medi-Cal EHR

20  Incentive Program payments was insufficient to meet procedural due process standards because,

21  without limitation, (1) the Department failed to ensure that Dignity received timely notice of the

22  audit findings for Marian; (2) the notice for all Dignity hospitals failed to identify any legal

23  authority supporting the audit findings, and (3) the notice for all Dignity hospitals failed to

24  identify the appropriate process for appealing the audit findings.

25  88.    Moreover, the Department's denial of payments or refusal to permit Dignity to

26  attest for future payment years post-2016 for certain hospitals without notice or a hearing violates

27  Dignity's due process rights.

28  89.    The conduct of audits in the absence of any statute providing for notice and a

28

FIRST AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

1   hearing, combined with the lack of any regulations, provider bulletins or similar instructions of the

2   necessary procedure for a notice and a hearing to challenge an audit, further violates Dignity's due

3   process.

4        90.   Moreover, the Department's denial of Marian's request for an appeal violates

5   procedural due process by failing to provide an actual hearing in the absence of notice to the

6   responsible individuals at Dignity and for applying an improper legal and factual standard.

7        91.   The 14th Amendment further bars the Department from retroactively infringing on

8   vested rights of Dignity.  Here, Dignity relied on the Department's commitment to make Medi-Cal

9   EHR Incentive Payments associated with Dignity hospitals based on the calculations from those

10  hospitals' Program Year 1 attestations.  In addition to attesting for the first year, Dignity continued

11  to act to continue to be eligible for the Medi-Cal EHR Incentive Program and continued to attest

12  or attempt to attest for later years of the program.  The Department's retroactive adjustment of

13  these payments to rely on non-cost report-derived data completely disrupts Dignity's vested

14  interest, which arose when it acted to meet the requirements of the Medi-Cal EHR Incentive

15  Program.

16       92.   The 14th Amendment of the United States Constitution further protects Dignity

17  from the arbitrary taking away of its Medi-Cal EHR Incentive Program payments without being

18  related to any legitimate government purpose.  The Department's audits infringe on Dignity's due

19  process rights by arbitrarily taking away Medi-Cal EHR Incentive Program payments.

20       93.   Dignity is informed and believes that the acts of Respondent Department, its

21  employees and agents, were intentional and that, at a minimum, the Department was deliberately

22  indifferent to the likelihood that its actions would violate Dignity's procedural due process rights.

23       **Writ of Mandate under Code of Civil Procedure § 1085**

24       (Department's Unlawful and Unconstitutional Audits against all Respondents/Defendants)

25       94.   Petitioners reallege and incorporate by reference each and every allegation

26  contained in the above paragraphs as though fully set forth herein.

27       95.   The Department's audit is unlawful for the reasons set forth in paragraph 70,

28

29

FIRST AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

1    without limitation.

2        96.     Dignity is beneficially interested in the Department's ministerial duties to comply

3    with the laws and Constitutional provisions described in paragraph 70. Dignity has no plain,

4    speedy, and adequate remedy to obtain the Department's compliance with the laws and

5    Constitutional provisions described in paragraph 70 other than the relief sought by this Petition.

6             **Writ of Mandate under Code of Civil Procedure § 1085**

7      (Department's Failure to Accept Later Year Attestations against all Respondents/Defendants)

8        97.     Petitioners reallege and incorporate by reference each and every allegation

9    contained in the above paragraphs as though fully set forth herein.

10       98.     The Department failed to accept or respond to certain attestations submitted by

11    Dignity post-2016 without notice of any adverse action is unlawful for the following reasons,

12    without limitation: (1) the lack of notice and a hearing violates Dignity's due process rights under

13    the State and Federal Constitutions; (2) the failure to notify Dignity of the outcome of the

14    attestation violates the State Plan, and accordingly, violates Welfare and Institutions Code sections

15    14046.1 and 14046.2, and 42 C.F.R. part 495; (3) the failure to make incentive payments to

16    Dignity violates Welfare and Institutions Code section 14046.2; and (4) the failure to make

17    payments to Dignity violates 42 C.F.R. sections 495.310 and 495.312, as well as 42 U.S.C. section

18    1396b(t).

19       99.     Dignity is beneficially interested in the Department's ministerial duties to comply

20    with the laws and Constitutional provisions described in paragraph 70. Dignity has no plain,

21    speedy, and adequate remedy to obtain the Department's compliance with the laws and

22    Constitutional provisions described in paragraph 70 other than the relief sought by this Petition.

23             **Writ of Mandate under Code of Civil Procedure § 1085**

24      (Department's Unlawful Denial of Appeal for Marian against all Respondents/Defendants)

25       100.    Petitioners reallege and incorporate by reference each and every allegation

26    contained in the above paragraphs as though fully set forth herein.

27       101.    To the extent that the State Plan establishes an administrative appeal process, the

28    Department must comply with the State Plan's processes. (Welf. & Inst. Code §§ 14046.1,

FIRST AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

14046.2; 42 C.F.R. Part 495.)  Moreover, this Court is authorized to issue a writ of mandate against the Department for arbitrary and capricious actions.  (*See Lowe v. Cal. Resources Agency* (1991) 1 Cal.App.4th 1140, 1149.)

102.    To the extent that the Department has the authority to entertain an administrative appeal from the audit findings, the Department's refusal to consider Marian's appeal is arbitrary and capricious, as follows: (1) The Department failed to properly consider the evidence before it in denying Marian Medical Center's request for an appeal; and (2) The Department applied an improper legal standard to establish good cause for filing a late appeal.

103.    Dignity is beneficially interested in the Department's ministerial duty to comply with the Administrative Procedure Act and the laws described in paragraph 70.  Dignity has no plain, speedy, and adequate remedy to obtain the Department's compliance with these laws, and the other than the relief sought by this Petition.

**Writ of Mandate under Code of Civil Procedure § 1094.5**

(Department's Unlawful Denial of Appeal against all Respondents/Defendants

[Alternative Relief])

104.    Petitioners reallege and incorporate by reference each and every allegation contained in the above paragraphs as though fully set forth herein.

105.    To the extent that the State Plan establishes an administrative appeal process, the Department must comply with the State Plan's processes.  (Welf. & Inst. Code §§ 14046.1, 14046.2; 42 C.F.R. Part 495.)  To the extent that the Department's decision to deny Dignity's request for good cause to file a late appeal was an adjudicatory decision or order, or otherwise subject to review under Civil Procedure Code section 1094.5, the Department proceeded without jurisdiction or exceeded its jurisdiction and the Department committed a prejudicial abuse of discretion by, *inter alia*, not proceeding in the manner provided by law, issuing an order or decision that is not supported by the findings, and/or issuing an order or decision whose findings are not supported by the evidence.

106.    In the alternative to a writ of traditional mandate, a writ of administrative mandate should issue against the Department because it erroneously declined to consider Dignity's appeal

FIRST AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

1  for Marian for the reasons set forth in paragraphs 101 and 102, without limitation.  Moreover, the

2  Department failed to consider properly the evidence submitted by Dignity.

3      107.    Dignity is beneficially interested in the Department's duty to comply with the

4  Administrative Procedure Act, its failure to comply with the State Plan's processes, and its denial

5  of Dignity's request to file a law appeal or to consider evidence.  Dignity has no plain, speedy, and

6  adequate remedy to obtain the Department's compliance with the Administrative Procedure Act,

7  and the other than the relief sought by this Petition.

8                                     **DECLARATORY RELIEF**

9      108.    Petitioners reallege and incorporate by reference each and every allegation

10  contained in the above paragraphs as though fully set forth herein.

11      109.    A real and immediate dispute exists between Petitioners and Respondents regarding

12  the rights of Dignity to Medi-Cal EHR Incentive Program payments it has already received and

13  the availability of Medi-Cal EHR Incentive Program payments for later program years.

14  Respondents' policies, actions, and inactions have resulted and will result in irreparable injury to

15  Dignity.

16      110.    An actual controversy exists between Dignity and Respondents in that

17  Respondents, their officers, agents, representatives, and employees, have engaged in the unlawful

18  acts alleged herein and intend to continue to do so. Dignity claims that these acts are contrary to

19  law and seeks a declaration of its rights with regard to this controversy.

20      **WHEREFORE**, Dignity prays that:

21      1.    A writ of mandate be issued pursuant to Code of Civil Procedure section 1085

22  ordering:

23      a.    The Department to set aside the audit findings described in paragraph 61 and

24  calculate the aggregate Medi-Cal EHR Incentive Program payment to Dignity based on the as-

25  filed cost report data submitted by Dignity in its Program Year 1 attestations; and

26      b.    The Department to accept Dignity's attestation for participation for post-2016

27  program years that the Department improperly denied or for which the Department barred Dignity

28  from attesting;

FIRST AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

2.      In the alternative to the above relief, a writ of mandate be issued pursuant to Code of Civil Procedure section 1085 or, in the alternative, Code of Civil Procedure section 1094.5 ordering the Department to grant Marian's request for an appeal;

3.      Preliminary and permanent injunctions be issued compelling Respondents and their officers, agents, representatives, and employees to comply with applicable laws governing payments to hospitals that participate in the Medi-Cal EHR Incentive Program with respect to the payments available to Dignity.

4.      A judgment be issued declaring that Respondents' audits as alleged herein violates the rights of Dignity to due process, the prohibition against the retroactive impairment of contracts and/or the laws governing the Medi-Cal EHR Incentive Program;

5.      Dignity be awarded its costs of suit and reasonable attorneys' fees; and

6.      The Court order such other and further relief as it deems just and proper.

Dated:  December 9, 2019                    ATHENE LAW, LLP

By: _____
                   FELICIA Y SZE
                   Attorneys for Petitioners

**VERIFICATION**

I am a corporate Officer of DIGNITY HEALTH and DIGNITY COMMUNITY CARE, a Petitioner/Plaintiff in this case. I have read the foregoing First Amended Verified Petition for Writ of Mandate and Complaint and I am informed and believe the matters therein to be true and on that ground allege that the matters stated therein are true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 6 day of December 2019 at San Francisco, California.

_____

Marvin O'Quinn

CM-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| FELICIA Y SZE (State Bar No. 233441)<br>LONG X. DO (State Bar No. 211439)<br>ATHENE LAW, LLP<br>5432 Geary Blvd., #200, San Francisco, CA 94121<br>TELEPHONE NO.: (415) 686-7531   FAX NO. *(Optional):* (844) 619-8022<br>E-MAIL ADDRESS *(Optional):* felicia@athenelaw.com<br>ATTORNEY FOR *(Name):* Dignity Health and Dignity Community Care | **ELECTRONICALLY**<br>**F I L E D**<br>*Superior Court of California,*<br>*County of San Francisco*<br><br>**12/09/2019**<br>**Clerk of the Court**<br>BY: KALENE APOLONIO<br>**Deputy Clerk** |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco |
|---|
| STREET ADDRESS: 400 McAllister Street |
| MAILING ADDRESS: |
| CITY AND ZIP CODE: San Francisco, CA 94102 |
| BRANCH NAME: Civil Division, Dept. 206 |

| PLAINTIFF/PETITIONER: Dignity Health et al. | CASE NUMBER:<br>CPF-19-516909 |
|---|---|
| DEFENDANT/RESPONDENT: Figueroa et al. | JUDICIAL OFFICER: |
| **NOTICE OF RELATED CASE** | DEPT.: |

*Identify, in chronological order according to date of filing, all cases related to the case referenced above.*

1. a. Title: San Joaquin Community Hospital et al. v. Figueroa et al.
   b. Case number: CPF-19-516626
   c. Court: [✔] same as above
      [ ] other state or federal court *(name and address):*
   d. Department: Civil Division, Dept. 206
   e. Case type: [ ] limited civil [✔] unlimited civil [ ] probate [ ] family law [ ] other *(specify):*
   f. Filing date: 04/12/2019
   g. Has this case been designated or determined as "complex?" [ ] Yes [✔] No
   h. Relationship of this case to the case referenced above *(check all that apply):*
      [ ] involves the same parties and is based on the same or similar claims.
      [✔] arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.
      [ ] involves claims against, title to, possession of, or damages to the same property.
      [ ] is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.
         [ ] Additional explanation is attached in attachment 1h
   i. Status of case:
      [✔] pending
      [ ] dismissed [ ] with [ ] without prejudice
      [ ] disposed of by judgment

2. a. Title:
   b. Case number:
   c. Court: [ ] same as above
      [ ] other state or federal court *(name and address):*
   d. Department:

Form Approved for Optional Use<br>Judicial Council of California<br>CM-015 [Rev. July 1, 2007]

**NOTICE OF RELATED CASE**

Cal. Rules of Court, rule 3.300<br>*www.courtinfo.ca.gov*

CM-015

| | |
|---|---|
| PLAINTIFF/PETITIONER: Dignity Health et al. | CASE NUMBER: |
| DEFENDANT/RESPONDENT: Figueroa et al. | CPF-19-516909 |

2. *(continued)*

    e. Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☐ other *(specify):*

    f. Filing date:

    g. Has this case been designated or determined as "complex?" ☐ Yes ☐ No

    h. Relationship of this case to the case referenced above *(check all that apply):*

        ☐ involves the same parties and is based on the same or similar claims.

        ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

        ☐ involves claims against, title to, possession of, or damages to the same property.

        ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

            ☐ Additional explanation is attached in attachment 2h

    i. Status of case:

        ☐ pending

        ☐ dismissed ☐ with ☐ without prejudice

        ☐ disposed of by judgment

3.  a. Title:

    b. Case number:

    c. Court: ☐ same as above

        ☐ other state or federal court *(name and address):*

    d. Department:

    e. Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☐ other *(specify):*

    f. Filing date:

    g. Has this case been designated or determined as "complex?" ☐ Yes ☐ No

    h. Relationship of this case to the case referenced above *(check all that apply):*

        ☐ involves the same parties and is based on the same or similar claims.

        ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

        ☐ involves claims against, title to, possession of, or damages to the same property.

        ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

            ☐ Additional explanation is attached in attachment 3h

    i. Status of case:

        ☐ pending

        ☐ dismissed ☐ with ☐ without prejudice

        ☐ disposed of by judgment

4. ☐ Additional related cases are described in Attachment 4. Number of pages attached: _____

Date: December 9, 2019

Felicia Y Sze
_____
      (TYPE OR PRINT NAME OF PARTY OR ATTORNEY)

▶ _____
      (SIGNATURE OF PARTY OR ATTORNEY)

1 | FELICIA Y SZE (State Bar No. 233441)
LONG X. DO (State Bar No. 211439)
2 | **ATHENE LAW, LLP**
5432 GEARY BLVD., #200
3 | SAN FRANCISCO, CA 94121-2307
Telephone: (415) 686-7531
4 | Facsimile: (844) 619-8022
E-Mail: felicia@athenelaw.com
5
Attorneys for Dignity Health, dba Marian Medical Center
6

7

**ENDORSED
F I L E D**
San Francisco County Superior Court

**OCT 31 2019**

**CLERK OF THE COURT**
BY:   ANGELICA SUNGA
Deputy Clerk

8                    **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                              **COUNTY OF SAN FRANCISCO**

10

11 | DIGNITY HEALTH, a California non-profit corporation, dba MARIAN MEDICAL
12 | CENTER,

13 |          Petitioner and Plaintiff,

14 |     vs.

15 | RICHARD FIGUEROA, in his official capacity as the acting Director of the
16 | California Department of Health Care Services; RAUL RAMIREZ, in his official
17 | capacity as the Director of the California Department of Health Care Services Office of
18 | Health Information Technology; BRUCE LIM, in his official capacity as the Deputy
19 | Director of California Department of Health Care Services Audits and Investigations; and
20 | the CALIFORNIA DEPARTMENT OF HEALTH CARE SERVICES,
21
22 |          Respondents and Defendants.

Case No. CPF-19-516909

**VERIFIED PETITION FOR WRIT OF MANDATE (CCP §§ 1085, 1094.5), AND COMPLAINT (42 U.S.C. § 1983, DECLARATORY RELIEF)**

23

24

25

26

27

28

VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

1          Petitioner and Plaintiff Dignity Health, dba Marian Medical Center, respectfully petitions

2 this Court for a writ of mandate under Code of Civil Procedure sections 1085 and/or 1094.5 and

3 for injunctive relief pursuant to 42 U.S.C. section 1983, directed to Respondents and Defendants

4 RICHARD FIGUEROA, in his official capacity as the acting Director of the California

5 Department of Health Care Services; RAUL RAMIREZ, in his official capacity as the Director of

6 the California Department of Health Care Services Office of Health Information Technology;

7 BRUCE LIM, in his official capacity as the Deputy Director of California Department of Health

8 Care Services Audits and Investigations; and the CALIFORNIA DEPARTMENT OF HEALTH

9 CARE SERVICES and by this verified Petition and Complaint alleges as follows:

10 **I.**      **<u>INTRODUCTION</u>**

11        1.       In the midst of the Great Recession of the late 2000s, Congress enacted the Health

12 Information Technology for Economic and Clinical Health ("HITECH") Act of 2009, as a key part

13 of a broad stimulus package to jumpstart the American economy. Healthcare providers were

14 encouraged to adopt and use government-certified electronic health records ("EHR")

15 infrastructures to increase much-needed economic spending while also potentially improving

16 patient care and outcomes. To be specific, the HITECH Act created an "incentive payment"

17 program, by which health care providers, including hospitals, could earn incentive payments from

18 the federal and state governments to defray a portion of the major expenditures that would be

19 required to upgrade their EHR systems. While there was an EHR incentive program run through

20 the federally-implemented Medicare program, states were given flexibility under the HITECH Act

21 to establish the particular procedures and rules for participation through their existing Medicaid

22 programs, including the precise methodologies to calculate the amount of incentive payments a

23 program participant could receive – subject to federal approval.

24        2.       Dignity Health was an early implementer in California's Medi-Cal EHR incentive

25 program, devised and implemented by the Department through its State Medicaid Health

26 Information Technology Plan ("State Plan"). Participation was a good means for Dignity Health to

27 do its part in the efforts to rebuild the country after one of the darkest moments in our nation's

28 economic history. Equally important, Dignity Health recognized the benefits to its operations and

1    Petitioner and Plaintiff Dignity Health, dba Marian Medical Center, respectfully petitions

2 this Court for a writ of mandate under Code of Civil Procedure sections 1085 and/or 1094.5 and

3 for injunctive relief pursuant to 42 U.S.C. section 1983, directed to Respondents and Defendants

4 RICHARD FIGUEROA, in his official capacity as the acting Director of the California

5 Department of Health Care Services; RAUL RAMIREZ, in his official capacity as the Director of

6 the California Department of Health Care Services Office of Health Information Technology;

7 BRUCE LIM, in his official capacity as the Deputy Director of California Department of Health

8 Care Services Audits and Investigations; and the CALIFORNIA DEPARTMENT OF HEALTH

9 CARE SERVICES and by this verified Petition and Complaint alleges as follows:

10  **I.      INTRODUCTION**

11    1.      In the midst of the Great Recession of the late 2000s, Congress enacted the Health

12 Information Technology for Economic and Clinical Health ("HITECH") Act of 2009, as a key part

13 of a broad stimulus package to jumpstart the American economy. Healthcare providers were

14 encouraged to adopt and use government-certified electronic health records ("EHR")

15 infrastructures to increase much-needed economic spending while also potentially improving

16 patient care and outcomes. To be specific, the HITECH Act created an "incentive payment"

17 program, by which health care providers, including hospitals, could earn incentive payments from

18 the federal and state governments to defray a portion of the major expenditures that would be

19 required to upgrade their EHR systems. While there was an EHR incentive program run through

20 the federally-implemented Medicare program, states were given flexibility under the HITECH Act

21 to establish the particular procedures and rules for participation through their existing Medicaid

22 programs, including the precise methodologies to calculate the amount of incentive payments a

23 program participant could receive – subject to federal approval.

24    2.      Dignity Health was an early implementer in California's Medi-Cal EHR incentive

25 program, devised and implemented by the Department through its State Medicaid Health

26 Information Technology Plan ("State Plan"). Participation was a good means for Dignity Health to

27 do its part in the efforts to rebuild the country after one of the darkest moments in our nation's

28 economic history. Equally important, Dignity Health recognized the benefits to its operations and

1

1   the quality of patient care provided at its hospitals and facilities by upgrading its EHR

2   infrastructures. Dignity Health thus expended substantial resources, including millions of dollars,

3   to adopt and to meaningfully use new EHR systems that met the requirements of California's EHR

4   incentive program, including specifically at Marian Medical Center in 2011.  For its efforts, as

5   contemplated by the HITECH Act, Dignity Health qualified for and received incentive payments.

6   Marian Medical Center in particular received over $3 million of incentive payments (receiving

7   $1.9 million in September 2012 and $1.1 million in May 2015).

8          3.      The Department pulled the rug out from under Dignity Health six years after

9   Dignity Health made its capital commitments to the EHR incentive program and received the $3

10  million in incentive payments for Marian Medical Center.  Through audit adjustments determined

11  in late 2018, the Department dubiously claimed that every incentive payment dollar that had been

12  paid to Marian Medical Center was an overpayment.  Not only did Dignity Health end up

13  receiving no incentive payments as promised under the HITECH Act for its EHR upgrade at

14  Marian Medical Center, the Department seeks to force Dignity Health to pay back all $3 million in

15  funds that had been received and absorbed into its accounts six years earlier.

16         4.      The shocking and unfair nature of the Department's audit actions are laid bare in

17  the dubious bases underlying its audit adjustments. The Department has never claimed that

18  Dignity Health's EHR upgrade at Marian Medical Center did not satisfy the requirements for

19  adoption and meaningful use of certified EHR systems under the HITECH Act. Nor does the

20  Department claim that Marian Medical Center's incentive payments run afoul of any written rule

21  or formula that the Department had developed to implement California's Medi-Cal EHR incentive

22  payment program.

23         5.      The Department's audit adjustments are entirely focused on the type of data used in

24  one part of the complex methodology that the Department devised to calculate incentive payments.

25  Dignity Health had submitted data related to discharges and care of Medi-Cal patients from its

26  cost report – a reliable report on a form mandated by the Centers for Medicare and Medicaid

27  Services ("CMS") used to determine reimbursement under Medicare and Medicaid programs. In

28  so doing, Dignity Health was strictly following written instructions and guidance issued by the

VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

1  Department, detailing the precise line and cell to use from the CMS cost report. In other words,

2  Dignity Health was following the Department's express instructions to provide the data elements

3  that yielded the $3 million in incentive payments originally paid to Marian Medical Center. Yet,

4  contrary to its own prior written guidance and instructions, the Department in its audit adjustment

5  claimed that a different type of data should have been used even though the Department had never

6  previously communicated such a change in formulation to Dignity Health. Moreover, rather than

7  try to gauge the appropriate quantity of discharge and Medi-Cal services for Marian Medical

8  Center under the Department's *post hoc* formulation, the Department simply zeroed out those data

9  elements. Such audit adjustments yielded the patently false position that Marian Medical Center

10  had no discharges and no services to Medi-Cal patients in the relevant period (a substantial

11  proportion of patients served by Marian Medical Center are Medi-Cal enrollees), and on that

12  absurd basis, the Department determined that Marian Medical Center is entitled to no EHR

13  incentive payment whatsoever. Compounding the injustice to Dignity Health, the Department

14  refused to accept, much less to visit the merits of, Dignity Health's administrative appeal of the

15  audit adjustments. Relying on a statutory deadline that applied to a different type of audit

16  altogether, the Department claimed that Dignity Health's administrative appeal was untimely and

17  lacked good cause.

18      6.      Dignity Health has no other avenue now but to come to this Court to seek an end to

19  the Departments' Kafkaesque treatment of Marian Medical Center in its implementation of the

20  Medi-Cal EHR incentive payment program pursuant to the HITECH Act. By this Complaint

21  pursuant to 42 U.S.C. section 1983, Dignity Health challenges the Department's audit adjustments

22  and related actions on the basis that (1) they constitute a retroactive impairment of contract in

23  violation of the U.S. Constitution, article I, section 10, and (2) they violate Dignity Health's due

24  process rights under the Fourteenth Amendment. Dignity Health also brings this Petition for Writ

25  of Mandate pursuant to California Code of Civil Procedure sections 1085 and, in the alternative,

26  1094.5 to compel the Department to comply with its ministerial duties in implementing the

27  HITECT Act's EHR incentive payment program in a manner that conforms to federal and state

28  law and the Department's own written rules and guidance.

VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

## II.     PARTIES

7.     Dignity Health is a California nonprofit public benefit corporation which operates a health care system serving California, Arizona and Nevada. Marian Regional Medical Center, also known as Marian Medical Center, is an acute care hospital operated by Dignity Health in Santa Maria, California.

8.     Respondent and Defendant Richard Figueroa is the acting Director of the Department of Health Care Services, the agency charged with administering and enforcing the provisions of the Medi-Cal program and is named in his official capacity only.

9.     Respondent and Defendant Raul Ramirez is the Chief of the Department of Health Care Services Office of Health Information Technology.  The Office of Health Information Technology is the office of the Department of Health Care Services charged with administering the Medi-Cal EHR Incentive Program.  Mr. Ramirez is named in his official capacity only.

10.     Respondent and Defendant Bruce Lim is the Deputy Director of the Department of Health Care Services Audits and Investigations Branch, the branch within the Department of Health Care Services charged with performing financial audits related to payments to healthcare providers of Medi-Cal or other State or federally funded healthcare programs.  Mr. Lim is named in his official capacity only.

11.     Respondent and Defendant California Department of Health Care Services administers a number of healthcare programs, including the Medi-Cal EHR Incentive Program.

12.     Respondents Figueroa, Ramirez and Lim are referred to herein as "Official Respondents/Defendants," collectively.  All Respondents and Defendants are referred to herein as the "Department," collectively.

## III.     JURISDICTION AND VENUE

13.     The Court has jurisdiction over this writ action pursuant to Code of Civil Procedure sections 410.10 and 1085.  The Court has jurisdiction over Dignity Health's claims arising under 42 U.S.C. section 1983 actions.  (*Chavez v. Keat* (1995) 34 Cal.App.4th 1406, 1413 [state court jurisdiction over claims arising under 42 U.S.C. § 1983].)  Respondent Department of Health Care Services maintain an office in the County of San Francisco; thereby, venue in San Francisco

VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

1  County is appropriate as to all defendants under Code of Civil Procedure sections 393(b), 395 and

2  401.

3  **IV.   CALIFORNIA'S IMPLEMENTATION OF ITS MEDICAID EHR INCENTIVE**

4       **PAYMENT PROGRAM**

5       A.   The HITECH Act

6       14.   The Medicaid Act, 42 U.S.C. section 1396, et seq., authorizes federal financial

7  support to states for medical assistance provided to certain low-income persons.  (*Orthopaedic*

8  *Hospital v. Belshe* (9th Cir. 1997) 103 F.3d 1491, 1493.)  The program is jointly financed by the

9  federal and state governments and administered by the states.  (*Ibid.*; 42 C.F.R. § 430.0.)  In order

10 to receive matching federal financial participation, states must agree to comply with the applicable

11 federal Medicaid law and regulations.  (*See Alexander v. Choate* (1985) 469 U.S. 287, 289, fn. 1.)

12 California's Medicaid program ("Medi-Cal") is administered by the Department.  (*See* Cal. Code

13 Regs., tit. 22, § 50004.)

14       15.   On February 17, 2009, the American Recovery and Reinvestment Act of 2009

15 (ARRA) was enacted.  The HITECH Act is part of the ARRA sections that adopted 42 U.S.C.

16 section 1396b(t), which authorized states to establish incentive payment programs to encourage

17 the voluntary adoption and use of certified electronic health record ("EHR") technology by

18 Medicaid healthcare providers, including certain eligible hospitals.  Hospitals are eligible for

19 Medicaid EHR incentive payments if "at least 10 percent of the hospital's patient volume [is]

20 attributable to individuals who are receiving medical assistance under [a state Medicaid

21 program]."  (42 U.S.C. § 1396b(t)(2)(B)(ii).)

22       16.   CMS implemented the Medicare and Medicaid EHR programs through a

23 rulemaking process, culminating in parts 412, 414, 422 and 495 of title 42 of the Code of Federal

24 Regulations.  The regulations governing the Medicaid EHR incentive programs are located at 42

25 C.F.R. sections 495.300, et seq.  The implementing regulations clarify that in most instances, the

26 role of a state in the implementation of a Medicaid EHR program is to "determine[] the provider's

27 eligibility for the EHR incentive payment under subparts A and D of this part and approve[],

28 process[], and make[] timely payments using a process approved by CMS."  (42 C.F.R. §

1   495.312(c).) States carry out such functions through a comprehensive state plan that must be

2   approved by CMS. Although administered by states, the federal government funds entirely the

3   Medicaid EHR incentive payments "to Medicaid providers… to encourage the adoption and use of

4   certified EHR technology."  (42 U.S.C. § 1396b(a)(3)(F).)

5        B.    The Legislature's Authorization of the Medi-Cal EHR Incentive Program

6       17.    On October 2, 2011, the California Legislature directed the Department to

7   "establish and administer the Medi-Cal Electronic Health Records Incentive Program ("Medi-Cal

8   EHR Incentive Program") for the purpose of providing federal incentive payments to Medi-Cal

9   providers for the implementation and use of electronic health record systems."  (Welf. & Inst.

10  Code, §§ 14046-14046.8.)  Welfare and Institutions Code section 14046.1 requires the Medi-Cal

11  EHR Incentive Program to "be administered in accordance with the State Medicaid Health

12  Information Technology Plan, as developed by the department and approved by the federal

13  Centers for Medicare and Medicaid Services."  Likewise, Welfare and Institutions Code section

14  14046.2 states that "[u]pon receipt of all necessary federal approvals, and in accordance with the

15  State Medicaid Health Information Technology Plan, the department shall accept applications

16  from, and make incentive payments to, eligible professionals and facilities."

17      18.    On December 3, 2010, the Department submitted its first draft of the State Plan to

18  CMS.  After substantial discussions and several revisions of the State Plan, CMS ultimately

19  approved the State Plan on September 30, 2011, and it went into effect the next day on October 1,

20  2011.

21      C.    Eligibility Requirements for Incentive Payments

22      19.    Medicaid EHR incentive payments were made available starting in 2011 and

23  annually thereafter through 2021. To receive each year's EHR incentive payment, eligible

24  hospitals must attest that they meet the requirements specified under the HITECH Act and any

25  other applicable state laws or rules. Eligibility for payment in the first year of the program requires

26  a hospital to adopt, implement, or upgrade to a certified EHR technology system.  To be eligible

27  for payments in later years of the program, a hospital must meet meaningful use requirements set

28  forth by CMS.  For each individual year, CMS specified the "stage" of meaningful use a hospital

VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

1  was required to meet and also revised the criteria for meeting each "stage" of meaningful use.

2  Those standards were set forth in sections 495.20 and 495.22 of title 42 of the Code of Federal

3  Regulations.

4       20.     Upon attestations by Medicaid providers of meeting the eligibility for the Medicaid

5  EHR incentive payments, states issue payments to qualifying providers.  (*See generally* 42 U.S.C.

6  § 1396b(t).)  However, each state must assure the Secretary of the U.S. Department of Health and

7  Human Services that Medicaid EHR incentive payments to a provider are paid "directly to such

8  provider… without any deduction or rebate."  (42 U.S.C. § 1396b(t)(6)(A).)

9       D.     <u>Methodology to Calculate Incentive Payments</u>

10       21.     Under the provisions of the Medi-Cal EHR Incentive Program, payment incentives

11  awarded to eligible hospitals are an aggregate of two components: the Overall EHR Amount and

12  the Medicaid Share. The formula for calculating the aggregate incentive payment amounts is

13  governed by federal law.  (*See* 42 U.S.C. § 1396b(t)(5); 42 C.F.R. § 495.310(g).)  The calculation

14  of the aggregate payment amount is unrelated to the actual costs that a hospital may expend in

15  order to qualify for the Medi-Cal EHR program. The aggregate payment amount is equal to the

16  product of the Overall EHR Amount and the Medicaid Share.

17       22.     The Overall EHR Amount is a dollar amount calculated based on a hospital's total

18  number of inpatient acute care discharges over a theoretical 4-year period.  (42 C.F.R. §

19  495.310(g)(1).)  This is considered a theoretical 4-year period because it is calculated once, based

20  on how much a hospital might be paid over 4 years.  Essentially, based on historical discharges

21  over a 4-year period, the State calculated an average annual growth rate over 3 years of historical

22  data and then applied that to the number of discharges in the last year of available data to project

23  theoretical discharges for a 4-year period.

24       23.     The two primary factors of the Overall EHR Amount are the Initial Amount and the

25  Transition Factor.  The Initial Amount is equal to $2 million plus a discharge-related amount

26  based on the number of discharges calculated for each of the 4 theoretical years described above.

27  (42 U.S.C. § 1395ww(n)(2); 42 C.F.R. § 495.310(g)(1)(i).)  The Transition Factor is a diminishing

28  percentage that is applied to the Initial Amount calculated for each of the 4 theoretical years.

1   Once the Transition Factor is applied to each of the Initial Amount calculated for each of the 4

2   theoretical years, the resulting products for each of the 4 theoretical years are totaled to determine

3   the Overall EHR Amount.

4          24.     The Medicaid Share essentially acts as a proxy for the percentage of Medicaid

5   inpatients that a hospital serves.  The formula for the Medicaid Share is as follows:

$$\frac{\#\ of\ Medicaid\ Acute\ Inpatient\ Days + \#\ of\ Acute\ Inpatient\ Managed\ Care\ days\ *}{Total\ Acute\ Inpatient\ Hospital\ Days\ x\ \left[\frac{Total\ Charges - Charges\ attributable\ to\ Charity\ Care}{Total\ Charges}\right]}$$

8          25.     One of the distinctions between CMS' regulation for calculating Medicaid EHR

9   incentive payments versus Medicare EHR incentive payments is that the Medicare EHR incentive

10  payments are subject to a reconciliation to actual data (42 C.F.R. section 495.102(a)(2)), while no

11  parallel provision exists for the Medicaid EHR incentive program.  (*See generally* 42 C.F.R. §

12  495.310(g).)

13         E.      Express Reference to Cost Report Data Elements to Calculate Incentive Payments

14         26.     As part of the approval process of the Department's State Plan, CMS required the

15  Department to include a detailed description of the methodology, including data sources, from

16  which the Department would calculate the components of the Medi-Cal EHR incentive payments.

17  The final State Plan describes the following steps for calculating the Overall EHR Amount:

> Calculation of the Overall EHR Amount is a one-time calculation
> based on the following steps:
>
> • Calculate the average annual growth rate over three years using
>   the Medicare/Medicaid Cost Reports prior to the most current
>   Cost Report….
>
> • **Calculate the total Medicaid discharges using the Medicaid
>   discharges in the Medicare/Medicare Cost Reports** plus the
>   discharges where Medicaid is the secondary payer.  Only
>   discharges between 1149 and 23,000 per [hospital] will be
>   allowable discharges.
>
> • Calculate each of the next four year's total discharges by
>   multiplying the previous year's discharges times the average
>   computed growth rate.

VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

- Calculate the Aggregate EHR Amount for each year by multiplying (total discharges times $200) plus the $2,000,000 base.

- Apply the appropriate transition factor to each year's Aggregate EHR Amount. (Year One – 100%, Year Two – 75%, Year Three – 50%, Year Four – 25%).

- Calculate the total Overall EHR Amount by adding the total of each year with the transition factor applied.

- Apply the Medicaid Share percentage to the Overall EHR Amount... This is the hospital's Medicaid Aggregate EHR Incentive amount.

Calculation of the Medicaid Share percentage:

- Total Medicaid days includes both the total Medicaid Days and total Medicaid HMO days from the Medicare/Medicaid Cost Report.

- Calculate the non-charity percentage. Divide the (total hospital charges less uncompensated care) by the total hospital charges.

- Calculate the non-charity days by multiplying the non-charity percentage times the total hospital days.

- Calculate the Medicare Share [sic] percentage by dividing the Medicaid days by the non-charity days.

(Emphasis added.)

27.    Between December 3, 2010, and September 30, 2011, CMS issued a Frequently Asked Questions ("FAQ") response, number 3471, that stated:

> **Based on the Medicare cost report guidance, Form CMS 2552-96 [i.e., the CMS form for Medicaid cost reports] will be used** until the implementation of the new Medicare cost report, Form CMS 2552-10. Although the State may choose to use the following data elements, it is the States' and hospitals' responsibility to ensure the integrity and regulatory compliance of the data. **The CMS 2552-96 data elements are as follows: Total Discharges  - Worksheet S-3 Part 1, Column 15, Line 12 Medicaid Days**  - Worksheet S-3, Part I, Column 5, Line 1 + Lines 6-10 Medicaid HMO Days - Worksheet  S-3, Part I, Column 5, Line 2-Total Inpatient Days - Worksheet  S-3 Part 1, Column 6, Line 1, 2 + Lines 6 -10-Total Hospital Charges - Worksheet  C Part 1, Column 8, Line 101 - Charity  Care  Charges  - Worksheet  S-10, Column 1, Line 30. The

9

1   CMS 2552-10 data elements are as follows:- Total Discharges  -
2   Worksheet  S-3 Part 1, Column 15, Line 14 -Medicaid Days  -
    Worksheet  S-3, Part I, Column 7, Line 1 + Lines 8-12 -Medicaid
3   HMO Days  - Worksheet  S-3, Part I, Column 7, Line 2 -Total
    Inpatient Days  - Worksheet  S-3 Part 1, Column 8, Line 1, 2 +
4   Lines 8 - 12 -Total Hospital Charges  - Worksheet  C Part 1, Column
    8, Line 200 Charity Care Charges - Worksheet  S-10, Column 3,
5   Line 20.

6   (Emphasis added.)

7   28.     As a result, section 3.4.2 of the Department's State Plan included these same cost

8   report data elements as the source of the "one-time calculation" of the Medi-Cal EHR incentive

9   payments.  A true and correct copy of section 3.4.2 of the 2011 State Plan is attached hereto and

10   incorporated herein as Exhibit 4.  As described in section 3.2.6, the State requested that the

11   hospitals use their most recently filed Medi-Cal cost reports for the data elements described CMS

12   guidance and the Department's State Plan.

13   29.     Appendix 14 to the State Plan was a State Level Registry User Manual.  A true and

14   correct copy of that Appendix is attached hereto and incorporated herein as Exhibit 5.  Text of the

15   Follow the steps below to complete the Hospital Information page.

16   1.   Input **Total Discharges** for the previous four years.

17   CCR Yr-3 =              CCR Yr-2 =              CCR Yr-1 =              CCR Yr =

18   Total Discharges are calculated from the CMS Cost report 2552. See the below help text
    from the CA EH Eligibility Workbook to calculate the value.

19   Use CMS Cost Reports (CMS 2552-96 or CMS 2552-10) to acquire data.

20   If using CMS 2552-96: Worksheet S-3, part I, column 15, sum of lines 1, 6-10.
    If using CMS 2552-10: Worksheet S-3, part I, column 15, sum of lines 1, 2, 8-12, 16, 17.

21   User Manual are copied nearly identically from the SLR website that hospitals used for attestation.

22   For example, the instructions for total discharges states:

23   Consistent with other written guidance, the User Manual instructs providers to use specified data

24   elements from a provider's Medi-Cal cost report.

25   30.     In its implementation of the Medi-Cal EHR Incentive Program, the Department

26   created a State Level Registry ("SLR").  The SLR is an on-line portal that allows providers to

27   register for the Medi-Cal EHR Incentive Program and prepare the attestations for application to

28   the program.

10

31.     On the SLR website, the Department posted several informational documents, including the SLR User Manual, a fillable Excel Workbook, a checklist and a frequently asked question document.  These documents instructed hospitals that they would need to upload the relevant pages from the hospital's most recent CMS Medicare cost reports.  Based on this information, the Department informed hospitals that the Excel Workbook would "show you your hospital's payment calculations[.]"  The Excel Workbook instructed hospitals that the "CMS Annual Cost Reports (2552-96 or 2552-10) should be used."

32.     The SLR User Manual and the Excel Workbook referenced the same cost report cells as identified by CMS in FAQ 3471 and reiterated in the Department's State Plan and related written instructions as the data sources from which the Medi-Cal EHR Incentive Program payments would be calculated.

33.     As described in the SLR User Manual, once a hospital submitted its application, the SLR displayed a pop-up window, which stated: "Congratulations.  Your hospital's application has been successfully submitted to the state.  Your application will be validated by the state and then sent to CMS for review prior to payment.  Please note that the validation process may take up to 10 weeks.  You will receive an email notification when your payment has been issued."

F.     The Department's Audits and Appeals Policies

34.     CMS' implementing regulations for the Medicaid EHR incentive program focus on a state's responsibilities to validate Medicaid EHR incentive payments prior to payment, but not on after-the-fact audits.  Specifically, 42 C.F.R. section 495.316 requires each state to submit a "detailed plan for monitoring, verifying and periodic auditing of the requirements for receiving incentive payments, as described in § 495.314[.]"  However, 42 C.F.R. section 495.314 only describes those activities required to be eligible to receive a Medicaid EHR incentive payment.

35.     Nothing in the implementing regulations mentions the use of post-payment audits as a mechanism to replace data pulled from cost reports used as the basis for calculating incentive payments.  (*Cf* 42 C.F.R. § 495.104(a)(2).)

36.     However, Dignity Health is informed and believes and thereupon alleges that the Department performed an audit/validation process with respect to each hospital attestation for the

VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

1 | Medi-Cal EHR Incentive Program that it received.  Specifically, the Department compared the
2 | data submitted by hospitals as to historical discharges, inpatient bed days, and charges against
3 | various sources, including the hospital's cost reports, files within the Department's control (e.g.,
4 | summaries of claims paid by the State of California for Medi-Cal services), and hospital
5 | submissions to the Office of Statewide Health Planning and Development.  With respect to other
6 | Dignity Health hospitals, the Department had previously instructed Dignity Health as to what data
7 | should be submitted in attestations, i.e., further instructing Dignity Health upon which data their
8 | Medi-Cal EHR Incentive Program payments would be based.  At no point during these
9 | audits/validation did the Department notify Dignity Health that it would substitute the data from
10 | as-filed cost reports with audited data.

11 |       37.     With respect to the appeal process, the implementing regulations at 42 C.F.R.
12 | section 495.370 requires each State to establish an appeals process to appeal: (1) incentive
13 | payments; (2) incentive payment amounts; (3) provider eligibility determinations; and (4) the
14 | demonstration of adopting, implementing, and upgrading, and meaningful use eligibility for
15 | incentives."  That section further requires that the State must ensure that "the provider... has an
16 | opportunity to challenge the State's determination under this part by submitting documents or data
17 | or both to support the provider's claim" and that "such process employs methods for conducting
18 | an appeal that are consistent with the State's Administrative Procedure law(s)."  (42 C.F.R.
19 | § 495.370(b).)  Such process must be "consistent with the requirements established in [42 C.F.R.]
20 | § 447.253(e)."  (42 C.F.R. § 495.370(a).)

21 |       38.     Section 447.253(e) of title 42 of the Code of Federal Regulations governs the
22 | requirement that state Medicaid programs provide an appeals procedure that "allows individual
23 | providers an opportunity to submit additional evidence and receive prompt administrative review,
24 | with respect to such issues as the agency determines appropriate, of payment rates."

25 |       39.     The Legislature provided general guidance to the Department regarding the audits
26 | and appeals processes that should apply in the Medi-Cal EHR Incentive Program.  First, the
27 | Legislature mandated that the Department the State Plan "[e]stablish the audit and appeals
28 | processes."  (Welf. & Inst. Code § 14046.1(b)(5).)  Second, in a section governing the acceptance

1   of applications from and the making of incentive payments to eligible professionals and facilities,

2   the Legislature provided that appeals under article 1.5 of chapter 6 of part 3 of division 9 of the

3   Welfare and Institutions Code "shall be conducted pursuant to" Welfare and Institutions Code

4   section 14043.65.  (Welf. & Inst. Code § 14046.2(c).)  Welfare and Institutions Code section

5   14043.65 establishes a procedure that does not include a "formal administrative hearing under the

6   Administrative Procedure Act[.]"  (Welf. & Inst. Code § 14043.65(a).)  Third, as discussed above,

7   the Legislature authorized the Department to implement the Medi-Cal EHR Incentive Program

8   through provider bulletins or similar instructions without taking regulatory action.  (Welf. & Inst.

9   Code § 14046.4.)

10          40.     Dignity Health is informed and believes that the Department has issued no provider

11   bulletins or similar instructions regarding the audits and appeals of Medi-Cal EHR Incentive

12   Program payments.

13          41.     The only publicly available documentation from the Department suggesting a post-

14   payment audit is in the State Plan.  The State Plan includes a section on audits of eligible hospital

15   payments in section 4.3.  It described Pre-Payment Reviews/Audits, through which the

16   Department "manually review[ed] all [eligible hospital] eligibility and payment data against

17   hospital cost reports uploaded" with the attestation.  It also outlined Post Payment

18   Reviews/Audits, intended to review "patient volume and payment data[.]"  A true and correct copy

19   of section 4.3 of the 2011 State Plan is attached hereto and incorporated herein as Exhibit 6.

20   Nothing in the State Plan discusses using non-cost report-derived data for calculating hospital

21   Medi-Cal EHR Incentive Program payments.

22          42.     Section 3.6 of the 2011 State Plan limits the applicability of the appeal process in

23   Welfare and Institutions Code section 14043.65 to appeals upon attestation.  By contrast, section

24   4.3 of the 2011 State Plan states that in response to an adverse overpayment finding in a post-

25   payment audit, the hospital "is allowed appeal rights through an administrative hearing process

26   under Welfare and Institutions Code (W&I Code) Section 14171."

27   / / /

28   / / /

43.     In October 2018, CMS approved an amended State Plan, which read:

> For audit appeals, DHCS has an established administrative hearing process referenced in the WIC, Section 14171, and California Code of Regulations, Title 22, Section 51016. Audit appeals are referred to the Office of Administrative Hearings and Appeals (OAHA), an independent office within DHCS, which handles Medi-Cal provider appeals for the Department. The EH or EP has 45 days from the date the EHR audit report is issued to file for an appeal with OAHA. OAHA affords providers an administrative hearing.   If the provider wishes to appeal further, the appeal must be filed through Superior Court.

## V.     DIGNITY HEALTH'S PARTICIPATION IN THE MEDI-CAL EHR PROGRAM AT MARIAN MEDICAL CENTER

44.     While Dignity Health had an EHR product at Marian Medical Center prior to 2012, the offer of Medi-Cal EHR incentive payments enticed Dignity Health to upgrade to certified EHR technology at its hospitals, including Marian Medical Center, and to participate in the Medi-Cal EHR Incentive Program.  The upgrade to certified EHR technology cost significantly more than Dignity Health received in incentive payments, including, without limitation, costs for new software, costs associated with software maintenance, hiring consultants and/or personnel, and training for staff to make the systems usable.  The process of participation in the Medi-Cal EHR Incentive Program included numerous steps, including registering for the Program through the SLR, taking all necessary steps to qualify and to demonstrate qualification for the program, gathering and uploading documents to support the attestation, including supporting documentation from its cost reports.  For later years, Dignity Health had to actually implement the certified EHR product at Marian Medical Center and take all the necessary steps to achieve the meaningful use goals.

45.     On or around June 27, 2012, Marian Medical Center voluntarily submitted its attestation to participate in the Medi-Cal EHR program for program year 2011, based on the hospital having met meaningful use.  Included in the attestation were the data elements required to determine the amount of the Medi-Cal EHR incentive payment to Marian Medical Center.  Specifically, consistent with the instructions from the Department, Dignity Health attested to: (1)

14

1  the discharges for 2008, 2009, and 2010 from the as-filed Medicare cost report for the respective

2  years; and (2) the discharges, Medicaid inpatient bed days, total inpatient bed days, total hospital

3  charges and total charity charges from the as-filed Medicare cost report for the fiscal year ending

4  2011.

5      46.    On or around September 7, 2012, Marian Medical Center received $1,916,021 for

6  its Year 1 Program from the Medi-Cal EHR Incentive Program.

7      47.    On or around December 22, 2014, Marian Medical Center submitted its attestation

8  continue its participation in the Medi-Cal EHR Incentive Program for program year 2014, based

9  on the hospital having achieved "meaningful use." On or around May 26, 2015, Marian Medical

10  Center received $1,149,612 for its Year 2 payment from the Medi-Cal EHR Incentive Program.

11      48.    On or around April 28, 2017, Marian Medical Center submitted its attestation to

12  continue its participate in the Medi-Cal EHR Incentive Program for program year 2016, based on

13  the hospital having achieved "meaningful use." The Department never responded to Marian

14  Medical Center's attestation. Dignity Health is informed and believes that the Department has not

15  approved the Program Year 2016 attestation for Marian Medical Center, and on that basis, has

16  barred Marian Medical Center from attesting for its fourth and final year of the Medi-Cal EHR

17  Incentive Program.

18      49.    At no point prior to 2016 did the Department inform Dignity Health that it intended

19  to replace the data from which it calculated Marian Medical Center's Medi-Cal EHR Incentive

20  Program payments.

21  **VI.    MARIAN MEDICAL CENTER'S COST REPORTS**

22      50.    As alleged herein, under the Medi-Cal EHR Incentive Program, the State Plan, the

23  SLR User Manual and the Excel Workbook instructed that required data elements for the

24  calculation of Medi-Cal EHR Incentive Program payments were to be derived from Medicare Cost

25  Reports. These resources that certain data elements for necessary for Medi-Cal EHR Incentive

26  Program payments for hospitals should be taken verbatim from certain cells in CMS Form 2552-

27  96 or CMS Form 2552-10.

28

VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

51.     These Cost Reports were not created for the specifically for the EHR Program, but are used by hospitals generally to furnish information to the Medi-Cal and Medicare programs and are used for multiple purposes outside of the EHR Program.  These forms, which are required to be submitted on an annual basis, and the rules governing these forms are issued by CMS.  In 1996, CMS issued a form for Medicare cost reports called 2552-96; this was updated in 2010 with the cost report form 2552-10.

52.     For the fiscal years 2008 through 2011, Marian Medical Center was a Medicare disproportionate share hospital, which means that the Medicare program would have paid specific attention to its charges and charity charges.  For the fiscal years 2008 through 2011, Medi-Cal paid Marian Medical Center based on the reasonable, allowable costs it incurred on its cost reports.  Accordingly, Medi-Cal would have carefully reviewed Marian Medical Center's cost report for accuracy.

53.     The Medicare fiscal intermediary routinely audits each hospital's cost reports.  Upon the final settlement of a hospital's cost report for a year, any re-opening of that cost report must occur within three years after the issuance of the audit on such cost report in the absence of fraud.  (42 C.F.R. § 405.1885(b)(1).)  These Medicare cost report audits are accessible to the public.

54.     Likewise, Medi-Cal routinely audits each hospital's cost reports.  The information in a hospital's Medi-Cal cost report is considered true and correct unless audited or reviewed within three years of submission of the cost report.  (Welf. & Inst. Code § 14170(a).)  These Medi-Cal cost report audits are accessible to the public.

55.     By December 31, 2011, the fiscal intermediary for CMS had audited the Medicare cost reports for Marian Medical Center for FYEs 2008 through 2011.  None of the audits adjusted the cost report cells that were used as the basis for calculating the Medi-Cal EHR Incentive Program payments for Marian Medical Center for Program Year 2011 on June 27, 2012.

56.     By the end of calendar year 2014, the time for Medi-Cal to audit the Medi-Cal cost report for Marian Medical Center for FYEs 2008 through 2011 had passed.  Dignity Health is informed and believes that none of the Medi-Cal cost report audits adjusted the cots report cells

VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

1   that were used as the basis for calculating the Medi-Cal EHR Incentive Program payments for

2   Marian Medical Center for Program Year 2011 on June 27, 2012.

3        57.    Prior to the Department's unlawful and untimely audit of Marian Medical Center's

4   Medi-Cal EHR Incentive Program attestation for Program Year 2011 in 2018, the Medicare and

5   Medi-Cal cost reports for FYEs 2008 through 2011 for Marian Medical Center were no longer

6   subject to adjustment in the regular course of business.

7   **VII.   THE DEPARTMENT'S UNLAWFUL AND UNTIMELY AUDIT OF MARIAN**

8            **MEDICAL CENTER'S MEDI-CAL EHR INCENTIVE PAYMENTS**

9        58.    On October 12, 2018, the Department's auditor commenced an audit requesting

10  substantial amounts of documentation, including, without limitation, documentation supporting

11  discharges for Marian Medical Center's fiscal years ending in 2008 through 2011 – despite those

12  Medicare cost reports having been closed for years.  On November 7, 2018, Dignity Health was

13  able to provide limited responses to the Department's audit requests, but was not able to provide

14  all of it, including documentation supporting historical discharges.

15       59.    On December 28, 2018, Dignity is informed that the Department's auditor sent

16  Marian Medical Center its audit findings, attached hereto as Exhibit 1.

17       60.    Dignity Health did not become aware of the audit findings in Exhibit 1 until April

18  19, 2019.  On or around that date, an employee of the Department called and left a message for a

19  Dignity Health Reimbursement Department employee informing him of an approximate $3

20  million adjustment to the Medi-Cal EHR incentive payments to Marian Medical Center.

21  Employees at Dignity Health diligently responded to the Department and were e-mailed a copy of

22  the audit findings at Exhibit 1 on April 24, 2019.

23       61.    The audit findings announced that the Department had conducted its examination

24  "under the authority of Section 14170 of the Welfare and Institutions Code[.]"  The audit findings

25  identified an overpayment of $3,065,633, i.e., all of the incentive payments that Marian Medical

26  Center had earned under the Medi-Cal EHR Incentive Program for Program Years 2011 and 2014.

27  The audit findings make no mention of Marian Medical Center's attestation for Program Year

28  2016.

VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

62.     The Department's 100% overpayment finding is based on the auditor's decision to zero out all of the hospital's discharges for fiscal years ending 2008, 2009, 2010 and 2011, and to zero out the total hospital charges and total hospital charity care charges for fiscal year ending 2011.

63.     Dignity is aware of no contention from the Department that Marian Medical Center was not eligible to receive the Year 1 or Year 2 payments for the Medi-Cal EHR Incentive Program.  In other words, the audit findings do not challenge that Marian Medical Center met the 10% Medicaid patient threshold for eligibility or that Marian Medical Center acquired, implemented or upgraded to a certified EHR system in Program Year 2011 or achieved "meaningful use" for Program Year 2012.

64.     The audit findings informed Dignity that "Welfare and Institutions Code, Section 14171 contains the procedures that govern an appeal."

## VIII.     THE DEPARTMENT'S IMPROPER DENIAL OF DIGNITY HEALTH'S ADMINISTRATIVE APPEAL

65.     On or about May 16, 2019, consistent with the instructions in the audit findings, Dignity Health submitted a letter requesting a hearing to the Department's Office of Administrative Hearings and Appeals ("OAHA") as instructed in the audit findings in Exhibit 2 to contest the findings.

66.     On June 4, 2019, the Chief of the Department's Office of Administrative Hearings and Appeals ("OAHA") sent a letter denying Dignity Health's request for a hearing as the letter requesting an appeal was received more than 60 days after the date on the audit report, citing California Code of Regulations, title 22, section 51022(a).  However, the letter permitted Dignity Health to request good cause for late filing within 15 calendar days from the date of the notice.

67.     On June 17, 2019, Dignity Health requested to leave to file its appeal because: (1) it contended that the 60-day deadline did not apply to its appeal; and (2) based on declarations, Dignity Health did not become aware of the audit findings until April 2019.

68.     On August 27, 2019, the Department's Office of Administrative Hearings and Appeals denied Dignity Health's request to submit its appeal.  A true and correct copy of the

1  denial letter is attached hereto and incorporated herein as Exhibit 3.  In that letter, without

2  analysis, OAHA stated: "The [Medi-Cal EHR Incentive] Program is administered in accordance

3  with the State Medicaid Health Information Technology Plan (Plan), which is required to

4  establish, inter alia, audit and appeals processes.  The Plan adopts the administrative hearing

5  process referenced in Welfare and Institutions Code section 14171 and its implementing

6  regulations at California Code of Regulations, title 22, section 51016 *et sequentes* for appeals of

7  EHR overpayment determinations arising from an audit."  (Exh. 3[footnotes removed].)

8        69.    The letter determines that Dignity Health failed to establish good cause based on its

9  failure to offer any reason why there was a significant delay between the certified return receipt

10  date of January 8, 2019, based on an illegible signature, and April 19, 2019.

11  **IX.**    **THE DEPARTMENT'S ACTIONS HAVE VIOLATED NUMEROUS LAWS AND**

12         **DIGNITY HEALTH'S CONSTITUTIONAL RIGHTS**

13        70.    The Department's audit unlawfully zeroes out discharges and charges from Marian

14  Medical Center's Year 1 Medi-Cal EHR Incentive Program attestation, as follows, without

15  limitation:

16        a.    The data for discharges and charges used to calculate the payments made to

17               Marian Medical Center were derived from Marian Medical Center's most

18               recently filed cost reports consistent with the instructions provided by the

19               Department and as approved by CMS.  No law authorizes the Department

20               substituting the data in Marian Medical Center's cost report with non-cost

21               report-derived data, as it has done by the audit.  Instead, Welfare and

22               Institutions Code sections 14046.1, 14046.2, and 14046.4 and 42 C.F.R.

23               part 495 require the Department to follow the State Plan and utilize cost

24               report-derived data to calculate the Medi-Cal EHR Incentive Program

25               payments for Marian Medical Center, consistent with the Department's

26               posted notices on its website.  This results in a calculation of Medi-Cal

27               EHR Incentive Program payments inconsistent with 42 U.S.C. section

28               1396b(t)(5) and 42 C.F.R. section 495.310.

19

b.   Marian Medical Center relied on the Department's representations as to how its Medi-Cal EHR incentive payments would be calculated when it decided to participate in the Medi-Cal EHR Incentive Program.  The Department's audit undermines the terms of a contract that arose between the Department and Dignity Health, infringing on the vested interests of Dignity Health.  Specifically, the actions of the parties (an offer by the Department in the form of the State Plan and other instructional notices on its website, as well as communications with Dignity Health, among other hospital providers; acceptance by Dignity Health by meeting the eligibility requirements and attesting to participate in the Medi-Cal EHR Incentive Program; and payment by the Department consistent with its offer) give rise to an implied contract between the Department and Dignity Health.  The Department's audit violates the terms of this contract by changing the methodology and data sources upon which the Medi-Cal EHR Incentive Program payments to Marian Medical Center are based.  These violations infringe on the protections in the Federal and State Constitutions against the state retroactively impairing contracts it has made with private entities and due process generally.  (U.S. Const., art. I, § 10; Cal. Const., art. I, § 9; *California Teachers Assn., v. Cory* (1984) 155 Cal.App.3d 494, 512; *see also United States Trust Co. v. New Jersey* (1977) 431 U.S. 1.)

c.   The audit findings result in a forfeiture, for which relief may be granted pursuant to Civil Code section 3275.  Dignity Health's omissions in responding timely to the audit were not grossly negligent, willful, or fraudulent, in light of the short time periods given for the audit and the age of the documentation requested.

d.   The Department cannot apply its audit findings because the identified authority, Welfare and Institutions Code section 14170, does not authorize audits of Medi-Cal EHR incentive payments.  Welfare and Institutions Code

VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

1   section 14170 only authorizes the Department to audit for "amounts paid for
2   services provided to Medi-Cal beneficiaries[.]"  Payments made pursuant to
3   the Medi-Cal EHR Incentive Program are not amounts paid for services
4   provided to Medi-Cal beneficiaries.  As it is well established under due
5   process that the State must give notice of the authority of its actions, the
6   Department's audit findings are invalid for failing to provide procedural due
7   process.  It further offends due process that the Department gave notice of
8   an audit of Program Year 1 payments, yet seeks to recoup payments made
9   to Marian Medical Center for Program Year 1 and Program Year 2.

10      e.    The Department's audit is further barred by the doctrine of laches, due to
11             the long delay between the Department's calculation of the aggregate Medi-
12             Cal EHR Incentive Program payments to Marian Medical Center (prior to
13             September 7, 2012) and the 2018 audit.  (*See generally Fountain Valley*
14             *Regional Hospital & Medical Center v. Bonta* (1999) 75 Cal.App.4th 316.)
15             The Department has no excuse to justify its delayed action, especially given
16             the close of the cost report audits for Marian Medical Center for FYEs 2008
17             through 2011 more than four years prior to the issuance of the audit findings
18             at issue in this case.

19      f.    In addition, the Department should be estopped from using in its audit any
20             data elements other than the cost report data elements that it instructed and
21             permitted Eligible Hospitals to use to calculate their EHR Incentive
22             payments. The Department knew that it instructed and permitted Eligible
23             Hospitals to use specific cells in the cost reports as described supra.  The
24             Department intended that Dignity Health use these cost report cells in
25             calculating their Medi-Cal Incentive Program payments and Dignity Health
26             had a right to believe that the Department so intended. Dignity Health was
27             ignorant of the fact that the Department would evaluate its Medi-Cal EHR
28             Incentive Program payment calculation using data elements different from

21

1   the specified cost report data elements. Dignity Health relied on the

2   Department's instruction and permission to use the specified data elements

3   to its detriment, when the Department audited the EHR Incentive payments

4   using different data elements and reduced Dignity Health's incentive

5   payments. Dignity Health has been injured by the reduction of the Medi-Cal

6   EHR Incentive Program payments and the potential of having to repay said

7   payments and by having to incur far more than the incentive payments

8   received in order to implement a certified EHR system. Dignity Health is

9   informed and believes that the Department's current position is based on

10  information that at all times was available to the Department. Failure to

11  uphold the estoppel would result in a grave injustice to Dignity Health.

12  Upholding an estoppel, on the other hand, would have little to no impact on

13  California public policy or California public interest, as the EHR Incentive

14  Program payments, which were entirely federal funds, were intended to

15  stimulate the economy. Retention of the payments that were calculated

16  according to the Department's own instruction and guidance, is in the

17  public interest.

18      g.  The Department's audit is arbitrary and capricious for the reasons set forth

19          above, as well as because the Department was fully aware that Marian

20          Medical Center was a functioning hospital with discharges in FYEs 2008,

21          2009, 2010 and 2011, and with charges/charity charges in FYE 2011.

22          Accordingly, it was arbitrary to assign zero discharges for the FYEs 2008

23          through 2011 and zero charges/charity charges for FYE 2011.  The

24          Department further acted unreasonably by failing to consider

25          documentation otherwise within the Department's possession or that are in

26          the public domain that could have substantiated some or all of Marian

27          Medical Center's discharges and charges/charity charges.  For example, and

28          without limitation, the audit substantiated 3,080 discharges during the

VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

period of April, May and June of 2011, but failed to include any of those discharges in Marian Medical Center's total discharges for 2011.

h.   The Department's audit was arbitrary and capricious by reducing Marian Medical Center's total Medi-Cal inpatient bed days from 13,392 to 3,913. Without limitation, the Department failed to consider other documentation or information in its possession or in the public domain, e.g., the documentation or information Department would have collected or confirmed during its cost report audit for Marian Medical Center for FYE 2011.   The Department's cost report audit for Marian Medical Center for FYE 2011 did not adjust Marian Medical Center's total Medi-Cal inpatient bed days.

i.   Finally, the Department violated Welfare and Institutions Code section 14046.4 by performing audits without providing any provider bulletin or similar instruction to Marian Medical Center of its intent to do so or the process of such audits.

71.   To the extent that the Department has the authority to entertain an administrative appeal from the audit findings, the Department's refusal to consider Marian Medical Center's appeal is arbitrary and capricious, as follows:

a.   The Department failed to properly consider the evidence before it in denying Marian Medical Center's request for an appeal.

b.   The Department applied an improper legal standard to establish good cause for filing a late appeal.

**X.     THE TENETS OF ADMINISTRATIVE EXHAUSTION PERMIT THIS PETITION**

72.   Dignity Health alleges that it is permitted to request a writ of mandate from this tribunal, notwithstanding the Department's denial of its appeal on the grounds of timeliness.

73.   First, "the exhaustion requirement is not applicable where an effective remedy is wholly lacking." (*Unfair Fire Tax Com. v. City of Oakland* (2006) 136 Cal. App. 4th 1424, 1429, quoting 3 Witkin, Cal. Procedure (4th ed. 1996) Actions, § 314, p. 404.)  In order to be effective,

1   the "statute or regulation under which that power is exercised establishes clearly defined

2   machinery for the submission, evaluation and resolution of complaints by aggrieved parties."

3   (*Ibid.*, quoting *Rosenfield v. Malcolm* (1967) 65 Cal.2d 559, 566.)  In this case, there is no clearly

4   defined machinery for any appeal from the Department's audit: (1) while Welfare and Institutions

5   Code section 14046.2 mentions an appeal mechanism under Welfare and Institutions Code section

6   14043.65, this appeal mechanism is neither mentioned in the audit letter nor does it meet the

7   requirements of 42 C.F.R. section 495.370(b); (2) the 2011 and 2014 State Plans reference appeals

8   pursuant to Welfare and Institutions Code section 14171, but does not reference the procedure that

9   should apply to any such appeal (i.e., the Government Code Administrative Procedure Act

10   procedures or the regulations in article 1.5 of chapter 3 of title 22 of the California Code of

11   Regulations); (3) the 2018 State Plan references Welfare and Institutions Code section 14171 and

12   a single section of article 1.5 of chapter 3 of title 22 of the California Code of Regulations, but

13   does not specify whether other procedural rules apply; (4) the Department's audit process and the

14   final audit letter gives instructions that are different from the State Plan, which further confounds

15   what procedures should apply; and (5) the Department's failure to issue any provider bulletins or

16   similar notices invalidates any attempt to mandate an administrative appeal mechanism.

17         74.     Second, an exception to exhaustion exists where the petitioner brings constitutional

18   claims as to the agency's ability to hear the appeal.  (*Unnamed Physician v. Bd. of Trustees of*

19   *Saint Agnes Med. Ctr.* (2001) 93 Cal. App. 4th 607, 621.)  Here, Dignity Health contends that the

20   audit violates the state and federal due process clauses and the prohibition against the retroactive

21   impairment of contracts.  First, the Department's cited authority, Welfare and Institutions Code

22   section 14170, does not authorize the audit.  Audits performed under Welfare and Institutions

23   Code section 14170 may rise to appeals under Welfare and Institutions Code section 14171 and

24   article 1.5 of chapter 3 of title 22 of the California Code of Regulations.  However, as this audit

25   cannot be justified pursuant to Welfare and Institutions Code section 14170, the audit procedures

26   from audits arising under Welfare and Institutions Code section 14170 are also unlawful and

27   invalid.  Second, any argument that exhaustion is required would attempt to validate an appeal

28   process that was established without following the Administrative Procedure Act or Welfare and

1   Institutions Code section 14046.4 and without clear procedures that comply with the

2   Administrative Procedure Act.  The conduct of an unlawfully constructed appeal process violates

3   Dignity Health's procedural due process rights.

4          75.     Third, an exception to exhaustion is recognized where the agency's decision is

5   virtually certain to be adverse.  (*See County of San Diego v. State* (1997) 15 Cal.4th 68, 89-90.)

6   The Department's Office of Administrative Hearings and Appeals has already considered three

7   sets of appeals on the Department's delayed Medi-Cal EHR Incentive Program audits and has

8   denied the appeals in each case.  These cases raise the same questions as to the Department's

9   authority to conduct these audits under the State Plan, whether the audits violate the contracts

10  between the Department and other hospital providers, whether by violating those contracts the

11  audits constitute unconstitutional retroactive impairments of contracts, and whether the delays in

12  conducting the audits invalidate the audits.  Two of those cases are currently pending at the San

13  Francisco Superior Court.

14         76.     Fourth, exhaustion is not required for Dignity Health's Constitutional claims under

15  42 U.S.C. section 1983.  (*Wilder v. Virginia Hosp. Ass'n* (1990) 496 U.S. 498, 523.)  Accordingly,

16  Dignity Health may pursue its claims under 42 U.S.C. section 1983 for the violation of is federal

17  Constitutional due process rights and for the violation of the federal Constitutional prohibition

18  against the retroactive impairment of contracts without exhausting administrative appeals.

19         77.     Last, a petition for writ of mandate is proper to appeal the agency's wrongful denial

20  of good cause.  (*See Morton v. Hollywood Park, Inc.* (1977) 73 Cal. App. 3d 248, 254.)  Here, in

21  the alternative or in addition, Dignity Health challenges the Department's improper denial of its

22  request for good leave to file a late appeal.

23                          **CAUSES OF ACTION**

24                          **First Cause of Action**

25                          **42 U.S.C. § 1983**

26         (U.S. Constitution, art. I, § 10 – Retroactive Impairment of Contracts against all Individual

27                          Respondents/Defendants)

28

VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

1    78.    Petitioner realleges and incorporates by reference each and every allegation

2    contained in the above paragraphs as though fully set forth herein.

3    79.    Section 10 of Article 1 of the United States Constitution provides that "[n]o State

4    shall enter into any… Law impairing the Obligation of Contracts[.]"  This Contract Clause "limits

5    the power of the States to modify their own contracts as well as to regulate those between private

6    parties."  (*U.S. Trust Co. v. New Jersey* (1977) 431 U.S. 1, 17.)  The State is prohibited from

7    retroactively impairing its own contracts, except where such impairment is the minimum

8    necessary to achieve compelling interest.  (*California Teachers Assn., v. Cory, supra*, 155

9    Cal.App.3d 494, 511-512.)

10   80.    A contract arose between the Department and Dignity Health that the Medi-Cal

11   EHR Incentive Program payments to Marian Medical Center would be made based on the cost

12   report fields identified in the State Plan and instructional materials posted on the Department's

13   website.  The Department's audit unconstitutionally impairs those contracts retroactively by

14   substituting the basis of the payments with non-cost report-derived data.

15   81.    The Department has neither a compelling interest to impose its arbitrary,

16   capricious, and untimely audit findings, nor is a permanent forfeiture of over $3 million is the

17   minimum necessary to accomplish such a compelling interest.

18   82.    Dignity Health is informed and believes that the acts of Respondent Department, its

19   employees and agents, were intentional and that, at a minimum, the Department was deliberately

20   indifferent to the likelihood that its unlawful and untimely audit results would retroactively impair

21   the contract between the State and Dignity Health.

22                              **Second Cause of Action**

23                              **42 U.S.C. § 1983**

24   (U.S. Constitution, amendment 14 –Due Process against all Individual Respondents/Defendants)

25   83.    Petitioner realleges and incorporates by reference each and every allegation

26   contained in the above paragraphs as though fully set forth herein.

27   84.    The 14th Amendment of the United States Constitution provides that "[n]o State

28   shall… deprive any person of life, liberty, or property, without due process of law…"

85.     Fundamental to the 14th Amendment's protection of due process is the requirement for notice and a hearing on the deprivation of life, liberty, or property.  (*Mathews v. Eldridge* (1976) 424 U.S. 319, 348.)  "The essence of due process is the requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it.'" (*Ibid.*, quoting *Joint Anti-Fascist Comm. v. McGrath* (1951) 341 U.S. 123, 171-172 (Frankfurter, J., concurring).)

86.     The Department violated the due process rights of Dignity Health by substituting non-cost report-derived data in its re-calculation of Marian Medical Center's Medi-Cal EHR Incentive Program payments by failing to issue any public notice (e.g., regulations or provider bulletins) that it would seek to change the payment calculation and source data.

87.     The notice given to Dignity Health with respect to the forfeiture of all Medi-Cal EHR Incentive Program payments was insufficient to meet procedural due process standards because, without limitation, (1) the Department failed to ensure that Dignity Health received timely notice of the audit findings; (2) the notice failed to identify any legal authority for the audit findings, and (3) the notice failed to identify the appropriate process for appealing the audit findings.

88.     Moreover, the Department failed to provide notice and a hearing to Dignity Health with respect to the denial of any payments for Program Year 2016, which, in turn, has prohibited Marian Medical Center from attesting for and receiving Medi-Cal EHR Incentive Program payments for the fourth year of the program.

89.     The lack of any statute providing for notice and a hearing, combined with the lack of any regulations, provider bulletins or similar instructions of the necessary procedure for a notice and a hearing to challenge an audit, further violates Dignity Health's due process.

90.     Moreover, the Department's denial of Marian Medical Center's request for an appeal violates procedural due process by failing to provide an actual hearing in the absence of notice to the responsible individuals at Dignity Health and for applying an improper legal and factual standard.

91.     The 14th Amendment further bars the Department from retroactively infringing on vested rights of Dignity Health.  Here, Dignity Health relied on the Department's commitment to make Medi-Cal EHR Incentive Payments to Marian Medical Center based on the calculations from Marian Medical Center's Program Year 2011 attestation.  In addition to attesting for the first year, Dignity Health continued to act to continue to be eligible for the Medi-Cal EHR Incentive Program and continued to attest or attempt to attest for later years of the program.  The Department's retroactive adjustment of these payments to rely on non-cost report-derived data completely disrupts Dignity Health's actions to meet the requirements of the Medi-Cal EHR Incentive Program.

92.     The 14th Amendment of the United States Constitution further protects Dignity Health from the arbitrary taking away of its Medi-Cal EHR Incentive Program payments without being related to any legitimate government purpose.  The Department's audit infringe on Dignity Health's due process rights by arbitrarily taking away all Medi-Cal EHR Incentive Payments to Marian Medical Center.

93.     Dignity Health is informed and believes that the acts of Respondent Department, its employees and agents, were intentional and that, at a minimum, the Department was deliberately indifferent to the likelihood that its actions would violate Dignity Health's procedural due process rights.

**Writ of Mandate under Code of Civil Procedure § 1085**

(Department's Unlawful and Unconstitutional Audit against all Respondents/Defendants)

94.     Petitioner realleges and incorporates by reference each and every allegation contained in the above paragraphs as though fully set forth herein.

95.     The Department's audit is unlawful for the reasons set forth in paragraph **Error! Reference source not found.**, without limitation.

96.     Dignity Health is beneficially interested in the Department's ministerial duties to comply with the laws and Constitutional provisions described in paragraph **Error! Reference source not found.**.  Dignity Health has no plain, speedy, and adequate remedy to obtain the Department's compliance with the laws and Constitutional provisions described in paragraph

1    **Error! Reference source not found.** other than the relief sought by this Petition.

2    **Writ of Mandate under Code of Civil Procedure § 1085**

3    (Department's Failure to Accept Year 3 and Year 4 Attestations against all

4    Respondents/Defendants)

5    97.    Petitioner realleges and incorporates by reference each and every allegation

6    contained in the above paragraphs as though fully set forth herein.

7    98.    The Department failure to accept or respond to the attestation submitted by Marian

8    Medical Center for Program Year 2016 without notice of any adverse action is unlawful for the

9    following reasons, without limitation: (1) the lack of notice and a hearing violates Dignity

10    Health's due process rights under the State and Federal Constitutions; (2) the failure to notify

11    Dignity Health of the outcome of the attestation violates the State Plan, and accordingly, violates

12    Welfare and Institutions Code sections 14046.1 and 14046.2, and 42 C.F.R. part 495; (3) the

13    failure to make incentive payments to Marian Medical Center violates Welfare and Institutions

14    Code section 14046.2; and (4) the failure to make payments to Marian Medical Center violates 42

15    C.F.R. sections 495.310 and 495.312, as well as 42 U.S.C. section 1396b(t).

16    99.    Dignity Health is beneficially interested in the Department's ministerial duties to

17    comply with the laws and Constitutional provisions described in paragraph 102. Dignity Health

18    has no plain, speedy, and adequate remedy to obtain the Department's compliance with the laws

19    and Constitutional provisions described in paragraph 102 other than the relief sought by this

20    Petition.

21    **Writ of Mandate under Code of Civil Procedure § 1085**

22    (Department's Unlawful Denial of Appeal against all Respondents/Defendants)

23    100.    Petitioner realleges and incorporates by reference each and every allegation

24    contained in the above paragraphs as though fully set forth herein.

25    101.    To the extent that the State Plan establishes an administrative appeal process, the

26    Department must comply with the State Plan's processes. (Welf. & Inst. Code §§ 14046.1,

27    14046.2; 42 C.F.R. Prat 495.) Moreover, this court is authorized to issue a writ of mandate against

28    the Department for arbitrary and capricious actions. (*See Lowe v. Cal. Resources Agency* (1991) 1

1    Cal.App.4th 1140, 1149.)

2       102.    The Department's denial of Dignity Health's request for good cause to file a late

3    appeal is arbitrary and capricious for the reasons set forth in paragraph 71, without limitation.

4    Specifically, and without limitation, the Department applied a time limitation that is inapplicable

5    to any administrative appeal of a Medi-Cal EHR Incentive Program audit, applied a standard

6    putting an impossible burden of proof on Dignity Health to prove where a document was routed

7    when it had established good cause that responsible persons were not aware of the audit findings,

8    and failed to properly consider the evidence submitted by Dignity Health.

9       103.    Dignity Health is beneficially interested in the Department's ministerial duty to

10   comply with the Administrative Procedure Act.  Dignity Health has no plain, speedy, and adequate

11   remedy to obtain the Department's compliance with the Administrative Procedure Act, and the

12   other than the relief sought by this Petition.

13              **Writ of Mandate under Code of Civil Procedure § 1094.5**

14          (Department's Unlawful Denial of Appeal against all Respondents/Defendants

15                                      [Alternative Relief])

16      104.    Petitioner realleges and incorporates by reference each and every allegation

17   contained in paragraphs 1 through 77 as though fully set forth herein.

18      105.    To the extent that the State Plan establishes an administrative appeal process, the

19   Department must comply with the State Plan's processes.  (Welf. & Inst. Code §§ 14046.1,

20   14046.2; 42 C.F.R. Part 495.)  To the extent that the Department's decision to deny Dignity

21   Health's request for good cause to file a late appeal was an adjudicatory decision or order, or

22   otherwise subject to review under Civil Procedure Code section 1094.5, the Department proceeded

23   without jurisdiction or exceeded its jurisdiction and the Department committed a prejudicial abuse

24   of discretion by, *inter alia*, not proceeding in the manner provided by law, issuing an order or

25   decision that is not supported by the findings, and/or issuing an order or decision whose findings

26   are not supported by the evidence.

27      106.    In the alternative to a writ of traditional mandate, a writ of administrative mandate

28   should issue against the Department because it erroneously declined to consider Dignity Health's

1  appeal for Marian Medical Center for the reasons set forth in paragraph 71, without limitation.

2  Specifically, and without limitation, the Department applied a time limitation that is inapplicable

3  to any administrative appeal of a Medi-Cal EHR Incentive Program audit, applied a standard

4  putting an impossible burden of proof on Dignity Health to prove where a document was routed

5  when it had established good cause that responsible persons were not aware of the audit findings,

6  and failed to properly consider the evidence submitted by Dignity Health.  Moreover, the

7  Department failed to consider properly the evidence submitted by Dignity Health.

8    107.    Dignity Health is beneficially interested in the Department's duty to comply with

9  the Administrative Procedure Act, its failure to comply with the State Plan's processes, and its

10  denial of Dignity Health's request to file a law appeal or to consider evidence.  Dignity Health has

11  no plain, speedy, and adequate remedy to obtain the Department's compliance with the

12  Administrative Procedure Act, and the other than the relief sought by this Petition.

### DECLARATORY RELIEF

14    108.    Petitioner realleges and incorporates by reference each and every allegation

15  contained in paragraphs 1 through 77 as though fully set forth herein.

16    109.    A real and immediate dispute exists between Petitioner and Respondents regarding

17  the rights of Dignity Health to Medi-Cal EHR Incentive Program payments it has already received

18  and the availability of Medi-Cal EHR Incentive Program payments for later program years.

19  Respondents' policies, actions, and inactions have resulted and will result in irreparable injury to

20  Dignity Health.

21    110.    An actual controversy exists between Dignity Health and Respondents in that

22  Respondents, their officers, agents, representatives, and employees, have engaged in the unlawful

23  acts alleged herein and intend to continue to do so. Dignity Health claims that these acts are

24  contrary to law and seeks a declaration of its rights with regard to this controversy.

25    **WHEREFORE**, Dignity Health prays that:

26    1.    A writ of mandate be issued pursuant to Code of Civil Procedure section

27  1085ordering:

28    a.    The Department to set aside the audit findings attached hereto as Exhibit 1 and

1 | calculate the aggregate Medi-Cal EHR Incentive Program payment to Marian Medical Center

2 | based on the as-filed cost report data submitted by Marian Medical Center in 2012; and

3 |      b.     The Department to accept Dignity Health's attestation for Marian Medical Center's

4 | participation in Program Year 2016 and an additional later year of the Medi-Cal EHR Incentive

5 | Program;

6 |      2.     In the alternative to the above relief, a writ of mandate be issued pursuant to Code

7 | of Civil Procedure section 1085 or, in the alternative, Code of Civil Procedure section 1094.5

8 | ordering the Department to grant Marian Medical Center's request for an appeal;

9 |      3.     Preliminary and permanent injunctions be issued compelling Respondents and their

10 | officers, agents, representatives, and employees to comply with applicable laws governing

11 | payments to hospitals that participate in the Medi-Cal EHR Incentive Program with respect to the

12 | payments available to Marian Medical Center.

13 |      4.     A judgment be issued declaring that Respondents' audit as alleged herein violates

14 | the rights of Dignity Health to due process and the prohibition against the retroactive impairment

15 | of contracts;

16 |      5.     Dignity Health be awarded its costs of suit and reasonable attorneys' fees; and

17 |      6.     The Court order such other and further relief as it deems just and proper.

18 |

19 | Dated: October 31, 2019           ATHENE LAW, LLP

20 |

21 |                 By: _____

22 |                         LONG X. DO

23 |                       Attorneys for Dignity Health dba
                      Marian Medical Center

24 |

25 |

26 |

27 |

28 |

VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT

1

## VERIFICATION

2    I am Vice President, Reimbursement of Dignity Health, the Petitioner in this case. I have

3  read the foregoing Petition and either know the contents therein to be true of my own knowledge

4  or I am informed and believe the matters therein to be true and on that ground allege that the

5  matters stated therein are true.

6    I declare under penalty of perjury under the laws of the State of California that the

7  foregoing is true and correct

8    Executed this 31st day of October 2019 at ___San Francisco___, California.

9

10

11    Eric Lucas

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PETITION FOR WRIT OF ADMINISTRATIVE MANDATE (CCP 1094.5) AND COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

# EXHIBIT 1

**REPORT ON THE**
**ELECTRONIC HEALTH RECORDS (EHR)**
**ADOPT/IMPLEMENT/UPGRADE (AIU)**
**INCENTIVE PAYMENT**

**MARIAN MEDICAL CENTER**
**SANTA MARIA, CALIFORNIA**
**NATIONAL PROVIDER IDENTIFIER: 1760510937**

**PROGRAM YEAR: 2011**

**Audits Section—Los Angeles**
**Financial Audits Branch**
**Audits and Investigations**
**Department of Health Care Services**

**Chief: Maria L. Delgado**
**Audit Manager: Ginn Sampson**
**Auditor: Ken Lo**

**DHCS**

State of California—Health and Human Services Agency

# Department of Health Care Services



JENNIFER KENT
*DIRECTOR*

EDMUND G. BROWN JR.
*GOVERNOR*

December 27, 2018


Robert Flores
Reimbursement Manager
Dignity Health
251 South Lake Avenue, 8th Floor
Pasadena, CA 91101


ELECTRONIC HEALTH RECORDS (EHR)
ADOPT/IMPLEMENT/UPGRADE (AIU) AUDIT
MARIAN MEDICAL CENTER
NATIONAL PROVIDER IDENTIFIER (NPI):  1760510937
PROGRAM YEAR:  2011

We examined the provider's Medi-Cal Electronic Health Records Incentive Program Hospital Workbook for the above-referenced program year. We made our examination under the authority of Section 14170 of the Welfare and Institutions Code and conducted in accordance with 42 Code of Federal Regulations 495.366 and 495.368 and, accordingly, included such tests and procedures, as we considered necessary under the circumstances.

In our opinion, the data presented in the accompanying audit report schedules represents a proper determination of the Medi-Cal EHR Incentive Program Payment Calculations for the above represented program year audited in accordance with principles and regulations of the applicable programs.

This audit report includes the:

1.  Computation of Medi-Cal Electronic Health Records Incentive Settlement

2.  Audit Adjustments that include EHR Incentive Program overpayments of $3,065,633

The Office of Health Information Technology (OHIT) will contact you with instructions to return the overpaid amounts. You may contact OHIT at Medi-Cal.EHR@dhcs.ca.gov or (916) 552-9181.

The Welfare and Institutions Code, Section 14171 contains the procedures that govern an appeal. You may request a hearing for any disputed audit or examination finding by filing a Statement of Disputed Issues, as defined in the California Code of Regulations,

Robert Flores
Page 2

Title 22, Section 51022. You must file the written request with the Department within 60 calendar days from the date you receive this letter.

Send the Statement of Disputed Issues and a copy of this letter to the following:

Chief
Department of Health Care Services
Office of Administrative Hearings and Appeals, MS 0016
3831 North Freeway Boulevard, Suite 200
Sacramento, CA 95834
(916) 322-5603

Please forward this audit report to your cost report preparer or financial consultant for review.

If you have questions regarding this report, you may call the Audits Section—Los Angeles at (213) 620-5911.

Maria L. Delgado, Chief
Audits Section—Los Angeles
Financial Audits Branch

Certified

cc:   FAB.EHR@dhcs.ca.gov                    Via Electronic Mail

      HOSPITAL.EHR@dhcs.ca.gov              Via Electronic Mail

STATE OF CALIFORNIA

SCHEDULE  1
EHR AIU

## COMPUTATION OF MEDI-CAL ELECTRONIC HEALTH RECORDS INCENTIVE SETTLEMENT

**Provider Name:**
**MARIAN MEDICAL CENTER**

**Program Year:**
**2011**

**NPI:**
**1760510937**

| | REPORTED | AUDITED |
|---|---|---|
| 90 Day Representation Period (April, May, June 2011) | | |
| 1.  Total Discharges  (Adj.) | 3,080 | 3,080 |
| 2.  Medi-Cal Discharges  (Adj.) | 1,399 | 1,399 |
| Annual Data 2011 | | |
| 3.  Total Inpatient Bed Days  (Adj.) | 34,711 | 34,711 |
| 4.  Total Discharges Previous Four Years | | |
|        2008  (Adj. 1) | 12,650 | 0 |
|        2009  (Adj. 1) | 13,893 | 0 |
|        2010  (Adj. 1) | 12,747 | 0 |
|        2011  (Adj. 1) | 11,282 | 0 |
| 5.  Total Medi-Cal Inpatient Bed Days  (Adj. 2) | 13,392 | 3,913 |
| 6.  Total Hospital Charges  (Adj. 3) | $  904,083,920 | $  0 |
| 7.  Total Hospital Charity Care Charges (Adj. 4) | $  4,481,297 | $  0 |
| EHR Incentive Payment Years | | |
|        Year 1 Payment (50%) | $  1,916,021 | $  0 |
|        Year 2 Payment (30%) | $  1,149,612 | $  0 |
|        Year 3 Payment (10%) | $  0 | $  0 |
|        Year 4 Payment (10%) | $  0 | $  0 |
| 8.  Overpayments Due Provider (State) (Adj. 5) | $  N/A | $  (3,065,633) |
| Future Potential EHR Incentive Payments | | |
|        Year 2 Payment (30%) | $  0 | $  0 |
|        Year 3 Payment (10%) | $  0 | $  0 |
|        Year 4 Payment (10%) | $  0 | $  0 |
| Total EHR Incentive Payments Years 1 - 4 | $  3,832,041 | $  0 |

State of California

Department of Health Care Services

| Provider Name | | Program Year | | NPI | | Adjustments |
|---|---|---|---|---|---|---|
| MARIAN MEDICAL CENTER | | 2011 | | 1760510937 | | 5 |
| Report References | | | | | | |
| Adj. No. | EHR Workbook Page Number | Explanation of Audit Adjustments | As Reported | Increase (Decrease) | | As Adjusted |
| | | **ADJUSTMENTS TO ELECTRONIC HEALTH RECORD SCHEDULES** | | | | |
| | | **Annual Data** | | | | |
| 1 | 1 | Total Discharges (2008) | 12,650 | (12,650) | | 0 |
| | 1 | Total Discharges (2009) | 13,893 | (13,893) | | 0 |
| | 1 | Total Discharges (2010) | 12,747 | (12,747) | | 0 |
| | 1 | Total Discharges (2011) | 11,282 | (11,282) | | 0 |
| 2 | 1 | Total Medi-Cal Inpatient Bed Days | 13,392 | (9,479) | | 3,913 |
| 3 | 1 | Total Hospital Charges | $ 904,083,920 | $ (904,083,920) | $ | 0 |
| 4 | 1 | Total Hospital Charity Care Charges | $ 4,481,297 | $ (4,481,297) | $ | 0 |
| 5 | N/A | Overpayments Due Provider (State) | $ 0 | $ (3,065,633) | $ | (3,065,633) |

To adjust the EHR workbook Schedules to agree with audit adjustments and/or provider records.
42 CFR 495, subpart D

# EXHIBIT 2

ATHENE
— L A W —

Felicia Y Sze, Esq.
5432 Geary Blvd. #200
San Francisco, CA 94121-2307
(415) 686-7531
www.athenelaw.com

May 16, 2019


Lisa Alder, Chief
Department of Health Care Services
Office of Administrative Hearings and Appeals
3831 N. Freeway Blvd, Suite 200
Sacramento, CA 95834


Re:   **REQUEST FOR HEARING**
      MARIAN MEDICAL CENTER (NPI 1760510937)
      Program Year 2011
      Electronic Health Records
      Adopt/Implement/Upgrade Audit


Ms. Alder:

This firm has been engaged to represent Marian Medical Center (the "Provider") in this appeal. Pursuant to the California State Medi-Cal Health Information Technology Plan section 4.3.3, the Provider requests an administrative hearing under Welfare and Institutions Code section 14171 from the audit findings attached hereto as Exhibit 1. The audit by the Department of Health Care Services Audits Section – Los Angeles Financial Audits Branch Audits and Investigation ("Audits") made an adjustment of $3,832,041 to Provider's Medi-Cal electronic health record ("EHR") payments for four program years.

The Provider objects to the improper calculation of Provider's Medi-Cal Medi-Cal EHR incentive payments in their totality (adjustments 1-5). Among the bases for Provider's objection are, without limitation –

- Procedural defects invalidating the audit, including, without limitation, the Department's intentional delays in commencing the audit resulting in extreme prejudice to Provider, the failure to prorate the audit for the Program Year 2011, the lack of authority for this audit adjustment, and the failure to identify appropriate authority for the audit.

- The Department improperly zeroed out the Provider's discharges (adjustment 1), total hospital charges (adjustment 3), total hospital charity charges (adjustment 4) and Medi-Cal EHR payments (adjustment 5) and substantially reduced the Provider's Medi-Cal inpatient bed days (adjustment 2), even though it had sufficient documentation in its possession to substantiate the data utilized for the Provider's attestation. In fact, the Department had previously audited each of the cost reports that served as the underlying source documentation for the Provider's Program Year 2011 attestation. The total reduction in the Provider's Medi-Cal EHR payment is arbitrary and capricious.

Lisa Alder, Chief
*DHCS Office of Administrative*
*Hearings & Appeals*
January 29, 2019
Page 2

Provider's and its agent's addresses are as follows:

Provider's Address:
Marian Medical Center c/o Dignity Health
Reimbursement Department (Michael Bass)
10901 Gold Center Drive
Suite 300
Rancho Cordova, CA 95670

Authorized Agent and Individual Authorized to Receive All Documents:

Felicia Y Sze, Esq.
Athene Law, LLP
5432 Geary Blvd., #200
San Francisco, CA  94121
(415) 686-7531
E-mail felicia@athenelaw.com

Please let me know if you would like to discuss this matter further.

Sincerely,

Felicia Y Sze

Cc:     Assistant Chief Counsel
        Department of Health Care Services
        Office of Legal Services, MS 0010
        P.O. Box 997413
        Sacramento, CA 95899-7413

        Maria L. Delgado, Chief
        Audits Section – Los Angeles
        311 S. Spring St., 10th Floor
        Los Angeles, CA 90013

# EXHIBIT 3



**DHCS**

JENNIFER KENT
*DIRECTOR*

State of California—Health and Human Services Agency
# Department of Health Care Services



GAVIN NEWSOM
*GOVERNOR*

AUG 2 7 2019

**CERTIFIED MAIL NO. – 7018 0040 0000 6802 5579**

Felicia Y Sze, Esq.
Athene Law, LLP
5432 Geary Blvd., #200
San Francisco, CA 94121-2307

Felicia@athenelaw.com

Irina Kachagin, Esq.
Department of Health Care Services
Office of Legal Services, MS 0010
P.O. Box 997413
Sacramento, CA 95899-7413

Irina.Kachagin@dhcs.ca.gov

In the Matter of:

MARIAN MEDICAL CENTER
NATIONAL PROVIDER ID: 1760510937
PROGRAM YEAR: 2011
CASE NUMBER:  EHR19-1211-959K

DEPT. OF HEALTH CARE SERVICES
AUDITS AND INVESTIGATIONS

MEDI-CAL PROGRAM

Dear Ms. Sze and Ms. Kachagin:

On December 27, 2018, the Department of Health Care Services (Department) issued
an audit report to Marian Medical Center (Provider), which reflected audit findings made
for the program year 2011 (Audit Report). Provider had 60 days from the date of receipt
of the Audit Report to file its appeal. (Cal. Code Regs., tit. 22, § 51022, subd. (a)(1).)
Provider's request for hearing and Statement of Disputed Issues (SODI) dated
May 16, 2019, was filed with the Office of Administrative Hearings and Appeals on
May 20, 2019.[1]  This was beyond the 60-day time limit for requesting a hearing and,
therefore, by letter dated June 4, 2019, the tribunal denied Provider's request.

---

[1] The term "file" means the delivery of a pleading or other paper to, and its date stamping by, the Office of
Administrative Hearings and Appeals.  (Cal. Code Regs., tit. 22, § 51016, subd. (a)(15).)

Felicia Y Sze, Esq.
Irina Kachagin, Esq.
August 27, 2019
Page 2


The tribunal's letter provided that the denial was final unless the Provider could establish in writing good cause for the late filing. The letter specified that such a showing must be established within 15 calendar days of notification of the untimeliness of its request. (Cal. Code of Regs. tit. 22, § 51022 subd. (c).)

In response, Provider, by and through its attorney Felicia Sze, submitted a letter dated June 17, 2019, in which Provider argued that the audit regulations cited by the tribunal (Cal. Code Regs., tit. 22, § 51016 et seq.) were inapplicable to Electronic Health Records (EHR) audits, and in which Provider sought to establish good cause for its untimely appeal.

Provider argued that the 60-day timeframe for requesting a hearing set forth in section 51022, subdivision (a)[2] does not apply to its appeal because the EHR audit does not involve reimbursement to the Provider for services rendered to Medi-Cal beneficiaries, nor does the Provider seek an appeal under section 51017, under which the 60-day timeframe would apply. Provider thus concluded that the tribunal cannot deny its request for a formal hearing to challenge the EHR audit findings.

Provider also argued that good cause exists for the late filing. Specifically, Provider argued that:

> Although the EHR Audit report is dated December 27, 2018, no responsible employee of Provider learned of its findings until April 24, 2019;

> Although the EHR Report was addressed to the Provider's Reimbursement Department, no employee in the Reimbursement Department learned of the EHR Report's findings until April 24, 2019;

> The provider's employee, to whom the EHR Audit report was specifically addressed, also did not learn of the findings of the audit until April 24, 2019; and

> The Provider acted diligently upon learning of the need to appeal the audit findings by promptly filing the SODI dated May 16, 2019, about three weeks after learning of the Audit findings.

---

[2] All references are to California Code of Regulations, title 22, unless otherwise noted.

Felicia Y Sze, Esq.
Irina Kachagin, Esq.
August 27, 2019
Page 3

By letter dated June 21, 2019, the tribunal provided the Department the opportunity to comment on Provider's good cause submission. On July 8, 2019, the tribunal received the Department's timely-filed comments opposing Provider's assertion of good cause.

The tribunal has reviewed and considered the parties' arguments and concludes that the Department's audit regulations at California Code of Regulations, title 22, section 51016 et sequentes apply to EHR audit appeals, and that the Provider failed to establish good cause for filing a late appeal.

## Applicability of Medi-Cal Audit Appeal Regulations

California established and administers the Medi-Cal Electronic Health Records Incentive Program (Program)[3] which provides incentive payments to Medi-Cal providers for the implementation and use of electronic health records systems.  The program is administered in accordance with the State Medicaid Health Information Technology Plan (Plan)[4, 5] which is required to establish, inter alia, audit and appeals processes.[6] The Plan adopts the administrative hearing process referenced in Welfare and Institutions Code section 14171 and its implementing regulations at California Code of Regulations, title 22, section 51016 et sequentes for appeals of EHR overpayment determinations arising from an audit.[7]  Accordingly, the cited audit appeal regulations apply to the instant appeal.

## Good Cause

California Code of Regulations, title 22, section 51022, subdivision (c) provides that all late requests for a hearing shall be denied and the audit or examination findings deemed final unless the provider establishes in writing good cause for the late filing.

The audit appeal regulations do not define "good cause."  We therefore look to other sources to aid our construction of the term.

In *County of Santa Clara v. Myers* (1983) 148 Cal.App.3d 684, a case similar to the present matter, the court asserts that "[t]he concept of good cause should not be enshrined in legal formalism; it calls for a factual exposition of a reasonable ground for the sought order.  The good cause may be equated to a good reason for a party's

---

[3] Welf. & Inst. Code, § 14046, et seq.
[4] Welf. & Inst. Code, § 14046.1, subd. (a).
[5] The State Medicaid Health Information Technology Plan is entitled: "California State Medi-Cal Health Information Technology Plan."
[6] Welf. & Inst. Code, § 14046.1, subd. (b)(5).
[7] California State Medi-Cal Health Information Technology Plan (Sept. 9, 2011), §§ 4.3.3;  *see also* California State Medi-Cal Health Information Technology Plan (Oct. 2018)  §§ 3.7, 3.8. 4.2, 4.3.

Felicia Y Sze, Esq.
Irina Kachagin, Esq.
August 27, 2019
Page 4

failure to perform that specific requirement from which the party seeks to be excused. [Citation.]" (Id. at p. 690.)  Further, it is a concept that is to be liberally construed. (*Id.* at p. 691.)

In the instant matter, the audit report was addressed to Robert Flores, Reimbursement Manager, Dignity Health, 251 South Lake Avenue, 8th Floor, Pasadena, CA 91101 and was sent via certified mail.[8]  The certified mail return receipt was signed on January 8, 2019, by an individual at Provider's address whose name is illegible.[9]  The certified mail return receipt establishes that Provider received the Audit Report on January 8, 2019.  Accordingly, Provider had until March 9, 2019, to file its SODI.

Provider, however, waited more than four months after receiving the Audit Report to file its SODI.  Provider argued that no responsible employee, no employee in its Reimbursement Department, nor the employee to whom the Audit Report was specifically addressed learned of the Audit Report until April 24, 2019, yet Provider offered no reason as to why.

Based on the foregoing, the tribunal concludes that Provider failed to establish good cause for filing a late appeal.  Provider's request for an administrative hearing is therefore denied.


Sincerely,

Patricia Freeman
Chief Administrative Law Judge

cc:   Judith Recchio                             Judith.Recchio@dhcs.ca.gov
      Sr. Assistant Chief Counsel
      Denise Ackerman                          Denise.Ackerman@dhcs.ca.gov
      Assistant Chief Counsel
      Lana Alton, Sr. Legal Analyst            Lana.Alton@dhcs.ca.gov
      Department of Health Care Services

---

[8] Exhs. 8 and 9 attached to Decl. of Ken Lo in Support of Dept. Response to Provider Assertion of Good Cause.
[9] See footnote 8.

# EXHIBIT 4



California Department of
**HealthCareServices**





# California State Medi-Cal Health Information Technology Plan

**September 9, 2011**

# TABLE OF CONTENTS

1  California's "As-Is" HIT Landscape ................................................................................ 4
  1.1  Overview ........................................................................................................... 4
  1.2  EHR Adoption Landscape .................................................................................. 5
  1.3  EHR Adoption by Practitioners ........................................................................... 7
  1.4  EHR Adoption by Hospitals .............................................................................. 10
    1.4.1  California's Critical Access Hospital Landscape .................................. 12
    1.4.2  EHR Adoption by Children's Hospitals ................................................. 14
  1.5  EHR Adoption by Community Clinics ................................................................ 14
  1.6  EHR Adoption by Large Medical Groups and Independent Practice Associations .... 16
  1.7  EHR Adoption by Indian Health Clinics ............................................................ 17
  1.8  Regional Extension Centers ............................................................................. 18
  1.9  Vulnerable Populations .................................................................................... 21
    1.9.1  Children in Foster Care in California .................................................... 21
    1.9.2  Mental Health and Substance Use Disorders ...................................... 22
  1.10  Broadband Internet Access ............................................................................ 24
  1.11  Health Information Exchange .......................................................................... 25
    1.11.1  State HIE/HIT Coordination ............................................................... 25
    1.11.2  State Designated Entity ..................................................................... 30
    1.11.3  Community Health Information Exchanges ......................................... 32
    1.11.4  HIE Infrastructures of Large Provider Organizations ......................... 34
    1.11.5  Community-based Organizations ....................................................... 34
    1.11.6  California Privacy and Security Advisory Board (CalPSAB) ............... 35
  1.12  Additional HIE Functions ................................................................................ 36
    1.12.1  e-Prescribing ..................................................................................... 36
    1.12.2  Medi-Cal Providers and Pharmacies ................................................. 37
    1.12.3  California's e-Prescribing Pilots ......................................................... 39
    1.12.4  e-Prescribing of Controlled Substances ............................................ 43
    1.12.5  Electronic Laboratory Reporting ........................................................ 43
  1.13  Public Health Reporting and Surveillance ....................................................... 46
    1.13.1  Laboratory and Disease Reporting .................................................... 46
    1.13.2  Immunization Registries .................................................................... 48
  1.14  IT Infrastructure and MITA ............................................................................. 50
    1.14.1  MMIS .................................................................................................. 50
    1.14.2  MITA .................................................................................................. 51
  1.15  IT Workforce Development .............................................................................. 52
  1.16  Interstate Exchange Activities ........................................................................ 53
  1.17  The Legal Landscape ..................................................................................... 54
2  California's "To-Be" HIT Landscape ............................................................................. 55
  2.1  California's 5-Year Plan ................................................................................... 55
  2.2  IT Architectural Changes ................................................................................. 57

2.3      Provider Technical Assistance ...................................................... 60
2.4      Provider and Beneficiary Outreach Campaign ............................... 62
   2.4.1    Overarching Strategic Plan ...................................................... 66
   2.4.2    Perceptions & Barriers for Providers and Beneficiaries ........... 67
   2.4.3    Campaign Phases ................................................................... 72
3   **Administration & Oversight of the Program** .................................... **82**
3.1      State Level Registry (SLR)........................................................... 82
   3.1.1    Overview................................................................................. 82
   3.1.2    SLR/NLR Interfaces ............................................................... 85
3.2      Provider Eligibility ....................................................................... 88
   3.2.1    Eligible Professional Types ..................................................... 89
   3.2.2    Eligibility Formulas for Professionals ..................................... 90
   3.2.3    Group/Clinic Eligibility ........................................................... 91
   3.2.4    Prequalification of Providers and Clinics ................................. 93
   3.2.5    SLR Workbook for Determining EP Eligibility.......................... 101
   3.2.6    Eligible Hospitals ................................................................... 106
3.3      Attestation for Incentive Payments............................................... 107
3.4      Payments..................................................................................... 108
   3.4.1    For Eligible Professionals ....................................................... 108
   3.4.2    For Eligible Hospitals ............................................................. 108
   3.4.3    Payment Processing ............................................................... 111
3.5      Verification and Validation............................................................ 117
   3.5.1    Prepayment Eligibility Verification for EP ................................ 117
   3.5.2    SLR Validation Stops .............................................................. 118
3.6      Appeals ....................................................................................... 122
3.7      Reporting ..................................................................................... 123
3.8      Help Desk .................................................................................... 124
3.9      Assumptions ................................................................................ 136
4   **California's Audit Strategies** ............................................................ **140**
4.1      Introduction ................................................................................. 140
4.2      Medical Review Branch: Audits of EPs ........................................ 141
   4.2.1    MRB EP Audit Landscape and Process.................................... 141
   4.2.2    Pre-Payment Audits ............................................................... 142
   4.2.3    Conjunction Audits (Post-Payment) ........................................ 142
   4.2.4    Focused Audits (Post-Payment) .............................................. 143
   4.2.5    Random Audits (Post-payment) ............................................... 143
   4.2.6    Audit for Recovery (AFR) Audits ............................................. 143
   4.2.7    MRB Audit Process ................................................................. 143
   4.2.8    Fraud and Abuse .................................................................... 144
   4.2.9    MRB Auditing Tools ................................................................ 145
   4.2.10   Auditing Techniques and Strategies ........................................ 146
   4.2.11   MRB Overpayment Tracking.................................................... 149
   4.2.12   MRB Continuing Development.................................................. 149
4.3      Financial Audits Branch – Audits of EHs and Clinic Providers ...... 150
   4.3.1    EH Audit Landscape and Process ........................................... 150

4.3.2    Pre-Payment Reviews/Audits ............................................................. 152
4.3.3    Post Payment Reviews/Audits ......................................................... 153
4.3.4    Fraud and Abuse Activities ............................................................. 154
4.3.5    FAB Data Resources ...................................................................... 155
4.3.6    FAB Continuing Development........................................................ 157
**5    California's HIT Roadmap ................................................................ 158**
5.1    2011-2012 Roadmap ........................................................................ 158
5.1.1    Enrollment/Verification/Payment.................................................... 159
5.1.2    Outreach and Technical Assistance ............................................. 161
5.1.3    Landscape Refinement and Evaluation ........................................ 163
5.1.4    Health Information Exchange and Public Health.......................... 164
5.2    Long Term Roadmap ........................................................................ 170
5.2.1    Health Information Exchange......................................................... 173
5.2.2    HIE and Meaningful Use ................................................................ 176
5.2.3    Conclusion ..................................................................................... 178

## 3.4   PAYMENTS

### 3.4.1   FOR ELIGIBLE PROFESSIONALS

The SLR designates the appropriate payment amount for the provider based upon the year for which they are receiving payment less any additional funding that is above the allowable threshold. The SLR is able to accommodate the two-thirds incentive payment for pediatricians meeting the 20% Medi-Cal eligibility threshold. The SLR also assures that only one payment per provider is issued per year, and does not calculate a payment for a provider that is ineligible (e.g. does not meet the 30% requirement). The SLR will also have functionality to limit the number of years of payments to any EP to six.

### 3.4.2   FOR ELIGIBLE HOSPITALS

The system will calculate the amount of the hospital incentive using the formula provided by CMS. As part of the registration and eligibility processes for hospitals, the system will gather all of the information required to complete the calculation. The SLR will display the calculation on a screen so that hospitals will be able to determine exactly how their incentive payments are calculated.

Calculation of the Overall EHR Amount is a one-time calculation based on the following steps:

- Calculate the average annual growth rate over three years using the Medicare/Medicaid Cost Reports prior to the most current Cost Report. Note that if a hospital's average annual rate of growth is negative over the three year period, it will be applied as such. Transition factors are applied to years one through four in the following amounts; Year One  – 1; Year Two – 75; Year Three – 5, and Year Four –.25.

- Calculate the total Medicaid discharges using the Medicaid discharges in the Medicare/Medicare Cost Reports plus the discharges where Medicaid is the secondary payer. Only discharges between 1149 and 23,000 per CCN will be allowable discharges.

- Calculate each of the next four year's total discharges by multiplying the previous year's discharges times the average computed growth rate.

- Calculate the Aggregate EHR Amount for each year by multiplying (total discharges times $200) plus the $2,000,000 base.

- Apply the appropriate transition factor to each year's Aggregate EHR Amount. (Year One – 100%, Year Two – 75%, Year Three – 50%, Year Four – 25%).

- Calculate the total Overall EHR Amount by adding the total of each year with the transition factor applied.
- Apply the Medicaid Share percentage to the Overall EHR Amount. (See Medicaid Share calculation below). This is the hospital's Medicaid Aggregate EHR Incentive amount.

Calculation of the Medicaid Share percentage:

- Total Medicaid days includes both the total Medicaid Days and total Medicaid HMO days from the Medicare/Medicaid Cost Report.
- Calculate the non-charity percentage. Divide the (total hospital charges less uncompensated care) by the total hospital charges.
- Calculate the non-charity days by multiplying the non- charity percentage times the total hospital days.
- Calculate the Medicare Share percentage by dividing the Medicaid days by the non-charity days.

DHCS has created a calculation worksheet for EHs that mirrors the calculation in the SLR application.

**FIGURE 22: HOSPITAL WORKBOOK**

| Medi-Cal EHR Incentive Program |
| Hospital Workbook |

**Input the required data in the ORANGE BOXES below.**

**STEP 1:   MEDICAID VOLUME (Medicaid Discharges/Total Discharges)**

**90-Day Representative Period:**

START DATE:

Choose a representative 90-day period within the prior federal fiscal year to determine your hospital's eligibility to participate in the program.

END DATE:

**Hospital Discharges:**

| TOTAL DISCHARGES | MEDICAID DISCHARGES |

You may use any auditable data source. Nursery and swing beds should not be excluded.

**Does your hospital have Medicaid discharges from other states that you are including to establish eligibility and payments?**

Enter Yes/No

Hospitals (except children's hospitals) must have a Medicaid volume ≥ 10% to be eligible.

**Medicaid Volume Percentage:**



Data sources from the Medicare hospital cost report are designated on the worksheet for each required data element. If charity care charges are not available, DHCS will allow data for uncompensated care to be used instead of charity care charges. If neither charity care data nor uncompensated care cost data are available, DHCS will set the charity care ratio to one. Hospitals submitting cost reports after May 1, 2010 use cost report version form CMS 2552-10. Any Medicare Cost Report prior to that date will have used version form CMS 2552-96. CMS has made charity care reporting mandatory after February 2010, and therefore 2010 Medicare Cost Report data on charity care may be more reliable than previous cost reports.

For the purpose of calculating the Medicaid discharges, DHCS will allow hospitals to count discharges when Medicaid is the primary or secondary payer. This method is in accordance with the instructions from the CMS Facts, Answers and Questions section published on the CMS website.

"Medicaid Share," which is applied against the aggregate EHR incentive amount, is essentially the percentage of a hospital's inpatient non-charity care days that are attributable to Medicaid inpatients. DHCS will only allow the hospital to count the Medicaid primary days for the purpose of calculating the Medicaid patient volume. This method is in accordance with the instructions from the CMS Facts, Answers and Questions section published on the CMS website.

The estimated amounts for total charges and charity care charges used in the formula must represent inpatient hospital services only and exclude any professional charges associated with the inpatient stay.

DHCS plans to pay the aggregate hospital incentive payment amount in four annual payments, contingent on the hospital's annual attestations and demonstrations of meaningful use. In the first year, if all conditions for payment are met, 50% of the aggregate amount will be paid to the EH. In the second year, if all conditions for payment are met, 30% of the aggregate amount will be paid to the EH. In the third year and fourth year, if all conditions for payment are met, 10% of the aggregate amount will be paid to the EH for each year. Payments are extended over four years in order to increase the number of EHs incentivized to achieve Stage 2 meaningful use. No Medi-Cal EHs may begin receiving payments after 2016 and payments will not be made after the calendar year 2021. Prior to 2015, payments can be made to an eligible hospital on a non-consecutive annual basis.

## 3.4.3   PAYMENT PROCESSING

DHCS has determined that the most efficient intervals for delivery of incentive payments to recipients is every two weeks. This will take advantage of the existing payments processes currently in place for the state and also ensure that incentive payments are made within the timeframes required by the Final Rule and subsequent CMS findings.

The payment processing begins in the State Level Registry (SLR). The system captures the payment request, request status, appeals, final disposition, and previous payment information. The system includes sufficient storage capacity in preparation of capturing and tracking transactions between 2011 and 2022.

The role of the SLR is to send the payment information to the state's payment system based upon the MMIS Interface Standards. The MMIS system will be able to process

# EXHIBIT 5



California Department of
**Health**Care**Services**





# California State Medi-Cal Health Information Technology Plan

Appendices
**September 9, 2011**



**California Medi-Cal Health Information Technology Plan**

# Table of Contents

Appendix 1:    Summary of Recent HIT Surveys in California January 2011 ...................... 2
Appendix 2:    UCSF Researcher Bios ........................................................................... 4
Appendix 3:    Medical Board Survey on EHR Use......................................................... 8
Appendix 4:    Optometrists as Eligible Providers........................................................11
Appendix 5:    California Grantees and CIP Funding.....................................................13
Appendix 6:    Department of Mental Health's HIT Roadmap .......................................15
Appendix 7:    California eHealth Partners/Organizations.............................................19
Appendix 8:    Charters ..............................................................................................22
Appendix 9:    Assembly Bill No. 278 .........................................................................27
Appendix 10:   CalOHII Demonstration Projects...........................................................32
Appendix 11:   Vision for EHR Adoption by Medi-Cal Providers ..................................48
Appendix 12:   List of RECs, Associations, Organizations, and Managed Health Plans .....53
Appendix 13:   Provider Outreach Campaign Timeline...................................................56
Appendix 14:   SLR User Manual .................................................................................57
Appendix 15:   Physician Assistant Led Attestation......................................................100
Appendix 16:   Excluded AID Codes for Medi-Cal EHR Incentive Program ....................101
Appendix 17:   American Academy of Family Physicians Practice Profile Study .............102
Appendix 18:   Methodology for Identifying Panel Members...........................................103
Appendix 19:   Inland Empire Health Plan Letter...........................................................105
Appendix 20:   California Health and Safety Code 1204(a) .............................................107
Appendix 21:   California Primary Care Association Letter ..............................................108
Appendix 22:   Vendor Letter Template.........................................................................110
Appendix 23:   Attestation Forms for EH/EP .................................................................111
Appendix 24:   Project Plan.........................................................................................115
Appendix 25:   Project Schedule ..................................................................................133
Appendix 26:   List of Acronyms...................................................................................160



California Medi-Cal Health Information Technology Plan

## Appendix 14: SLR User Manual



Department of Health Care Services

CA-MMIS

California Medi-Cal State Level Registry (SLR) for the

CMS Provider Incentive Program

State Level Registry (SLR) User Manual

Eligible Hospitals

**V 0.08**

**09/01/2011**



**California Medi-Cal Health Information Technology Plan**

# 1.   Introduction

## 1.1   Overview

The overall goal of the User Manual is to help guide hospital providers through the process of completing California's application process for provider incentive monies.

## 1.2   User Manual Goals

The **California Medi-Cal State Level Registry (SLR) User Manual** will help walk you through the following steps:

How to create your SLR account.

How to access the SLR application.

How to register for the provider incentive program.

How to enter your eligibility information for the provider incentive program.

How to enter your attestation for your certified Electronic Health Record (EHR) technology.

How to submit your final attestation.

How to make changes to your account.

Who to call when you need help.

## 1.3   Problem Reporting

For general Help, all SLR web pages have a Help Link that opens up a copy of this User Manual. For SLR Web application assistance, you can contact the Help Desk designated to support the SLR.

**Phone: (866) 879-0109**
**Email:** SLRHelpdesk@acs-inc.com



**California Medi-Cal Health Information Technology Plan**

---

# 2.        Overview

As the healthcare landscape continues to modernize, recent legislation was passed to encourage the adoption of Electronic Health Record (EHR) technology in documenting patient care. Because of the American Recovery and Reinvestment Act of 2009, beginning in 2011, eligible Medi-Cal providers are being offered financial incentives for the implementation and meaningful use of Health Information Technology (HIT) in the management of patient populations.

The State Level Registry (SLR) application gives Eligible Hospitals access to a streamlined application for federally funded HIT incentives through an easy to use website. With self-service flexibility, the provider can move through registration, eligibility, and attestation at their own pace while the SLR application stores the information in an organized manner. Resulting in the most direct path for the provider to receive their incentive payment.

## 2.1        Application Features

The SLR application features the following functions that are explained further in this User Manual:

> Create your SLR user account
> Login – Accessing the SLR
>> o   Retrieve Your User ID
>> o   Retrieve Your Password
>> o   Reset Your Password
> Applying for the incentive as an Eligible Hospital (EH):
>> o   Step 1: About You (Registration)
>> o   Step 2: Eligibility Information
>> o   Step 3: Certified EHR Technology
>> o   Step 4: Attestation
>> o   Step 5: Submit
> View Messages
> View Reports
> View Payment Information

## 2.2        Application Architecture

The SLR Web application features the following:

> Compliance with Section 508 accessibility guidelines.
> Accessibility from the internet.
> Secure protected page access.

## 2.3        Materials and Preparations

Materials the user will need to use the software:

> Computers with access to the web browser.
> Note: This application is compatible with Microsoft Internet Explorer v7.0 and v8.0, Firefox, Safari, and Chrome.
> Software – Adobe Acrobat Reader – installed on your machine to view PDF files.
> Pop-up Blocker browser feature should be set to "Off" to receive the Pop-up window features.
> Manuals and/or FAQ's that are available for distribution.



**California Medi-Cal Health Information Technology Plan**

---

# 3.       Provider Outreach Web Portal

The Provider Outreach Web Portal provides the user with a central location to access information and resources regarding the Provider Incentive Program established through the American Recovery and Reinvestment Act, in addition to the portal to the California Medi-Cal EHR State Level Registry site at www.medi-cal.ehr.ca.gov.

## The Provider Outreach page displays the following:

1. **Provider Outreach Page Header.** The header displays the following items that are visible on every page of the SLR application:

    a. **Logo of California Department of Health Care Services (DHCS).** Link to state department website.

    b. **Contact Us.** Pop-up page displaying contact information including the Help Desk phone number and email as well as the DHCS email address for the incentive program.

2. **Left side panel content.**

    a. **Step 1: Register with CMS!** The "registering with CMS" link directs you to the designated website for registering as a health provider with the Centers for Medicare & Medicaid Services.



    b. **Step 2: Create an SLR Account.** The "Create a Medi-Cal EHR Incentive Portal account" link directs you to the "Create Account" page.





**California Medi-Cal Health Information Technology Plan**

c.  **Already have an SLR account?** The "go directly to the Medi-Cal EHR Incentive Portal" link directs you to the "Login" page.



d.  **Centers for Medicare & Medi-Cal Services (CMS).** Links in this section opens up a new window and displays CMS news.



e.  **Healthcare IT News.** Links in this section opens up a new window and displays an article related to Healthcare IT news.



**California Medi-Cal Health Information Technology Plan**

   f.  **EMR and HIPPA.** Links in this section opens up a new window and displays an article related to EMR and HIPPA news**.**



3. **Right side panel content.**
   a.  **Are you Eligible?** The "Run the CMS Eligibility Wizard" link opens up a new window and runs a test to verify that a provider qualifies for incentive payments.



   b.  **Frequently Asked Questions.**

     i.  The "Medi-Cal EHR Incentive Program FAQs" link directs you to the DHCS frequently asked questions website related to electronic health record (EHR) technologies and the incentive program.



**California Medi-Cal Health Information Technology Plan**

    ii.    The "CMS EHR Incentive Program FAQs" link directs you to CMS frequently asked questions website related to electronic health record (EHR) technologies and the incentive program.

  c.  **Downloadable Resources.** Links in this section opens a worksheet in Excel to assist with determining Eligibility and Attestation for Provider Incentive Payments.

> Downloadable Resources
>
> (all links open in new window)
>
> Eligible Hospitals
>
> CA EH Eligibility Workbook

4. **Primary Body Content section.** The primary page content includes the following sections:

  a.  **Welcome text.** An overview of the Provider Outreach Web portal.

  b.  **Important Web Resources.** Links in this section open up a new window and displays the appropriate website.

    i.    **CMS EHR Incentive Program Registration Site.** Opens a new window and displays the **Official Web Site for the Medicare and Medicaid EHR Incentive Programs**.

    ii.    **CMS EP Registration User Guide.** Opens a new window and displays the CMS users guide for registering with the federal EHR Incentive Program.

    iii.    **Centers for Medicare & Medicaid Services (CMS).** Opens a new window and displays the home page for the CMS EHR Incentive Program.

    iv.    **Department of Health Care Services.** Opens a new window and displays the DHCS Office of Health Information Technology website.

    v.    **Medi-Cal.** Opens a new window and displays the home page for the California Medi-Cal program.

    vi.    **ONC Certified Health IT Products.** Opens a new window and displays the **Certified Health IT Product List**.

    vii.    **California eHealth.** Opens a new window and displays the CA Health and Human Services page for provider information on the EHR Incentive Program.

    viii.    **Cal eConnect.** Opens a new window and displays the home page of a health information exchange resource website.

    ix.    **California Department of Public Health.** Opens a new window and displays the CA state department website discussing meaningful use of Health Information Technology.

    x.    **Medi-Cal EHR Incentive Program General Information.** Opens a new window and displays a DHCS article giving an overview of the Medi-Cal EHR Incentive Program.



**California Medi-Cal Health Information Technology Plan**

c. **Regional Extension Centers (REC).** Link in this section opens a new window and displays the REC website.

 i.  California **Health Information Partnership & Services Organization (CalHIPSO).** Opens a new window and displays the site for the REC resource site for CA, excluding the Los Angeles and Orange Counties.

 ii.  **California Rural Indian Health Board.** Opens a new window and displays a resource for healthcare providers of the member Tribes of California.

 iii.  **CalOptima.** Opens a new window and displays the site for the REC resource site for Orange County.

 iv.  **HITEC-LA.** Opens a new window and displays the site for the REC resource site for Los Angeles County.



**California Medi-Cal Health Information Technology Plan**

The image below illustrates the primary body content of the Providers Outreach page.

---

## Welcome to the Medi-Cal EHR State Level Registry (SLR) for Provider Incentive Payments — Provider Outreach Page

As a result of the American Recovery and Reinvestment Act, beginning in 2011 Medi-Cal is able to offer eligible practitioners and hospitals substantial financial incentives to adopt, implement and upgrade electronic health records. Incentive payments will also be available for the "meaningful use" of electronic health records by practitioners (over 6 years) and hospitals (over 4 years).

Practitioners and hospitals are required to first register for the program through CMS. The next step is to register with the state-level registry through this portal. This portal also provides links to valuable resources for practitioners and hospitals planning EHR implementation and other health information technology efforts.

Thank you for joining Medi-Cal in realizing the vision of "Connecting California for Better Health."

**Important Web Resources** (all links open in new window)

- CMS EHR Incentive Program Registration site (Available October 3, 2011)
- CMS EP Registration User Guide
- Centers for Medicare & Medicaid Services (CMS)
- Department of Health Care Services
- Medi-Cal
- Office of the National Coordinator for Health Information Technology (ONC) Certified Health IT Product List
- California eHealth
- Cal eConnect
- California Department of Public Health
- 🗎 Medi-Cal EHR Incentive Program General Information — Department of Health Care Services

**Regional Extension Centers (REC)** (all links open in new window)

The HITECH act provides for the establishment of RECs to provide education, outreach, and technical assistance to help primary care providers in their geographic service areas to select, successfully implement and meaningfully use certified Electronic Health Record technology to improve the quality and value of health care.

- California Health Information Partnership & Services Organization (CalHIPSO)
- California Rural Indian Health Board
- CalOptima
- HITEC-LA



---

5. **Footer section.** Located at the bottom of the page, the footer displays the following items:
   a. **Privacy.** Opens a new window to the DHCS Privacy policy.
   b. **Conditions of Use.** Opens a new window to the DHCS Conditions of Use policy.
   c. **Accessibility.** Opens a new window with the website's Accessibility policy displayed.
   d. **State of California Copyright.**



**California Medi-Cal Health Information Technology Plan**

# 4.    California Medi-Cal State Level Registry (SLR)

## 4.1    Create a New SLR Account for Hospital Representatives

Follow the steps below to create and log on to the California Medi-Cal State Level Registry (SLR) for the CMS Provider Incentive Program.

> Note: The Hospital representative should have already completed their registration with CMS by using the "registering with CMS" link on the Provider Outreach Page.



1. Click the "leave this site and create an SLR account" link located on the upper left hand corner of the Provider Outreach webpage. User will be taken to the logon site to create a new user account.

   > Reference: The State Level Registry (SLR) site can be accessed directly by going to the following website - https://www.medi-cal.ehr.ca.gov/

   > Note: The CA State Level Registry URL is secured – "https:"



2. Click the **Create Account** button.





**California Medi-Cal Health Information Technology Plan**

---

3. Complete "Identify Yourself" window fields to create account:



a. Select **Hospital Representative** from the drop down menu.



b. Input Hospital's National Provider Identifier (NPI) into field.

   <u>Note</u>: If more than one NPI is available, then use the NPI used for the CMS EHR Incentive registration.

c. Input Hospital's Taxpayer Identification Number (TIN) into field.



d. Type characters into field from the security CAPTCHA image.

   In the event that the CAPTCHA image is not clear, click "new image" link to display a new image.

e. Click the "**Continue**" button to submit for new account creation.



**California Medi-Cal Health Information Technology Plan**

The **"Cancel and return to Login"** link will exit the screen without the submission of data.

4.  In the new "Is This You" window, confirm Name, Address, and Additional information associated with the NPI entered into Create Account screen.



a.  Complete the Create a New SLR Account section:

| To... | Click/Call... |
|---|---|
| save data | **Yes, Continue** button |
| Re-enter the eligible hospital NPI | **No, Go back** button and return to step 3.a of this manual |
| Speak with the Help Desk | (866) 879-0109 for assistance |

## 4.1.1    Create Logon for SLR Account

Follow the steps below to complete the "Create Account" process and set the User ID, Password, Challenge Question, and Contact Information.

```
Create Login
Enter the necessary information below and click Create Account. * Indicates required fields.
                              User ID *  [            ]
                             Password *  [            ]
                     Confirm Password *  [            ]
         Select a Challenge Question *   [Select...              ▼]
          Your Answer to the Question *  [            ]
                                Phone *  [            ]
                                         9999999999 (no spaces, dashes, parens)
                        E-mail Address * [            ]
                                         name@domain.com

              [Create Account →]    Cancel and return to Login
```
Click Create Account to continue.

1.  Input desired User ID.
    <u>Information</u>:  The User ID needs to be at least 8 letters/numbers long but cannot be more than 20 characters.



**California Medi-Cal Health Information Technology Plan**

2. Input Password.
    <u>Information</u>: The password needs to be at least 8 letters/numbers long but cannot be more than 20 characters. The following are guidelines when setting up a new password. The new password must contain:

    > at least one capital letter
    > at least one lower case letter
    > at least one number
    > at least one of the following special characters: @ or # or!

The password cannot be the User ID forwards or backwards. In addition, a previous password may not be used.

3. Confirm password by reentering in the "Confirm Password" field.

4. Select a Challenge Question from the drop down menu to answer.

5. Input answer to selected Challenge Question.

6. Input contact phone number.

7. Note: input phone number with no spaces, dashes, or parenthesis.

8. Input the contact email address.

9. Click the "Create Account" button to finish creating the account.

10. Click the "Cancel and return to login" to exit the account creation process.

11. Click the "continue to Login" button after confirming the "Account successfully created" message.

# Create Account

| ✓ User Account has been successfully created! |
|---|

| ❓ Please click here to log into your account. |
|---|

| Continue to Login ← | Click Contine to return to Login page |
|---|---|



**California Medi-Cal Health Information Technology Plan**

## 4.1.2    Forgot User ID for SLR

Use the following steps to have the User ID emailed to the account on record.

1.  Click the **Forgot User ID** link from the login page.

2.  Select the **Hospital Representative** user role from the drop down list.



3.  Input Hospital's National Provider Identifier (NPI) into field.
    Note: If more than one NPI is available, then use the NPI used for the CMS EHR Incentive registration.



4.  Input Hospital's Taxpayer Identification Number (TIN) into field.

5.  Click **Continue** to move to next screen.

6.  Input answer to previously selected Challenge Question.



7.  Click **Continue** to move to next screen.

8.  Look for confirmation of system email sent to Hospital Representative.

> ? An email has been sent containing the requested information.

9.  Click **Cancel and return to Login** link to return to login screen.

10. Retrieve system generated email sent to the Hospital Representative's email account from "California State Level Registry System Messages".

11. Log into the SLR as normal using the emailed User ID.

## 4.1.3    Forgot Password for SLR

Use the following steps to have a link sent to the email account on record in order to reset the user password.

1.  Click the **Forgot Password** link from the login page.

2.  Input the User ID into the input field.

3.  Click **Continue** to move to next screen.

4.  Input answer to previously selected Challenge Question.

5.  Click **Continue** to move to next screen.



**California Medi-Cal Health Information Technology Plan**

6. Look for confirmation of system email sent to Hospital Representative.

An email has been sent to the email address on file for the User ID you entered. When the email arrives, click the link provided in the email and you will be taken to a screen where you can reset your password.

7. Click **Return to Login** link to return to login screen.

8. Retrieve system generated email sent to the Hospital Representative's email account from "California State Level Registry System Messages".

9. Click the link provided in the email to reset.

10. Input a new password in the **New Password** field.

New Password *  [                    ]

Confirm New Password *  [                    ]

Information:  The password needs to be at least 8 letters/numbers long but cannot be more than 20 characters. The following are guidelines when setting up a new password. The new password must contain:

at least one capital letter.
at least one lower case letter.
at least one number.
at least one of the following special characters: @ or # or!

The password cannot be the User ID forwards or backwards. In addition, a previous password may not be used.

11. Re-input password into **Confirm New Password** field.

12. Click the **Change Password** link to submit requested password change.

13. Click the "**Continue to Login**" button after confirming the "Password Reset" message.

┌─ Password Reset ────────────────────────────────
│  ✓  Your password has been reset. Select Continue to proceed to the login screen.
│
└─────────────────────────────────────────────────

[ Continue to Login → ]

14. Log into the SLR as normal using the new password selected by Hospital Representative.

DHCS

**California Medi-Cal Health Information Technology Plan**

## 4.2    Log on to the State Level Registry (SLR) system

Follow the steps below to log on to the SLR.



1.  Enter user logon in the "User ID" field.

2.  Enter user password In the "Password" field.

3.  Click the "log In" button to access the SLR.

### 4.2.1    Accepting the End User License Agreement (EULA)

Once the Login is complete, the Hospital Representative is presented with the End User License Agreement (EULA). The EULA is the licensing agreement between the Department of Health Care Services and the Hospital Representative for use of the SLR and must be accepted in order to continue.

**California Department of Health Care Services**
**California Medi-Cal Electronic Health Record (EHR) Incentive Program**
**End User License Agreement and Terms of Use**
ACCEPTANCE OF TERMS

Indicate your acceptance of the End User License Agreement below. * indicates required fields.

The services that California Department of Health Care Services (CA-DHCS) provides to you are subject to the terms and conditions of this End User License Agreement and Terms of Use ("this Agreement"). This Agreement governs the use of all data and software available at this site ("Site"). Please read the rules contained in this Agreement carefully.You can access this Agreement at any time by clicking on User Agreement at the bottom of every page on this Site. If you do not agree to abide by this Agreement, your access to any other pages of this Site will be denied. Clicking on the "I Agree" button at the end of this Agreement and accessing this Site constitutes your acceptance of this Agreement. Continued access to this Site will constitute your acceptance of any amendments to this Agreement. Your failure to follow the terms and conditions for use of this Site, whether listed below or in bulletins posted at various points in this Site, may result in suspension or termination of your access to this Site, without notice, in addition to other remedies available to CA-DHCS.

**1. DEFINITIONS**
In addition to the terms defined elsewhere in this Agreement, for purposes of this Agreement the following terms shall be defined as specified below:

a.  Authorized Employee shall mean an employee of a Provider who needs to access this Site to perform their duties for the Provider and who the Provider properly trained regarding use of this Site, the Services, the Software, HITECH, and HIPAA. Provider is responsible for the actions of its Authorized Employees.

b.  HIPAA shall mean the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, all implementing regulations and all amendments

☐ * I Agree with the End User License Agreement.   Print EULA

Click to accept Agreement    Continue    Cancel and return to Log in

1.  Read the EULA in full.

2.  Click the "Print EULA" to print the agreement for user records.



**California Medi-Cal Health Information Technology Plan**

3. Click the check box to agree to the EULA.
   Note: The EULA must be accepted once a year or when the EULA has been updated.

4. Click the "Continue" button to continue to the SLR Homepage.

# 4.3    SLR Homepage

The SLR homepage is the center of the application and is the place from which the Eligible Hospital will apply for the Medi-Cal provider incentive.

From the Homepage the hospital provider has the ability to:

1. Make changes to their user account through the "My Account" link.

2. Review the instructions for completing the SLR registration with the "User Manual" link.

3. Retrieve the helpdesk information through the "Contact us" link.

4. Retrieve system messages regarding Payments, Reporting, Audits, Appeals, and System communications.

5. Access the SLR workflow steps to complete Registration and Attestation for the incentive program.
   Step 1: About You (Registration)
   Step 2: Eligibility Information
   Step 3: Certified EHR Technology
   Step 4: Attestation
   Step 5: Submit





**California Medi-Cal Health Information Technology Plan**

## 4.4 My Account Functionality

The My Account link on the homepage provides the user the ability to update user information including changing passwords, challenge question, phone number, and email address.



Changing the contact information in the My Account screen does not change the contact information set up under the About You page or the contact information provided by CMS in the registration process. SLR generated messages will be sent to all email accounts recorded for this provider. **Reset Password messages will only be sent to the email account listed under the My Account Page.**

### 4.4.1 Voluntary Password Change in My Account

The Hospital Representative user password is valid for 74 days. When expiration period has passed, a Reset Password page will appear allowing the representative to change their password.

In addition, the user password may be changed prior to the 74 day expiration period through the My Account link on the SLR application homepage.

Follow the steps below to change the user password.

1. Click the **My Account** link.

2. Input Password.
   Information:  The password needs to be at least 8 letters/numbers long but cannot be more than 20 characters. The following are guidelines when setting up a new password. The new password must contain:
   > at least one capital letter.
   > at least one lower case letter.
   > at least one number.
   > at least one of the following special characters: @ or # or!

   The password cannot be the User ID forwards or backwards. In addition, a previous password may not be used.

3. Confirm password by reentering in the "Confirm Password" field.

4. Complete the My Account section:

| To... | Click... |
|---|---|
| save data | **Save** and wait for the system confirmation. |
| | ✓                                    *Account is Updated.* |
| exit screen without saving inputs | **Cancel and Delete Changes**. |

5. Click **Back to Dashboard** to return to SLR Dashboard.

« Back to Dashboard



**California Medi-Cal Health Information Technology Plan**

### 4.4.2    Voluntary Challenge Question Change in My Account

Follow the steps below to change the Challenge Question.

1.  Click the **My Account** link.
2.  Select a Challenge Question from the drop down menu to answer.
3.  Input answer to selected Challenge Question in "Your Answer to the Challenge Question" field.
4.  Complete the My Account section:

| To... | Click... |
|---|---|
| save data | **Save** and wait for the system confirmation. <br> ✓ *Account is Updated.* |
| exit screen without saving inputs | **Cancel and Delete Changes**. |

5.  Click **Back to Dashboard** to return to SLR Dashboard.

« Back to Dashboard

### 4.4.3    Update Phone Number and Email in My Account

Follow the steps below to change the Hospital Representative phone number and email address.

1.  Click the **My Account** link.
2.  Input new Phone number in the "Phone" field.
3.  Input new email address in the "Email Address" field.
4.  Complete the My Account section:

| To... | Click... |
|---|---|
| save data | **Save** and wait for the system confirmation. <br> ✓ *Account is Updated.* |
| exit screen without saving inputs | **Cancel and Delete Changes**. |

5.  Click **Back to Dashboard** to return to SLR Dashboard.

« Back to Dashboard



**California Medi-Cal Health Information Technology Plan**

## 4.5    Step 1. About You Section

The State of California requires that additional information be provided to be used to determine eligibility to participate in the Medicaid Incentive Program.

Follow the steps below to complete the About You section of the California State Level Registry.

1. Click the link **1. About You** to access screen.

2. Confirm that the CMS Medicaid EHR Incentive Program Registration Data has been received.

> ✅ Data has been received from the CMS Registration & Attestation site. <u>View CMS Data</u>

<u>Note</u>: Use the **Register with CMS** link to access and complete hospital registration with CMS, if not completed previously. Registration data from CMS may take up to 3 days to migrate to the CA State Level Registry system.

> ⓘ Data has NOT been received from the CMS Registration & Attestation Site. <u>Register with CMS</u> ⊠

3. Under the Contact Person section, confirm the name of the hospital representative in the "Name" field. If incorrect, update with the correct name of the hospital representative.

4. Input the title of the hospital representative in the "Title" field.

5. Confirm the contact phone number and update, if necessary.

6. Confirm the contact email address and update, if necessary.

7. Complete the About You section:

| To... | Click... |
|---|---|
| save data and remain in the screen for further editing | **Save** |
| save data and move to step 2. Eligibility Information | **Save and Continue** |
| exit screen without saving inputs | <u>Cancel and Delete Changes</u>, then **Back to Dashboard** |

## 4.6    Step 2. Eligibility Information

Provide the patient volume information to show hospital eligibility for the Medi-Cal Incentive Program. The registration of Eligible Hospitals (EH) is dependent upon the EH meeting the Medi-Cal volume requirements.

To be eligible for the Electronic Health Record Incentive Program for Medicaid providers the eligible hospital must meet the following criteria:

Must have at least a 10 percent Medi-Cal patient volume for each year which the hospital seeks an EHR incentive payment.

Children's hospitals are exempt from meeting a patient volume threshold.

### 4.6.1    Hospital Medicaid Volume

Follow the steps below to fill out the Medicaid volume eligibility section.

1. Input the start date for the preferred **90 day representative period** from within the prior federal fiscal year end (October 1-September 30).
   Note: the full 90 day period must be within the previous federal fiscal year end.

   **Start Date** ＊ [                ] 📅          **End Date** ＊ mm/dd/yyyy

2. Input **Total Discharges** for representative period, excluding numbers for the nursery and swing bed patients.

   Total Discharges ＊ [                        ]
   Medicaid Discharges ＊ [                        ]

3. Input **Medicaid Discharges** for representative period, excluding values for nursery and swing bed patients.

4. Indicate whether discharge values from other states are included in the "**Total Discharges**" number above.

   **Include Medicaid discharges from** ＊  ○ Yes ＊  ◉ No ＊
   **other states?**

5. Confirm Hospital Medicaid Volumes meets eligibility requirements.

   Medicaid Volume   [ 30.00 ] %

   ✓ Meets Medicaid Eligibility Requirements? Yes

   In the event that the Hospital Medicaid Volumes do not meet the eligibility requirements, DHCS recommends selecting a different 90 day period with which to apply from.

### 4.6.2    Average Length of Stay (ALOS)

Follow the steps below to fill out the Average Length of Stay section.

1. Input the year of the current Cost Report totals.

   **Current Cost Report Year** ＊ [                ]

   Enter the year of your Hospital's most current cost report.

2. Input total Inpatient Bed Days.

   **Total Inpatient Bed Days** ＊ [                ]

   Total Inpatient Bed Days come from the CMS Cost Report 2552. See the below help text from the SLR to calculate the value.

   **Use CMS Cost Reports (CMS 2552-96 or CMS 2552-10) to acquire data.**

   If using CMS 2552-96: Worksheet S-3, part I, column 6, sum of lines 1, 2, 6-10.
   If using CMS 2552-10: Worksheet S-3, part I, column 8, sum of lines 1, 2, 8-12, 16, 17.



**California Medi-Cal Health Information Technology Plan**

3. Input Total Discharges for stated 90 day period.

**Total Discharges**          ＊ [            ]

Total Discharges are calculated from the CMS Cost report 2552. See the below help text from the SLR to calculate the value.

**Use CMS Cost Reports (CMS 2552-96 or CMS 2552-10) to acquire data.**

If using CMS 2552-96: Worksheet S-3, part I, column 15, sum of lines 1, 2, 6-10.
If using CMS 2552-10: Worksheet S-3, part I, column 15, sum of lines 1, 2, 8-12, 16, 17.

4. Confirm Average Length of Stay meets Eligibility requirements.

<u>Note</u>: Hospitals (except children's hospitals) must have an Average Length of Stay < 25 days to be eligible for the program.

## Average Length of Stay ＊ [  3.6  ] Day(s)

[ ✓ Meets Medicaid Eligibility Requirements? Yes ]

### 4.6.3     Additional Hospital Information

Follow the steps below to complete the Hospital Information page.

1. Input **Total Discharges** for the previous four years.

CCR Yr-3 ＊ [          ]     CCR Yr-2 ＊ [          ]     CCR Yr-1 ＊ [          ]     CCR Yr ＊ [          ]

Total Discharges are calculated from the CMS Cost report 2552. See the below help text from the CA EH Eligibility Workbook to calculate the value.

**Use CMS Cost Reports (CMS 2552-96 or CMS 2552-10) to acquire data.**

If using CMS 2552-96: Worksheet S-3, part I, column 15, sum of lines 1, 2, 6-10.
If using CMS 2552-10: Worksheet S-3, part I, column 15, sum of lines 1, 2, 8-12, 16, 17.

2. Input **Total Medicaid Inpatient Bed Days.**

**Total Medicaid Inpatient**   ＊ [            ]
**Bed Days**

**Total Medicaid Inpatient Bed Days** are calculated from the CMS Cost report 2552. See the below help text from the SLR to calculate the value.

**Use CMS Cost Reports (CMS 2552-96 or CMS 2552-10) to acquire data.**

If using CMS 2552-96: Worksheet S-3, part I, column 5, sum of lines 1, 2, 6-10.
If using CMS 2552-10: Worksheet S-3, part I, column 7, sum of lines 1, 2, 8-12, 16, 17.



**California Medi-Cal Health Information Technology Plan**

3. Input **Total Hospital Charges**.

**Total Hospital Charges**  *  [        ]

> **Total Hospital Charges** are calculated from the CMS Cost report 2552. See the below help text from the SLR to calculate the value.
>
> **Use CMS Cost Reports (CMS 2552-96 or CMS 2552-10) to acquire data.**
>
> If using CMS 2552-96: Worksheet C, part I, column 8, line 101.
> If using CMS 2552-10: Worksheet C, part I, column 8, line 200.

4. Input **Total Hospital Charity Care Charges**.

**Total Hospital Charity Care** * [        ]
**Charges**

> **Total Hospital Charity Care Charges** calculated from the CMS Cost report 2552. See the below help text from the SLR to calculate the value
>
> **Use CMS Cost Reports (CMS 2552-96 or CMS 2552-10) to acquire data.**
>
> If using CMS 2552-96: Worksheet S-10, line 30.
> If using CMS 2552-10: Worksheet S-10, column 3, line 20.

5. Attach either CMS Cost report 2552-96 or 2552-10 and any additional back up to the SLR using the **Upload Files** button.
   Information: The attached files must be 10MB or smaller and one of the following file types: Adobe PDF, GIF, JPEG, BMP, XLS, JPG, XLSX, DOC, DOCX, and PNG
   a. Click **Upload Files** button.

   [ Upload Files ]

   b. Identify the **Subject** type of the file to be added:
      Cost report – **required file**
      Other document
   c. Click the **Add File(s)** button. **[+]**



   d. Navigate to the file that meets the Subject type from the open **Choose file** window.



   e. Select file and click **Open** to attach the file.
   f. Add additional files as needed to the **Upload Files** pop-up window.
   g. Click **Done** to close Upload window and return to the **Eligibility Information** page.

   [ Done ]



**California Medi-Cal Health Information Technology Plan**

To remove a file that has already been attached to the SLR, click the [X] to delete the file.



6. Finish the Hospital Information page:

| To... | Click... |
|---|---|
| save data and remain in the screen for further editing | **Save** |
| save data and move to step 2.B. **Payment Calculation** to review the calculation figures | **Save and Continue** |
| exit screen without saving inputs | **Cancel and Delete Changes**, then **Back to Dashboard** |

7. Review the Payment Calculation page for the projected incentive payments.

## 2. Eligibility Information - (Payment Calculations)



8. Click **Continue** on bottom of the **Payment Calculation** page to be directed to step 3 **Certified EHR Technology**.

## 4.7    Step 3. Certified EHR Technology

In this section, the attestation type is chosen. Once the attestation type is selected, upload documents related to the hospital EHR and enter the CMS certification number of the EHR system received from the Office of the National Coordinator (ONC) for Health Information Technology. The first step of completing this section is to choose the type of attestation. The Certified EHR Technology page can only be accessed after the **About You** and **Eligibility Information** sections have been completed.



**California Medi-Cal Health Information Technology Plan**

### 4.7.1    Step 3.A Adopt, Implement, Upgrade Method

Follow the steps below to fill out the Adopt, Implement, Upgrade section.

1.  Select the "**Attest to Adopt, Implement, Upgrade**" button.
    Note: After the first year, the "**Attest to Adopt, Implement, Upgrade**" link will no longer be available and the Hospital representative will be taken directly to the "**Attest to Meaningful Use**" screen.

## 3. Attestation of EHR

| Attest to Adopt, Implement, Upgrade | Attest to Meaningful Use |
|---|---|
| Select this option to attest to your Adoption, Implementation or Upgrade of certified EHR technology. AIU is available for your first year of participation only, and does not require entering data for a specific reporting period. | This feature will be available in the First Quarter of 2012. |

2.  Select the attestation type from the **Method** drop-down list.



a.  Select **Adopt** - Acquire, purchase, or have access to certified EHR technology. Evidence of a binding legal and/or financial commitment to adopt a CMS certified EHR Technology is required to demonstrate adoption.

b.  Select **Implement** - Install or commence utilization of certified EHR technology. This may include staffing, maintenance, and training or other activities.

c.  Select **Upgrade** - Expand the functionality of an existing EHR so that it meets CMS certification requirements. This may include the addition of decision support modules, the establishment of interfaces for HIE, etc.

3.  Input a brief description of how the EHR technology standard has been met in the text box.

> \* Input a brief description of how the Criteria Method has been met



**California Medi-Cal Health Information Technology Plan**

4. Attach contract file and any additional back up to the SLR using the **Upload Files** button.
    Information: The attached files must be 10MB or smaller and one of the following file types: Adobe PDF, GIF, JPEG, BMP, XLS, JPG, XLSX, DOC, DOCX, and PNG
    a. Click **Upload Files** button.

    > Upload Files

    b. Identify the **Subject** type of the file to be added: Contract - **\*\*required file\*\***
        Workplan Action
        Plan      Staffing
        Workplan
    c. Click the **Add File(s)** button. **[+]**



| Upload Files | |
| --- | --- |
| Contract | [+] |
| Workplan | [+] |
| Action Plan | [+] |
| Staffing Workplan | [+] |

    d. Navigate to the file that meets the Subject type from the open **Choose file** window.



    e. Select file and click **Open** to attach the file.
    f. Add additional files as needed to the **Upload Files** pop-up window.
    g. Click **Done** to close Upload window and return to the **Certified EHR Technology – Adopt, Implement, Upgrade** page.

    > Done

    To remove a file that has already been attached to the SLR, click the [X] to delete the file.

**California Medi-Cal Health Information Technology Plan**



5. Complete the AIU Method section:

| To... | Click... |
|---|---|
| save data and remain in the screen for further editing | **Save** |
| save data and move to step **3.B. EHR Certification** | **Save and Continue** |
| exit screen without saving inputs | **Cancel and Delete Changes**, then **Back to Dashboard** |

Note: Step **3.B: EHR Certification** will remain locked from access until data has been saved for **3.A AIU Method.**

## 4.7.2   3.B: EHR Certification

Hospital representatives must provide information demonstrating that their EHR technology is certified through the Office of the National Coordinator (ONC). ONC provides a public web service that contains a list of all certified EHR technology, including the name of the vendor and the product's unique certification ID, and the meaningful use criteria for which the product was certified. The state is required to validate the verification of the Certified EHR information before making any payment to hospital.

It is the representative's responsibility to ensure that its certified EHR technology code is listed on the ONC public web service before attesting to the state. Failure to do so could result in disqualification of the hospital from receiving payment.

Follow the steps below to complete the CMS EHR Certification section.

1. Select the **CMS EHR Certification ID** tab on the left of the screen to certify that the EHR technology being used is approved by the Office National Coordinator (ONC).

2. Read the Certified EHR Technology information below to learn the policy for certifying the Eligible Hospital technology.

"Certified EHR Technology

Hospital representatives must provide information demonstrating that their EHR technology is certified through the Office of the National Coordinator (ONC). ONC provides a public web service that contains a list of all certified EHR technology, including the name of the vendor and the product's unique certification ID, and the meaningful use criteria for which the product was certified. The state is required to validate the verification of the Certified EHR information before making any payment to hospital.



**California Medi-Cal Health Information Technology Plan**

It is the representative's responsibility to ensure that its certified EHR technology code is listed on the ONC public web service before attesting to the state. Failure to do so could result in disqualification of the hospital from receiving payment.

To proceed, please indicate your understanding of this responsibility by agreeing to the following statement."

3. Click the check box to indicate understanding and acceptance of the EHR certification policy.

4. Go to the ONC website to receive the CMS EHR Certification ID at:
   http://onc-chpl.force.com/ehrcert
   a. Select your practice type by selecting the Ambulatory or Inpatient buttons.
   b. Search for EHR Products by browsing all products, searching by product name or searching by criteria met.
   c. Add product(s) to your cart to determine if your product(s) meet 100% of the required criteria.
   d. Request a CMS EHR Certification ID for CMS registration or attestation from your cart page.
      Note: ONC does not allow you to mix Inpatient products and Ambulatory products together to represent a complete EHR solution. **Additionally, if the product(s) you add to your shopping cart do not represent a complete EHR solution capable of achieving meaningful use criteria, you will not be able to click "Get CMS EHR Certification ID"**

5. Input the CMS EHR Certification ID received from the ONC website in the **CMS EHR Certification ID** field.

   CMS EHR Certification ID [                    ]  [ Validate ]

6. Select the **Validate** button to confirm the input.

7. Attach technology receipt file and any additional back up to the SLR using the **Upload Files** button.
   Information: The attached files must be 10MB or smaller and one of the following file types: Adobe PDF, GIF, JPEG, BMP, XLS, JPG, XLSX, DOC, DOCX, and PNG
   a. Click **Upload Files** button.

   

   b. Identify the **Subject** type of the file to be added:
      Contract **required file**
      Workplan    Action
      Plan        Staffing
      Workplan    Vendor
      Letter
   c. Click the **Add File(s)** button. **[+]**

**California Medi-Cal Health Information Technology Plan**



d. Navigate to the file that meets the Subject type from the open **Choose file** window.



e. Select file and click **Open** to attach the file.
f. Add additional files as needed to the **Upload Files** pop-up window.
g. Click **Done** to close Upload window and return to the **Certified EHR Technology – CMS EHR Certification ID** page.

Done

To remove a file that has already been attached to the SLR, click the [X] to delete the file.



8. Complete the **3.B: CMS EHR Certification ID** section:

| To... | Click... |
|---|---|
| save data and remain in the screen for further editing | **Save** |
| save data and move to step **4. Attestation** | **Save and Continue** |
| exit screen without saving inputs | **Cancel and Delete Changes**, then **Back to Dashboard** |



**California Medi-Cal Health Information Technology Plan**

## 4.8    Step 4. Attestation

The State of California requires that hospitals submit a signed Attestation Agreement certifying that all information in this application to the SendYearSubmission.aspx is accurate and complete.

1. Read the Hospital Attestation letter thoroughly.

2. Click the **Print Attestation** button to print letter for the Hospital Administrator to sign and for hospital records.

3. Hospital Administrator signs the Hospital Attestation Letter indicating understanding and acceptance of the conditions of the Medi-Cal EHR Incentive program.

4. Scan the letter into PDF format after the Hospital Administrator has signed it.

5. Attach Signed Attestation file to the SLR using the **Upload Files** button.
   Information: The attached files must be 10MB or smaller and one of the following file types: Adobe PDF, GIF, JPEG, BMP, XLS, JPG, XLSX, DOC, DOCX, and PNG.

   a. Click **Upload Files** button.

   

   b. Identify the **Subject** type of the file to be added:        Signed Attestation - **required file**

   c. Click the **Add File(s)** button. **[+]**

   

   d. Navigate to the file that meets the Subject type from the open **Choose file** window.

   

   e. Select file and click **Open** to attach the file.
   f. Add additional files as needed to the **Upload Files** pop-up window.
   g. Click **Done** to close Upload window and return to the **Attestation** page.

   Done

   To remove a file that has already been attached to the SLR, click the [X] to delete the file.

   | Signed Attestation | [+] |
   |---|---|
   | Attestation file.docx | [X] |
   | Reciept File.docx     Click [X] to remove attached file from Upload files ➞ | [X] |

6. Complete the **Attestation** section:

   | To... | Click... |
   |---|---|
   | save data and remain in the screen for further editing | **Save** |
   | save data and move to step 5. **Submit** | **Save and Continue** |

**DHCS**
HealthCareServices

**California Medi-Cal Health Information Technology Plan**

| exit screen without saving inputs | **Cancel and Delete Changes**, then **Back to Dashboard** |
|---|---|

## 4.9    Step 5. Submit

The final step is to submit the eligible hospital attestation to participate in the Medi-Cal EHR Incentive program. All necessary data has been input in the SLR review and is now prepared to be sent to CMS for review. Upon formal submission of Attestation to the state of California the steps to the SLR will be locked and set to read-only for review purposes.



1. Read the pop up message about completing submission of the Hospital Attestation.



**California Medi-Cal Health Information Technology Plan**

# Send Attestation to State 

You have completed all the necessary information for sending your attestation to the State of California. If for any reason you need to change your information please contact the help desk (866)879-0109 or by email at SLRHelpdesk@acs-inc.com.

After your attestation is successfully submitted, it will be validated by the state. After successful validation, the state will release your attestation to CMS for review prior to payment.

PLEASE NOTE: The validation process may take up to 10 weeks for your application to be reviewed by the state and CMS and for payment to be issued. You will receive an email notification when your payment has been issued.

Please check back periodically for information about the status of your attestation in the Message area of the home page.

Click to send SLR Attestation to DHCS for Review



Send Attestation          Cancel and do not send attestation

2. Click **Send Attestation** to formally submit the attestation report saved in Step 4. **Attestation.**
   <u>Note</u>: Following the submission, all sections will be set to "view only" and no further changes may be made.

3. Confirm Attestation has been submitted in the pop-up window.

# Attestation Complete 

✓ Attestation Submitted

You have completed all the necessary information for sending your attestation to the state of California. After you click [Send Attestation] you will no longer be able to make changes to your attestation information.

After your attestation is successfully submitted, it will be validated by the State. If there are no problems with your attestation, and you are eligible to receive incentive payment, the State will then release your attestation to CMS for review and payment.

PLEASE NOTE: The validation process may take up to 17-33 business days before the payment process is initiated. You will be notified by email as your attestation progresses through the process.

Please check back periodically for information about the status of your attestation in the Message area of the home page.

DHCS
HealthCareServices

**California Medi-Cal Health Information Technology Plan**

4. Verify "System Messages" section on the Homepage has a notice that is confirming the Attestation has been submitted.



| System Messages (5) | | |
|---|---|---|
| Subject | Date Received | From |
| Your attestation has been submitted | 7/1/2011 11:22:04 AM | HEALTHCARE |

5. Confirm receipt of an email from "California State Level Registry System Messages" and save for hospital records.

From: California State Level Registry System Messages [mailto:noreply@acs-inc.com] Sent: Wednesday, July 06, 2011 4:01 PM
To: Hospital Representative
Subject: Your attestation has been submitted

Dear Hospital Representative,

Your application has been successfully submitted for Year 1 of the Provider Incentive Program to the State of California. Your application will be validated by the State to determine your eligibility to receive the incentive payment. The State may elect to audit any or all information submitted as part of your attestation prior to approving your payment. The validation process may take up to 30 business days to complete.

Once the state has completed validation, your information will be submitted to CMS to verify you have not received payment from another source and are eligible to receive Federal funds. Upon receiving confirmation from CMS that you are eligible to receive payment, the State will initiate the payment process. You will be notified via email as your attestation progresses through the process.

Thank you

The process for applying for the Electronic Health Record Incentive Program for Medicaid providers has been completed. Please check back periodically for the status of the hospital's application with the CA Department of Health Care Services and the Centers for Medicare and Medicaid Services. The review process may up to 30 business days to complete.

Thank you for your participation in the Electronic Health Record Incentive.



**California Medi-Cal Health Information Technology Plan**

## 4.10    Access Reports

### 4.10.1    Reports for Eligible Hospitals

Five report types are available to the Hospital Representative.

<u>Payment Information</u>
You can check this area for the status of your application once it has been submitted.

<u>Reports</u>
Provider SLR Application Information

<u>Audit</u>
Audit Message content

<u>Appeals</u>
Appeals Message content

<u>System Messages (5)</u>

1. Payment Information – Payment Information notices provides the status of the eligible hospital's application.

2. Reports – Report notices provide a summary of the SLR applicant data supplied in step 1. The notice will not be available until after step2 has been completed.

3. Audit – Audit notices provide details of any current Audit on the eligible hospital's application.

4. Appeal – Appeal notices provide details of any current Appeals by the eligible hospital of their application's status.

5. Systems Messages – Provides confirmations of actions within the SLR. For example, changes to the password or use of the "Forgot User ID?" function will result in a system message being generated.



**California Medi-Cal Health Information Technology Plan**

# 5.    Troubleshooting

## 5.1    Accessing Help

For SLR Web application assistance, contact the Help Desk designated to support the SLR.

**Phone: (866) 879-0109**
**Email: SLRHelpdesk@acs-inc.com**

### 5.1.1    Help Text Displays

Located throughout the SLR Web application, there are various tool tips, help text, and more info link displayed to help you complete the pages.

Here are a few examples:

**Tool Tips.** A tool tip is text that displays when the mouse hovers over an area on the page.

Normal page view:

Page view with tool tip:

**Help Text.** Help text is text that displays on the page. Help text instructs you on how to respond to a particular field or, it provides some additional information about the field or the page. For example:





**California Medi-Cal Health Information Technology Plan**

**More Info.** Provides more details around the field or page that you are completing. For example:





## 5.2     Web Page Message Display

Use the table below to indentify how to resolve an issue:

| What is the error message? | On what page(s) could this error appear? | How can you fix it? |
|---|---|---|
| Your login attempt was not successful. Please try again. | Login | Re-enter your Login ID and password. You have four total attempts to enter the correct information. |
| Your account is currently locked out; please contact your site administrator or Help Desk at 866-879-0109. | Login | Contact the site administrator or Help Desk to get your account unlocked. |
| Please select the agreement checkbox to continue. | EULA | Click the checkbox. |
| The User ID entered is not recognized in the system. Please try again. | Forgot Password | Re-enter your User ID. You have four total attempts to enter the correct information. |

**California Medi-Cal Health Information Technology Plan**

| What is the error message? | On what page(s) could this error appear? | How can you fix it? |
|---|---|---|
| Your attempt to retrieve your User ID was not successful. Please contact the Help Desk at 866-879-0109. | Forgot Password | Contact the site administrator or Help Desk |
| Your answer could not be verified. Please try again. | Forgot Password | Re-enter your answer to the Challenge Question. You have four total attempts to enter the correct information. |
| Your attempt to retrieve your password was not successful. Please contact the Help Desk at 866-879-0109. | Forgot Password | Contact the site administrator or Help Desk. |
| Password must have a minimum of 8 characters and a maximum of 20. Your password must include at least 1 upper case and 1 lower case letter, 1 number, 1 special character (the "at" symbol "@"; pound "#"; exclamation "!"); not your login name, not an old password. | Reset Password<br><br>Create Login<br><br>My Account<br><br>Create Account | Re-enter your password. You have four total attempts to enter the correct information. |
| The Confirm New Password must match the New Password entry. | Reset Password<br><br>Create Login<br><br>My Account<br><br>Create Account | Re-enter the new password. |
| NPI is 10 digits. | Forgot User ID<br><br>Create Account | Re-enter your 10 digit NPI. |
| TIN is 9 digits. | Forgot User ID<br><br>Create Account | Re-enter your 9 digit TIN. |
| IDs entered are not in our system. If you need assistance, please contact the Help Desk at 866-879-0109. | Forgot User ID | Re-enter any numbers that are incorrect. |
| The TIN and ID entered does not match a provider on file. Please contact the help desk at 866-879-0109 for assistance. | Create Account | Contact the Help Desk. |

SMHP APPENDIX v2.0



**California Medi-Cal Health Information Technology Plan**

| What is the error message? | On what page(s) could this error appear? | How can you fix it? |
|---|---|---|
| The characters you entered didn't match the image verification. Please try again. | Create Account | Check input.<br><br>Click on "new image" to reset CAPTCHA image |
| The User ID must be between 8 – 10 characters. No spaces or special characters are allowed. Please try again. | Create Login<br><br>Create Account | Enter a User ID that is between 8 to 10 characters without spaces or special characters. |
| User ID is not available. Please try again. | Create Login<br><br>Create Account | Enter a new User ID. |
| Please enter a valid Email address. | Create Login<br><br>My Account<br><br>Create Account<br><br>About You for EH | Re-enter your email address. |
| Medi-Cal number is 9 digits. | About You for EH | Re-enter your 9 digit Medi-Cal number. |
| License number is 9 digits. | About You for EH | Re-enter your 9 digit license number. |
| To proceed, please select the checkbox to agree with the statement. Providers that do not meet these minimum criteria are not eligible to participate in the program. | About You for EH | Click the checkbox. |
| The entire 90 day Representative Period must be in the previous federal fiscal year. | Eligibility Information for EH | Re-enter dates in the previous calendar year. |
| You have entered the same state twice. Please remove the state or change it to a unique state for indicating patient volumes. Duplicate states are not allowed. | Eligibility Information for EH | Review the states you have entered and remove duplicates or change the entry to a unique state. |

**California Medi-Cal Health Information Technology Plan**

| | | |
|---|---|---|
| Numerical data must be entered in the Total Discharges for Representative Period and Medi-Cal Discharges for Representative Period fields for the calculation to be run. | Eligibility Information for EH | Re-enter the appropriate data in the required fields. |

| What is the error message? | On what page(s) could this error appear? | How can you fix it? |
|---|---|---|
| Numerical data must be entered in the Total Inpatient Bed Days and Total Discharges for Representative Period fields for the calculation to be run. | Eligibility Information for EH | Re-enter the appropriate data in the required fields |
| You must attach a minimum of one document supporting your choice to complete this step | Eligibility Information for EH<br><br>Certified EHR Technology for EH<br><br>Attestation for EH | Attach back up documentation using the **Upload File** function |
| There was an error connecting to the ONC CHPL Web Service used for certification validation. Please try again | Attestation for EH | |
| Your Certification Number is not found. | Attestation of EHR – Certified EHR Technology for EH | Re-enter the certification number of your EHR. |
| Attestation of EHR – Criteria for EH | A brief description of how you meet the selected Criteria is required to continue. | Enter a brief description of how you meet the selected criteria. |
| Word cannot start the converter mswrd632.wpc. | Opening a previously attached .docx file from provider in the Managed Files function | Contact local tech support to verify mswrd632.wpc file is in place on hospital computer system |

## 5.3    Frequently Asked Questions (FAQs)

Clicking on the highlighted section links following the questions below will direct you to that section within the User Manual.

**How do I report a problem with the SLR application?** Section 1.4 –  Problem Reporting or Section 5.1  –Accessing Help



**California Medi-Cal Health Information Technology Plan**

**Why was the SLR Web application developed?** Section 2 - Overview

**What can I do with the SLR Web application?** Section 2.1 – Application Features

**What do I need in order to be able to use the SLR Web application?** Section 2.3 – Materials and Preparation

**What does CMS consider an Eligible Hospital?** Section 6 - Definitions

**How do I log into the SLR Web application?** Section 4.2 – Log on to the State Level Registry (SLR) system

**How do I create an SLR account for the hospital?** Section 4.1 – Creating a New SLR Account for Hospital Representatives

**How do I change my password?** Section 4.4.2 – Voluntary Challenge Question Change in My Account

**What do I do If I forgot my password?** Section 4.1.2 - Forgot User ID for SLR

**What do I do If I forgot my user Id?** Section 4.1.3 - Forgot Password for SLR

**How do I get started in applying for the incentive payment for an Eligible Hospital?** Section 4.5 – Applying for the Incentive Program

**How do I access messages and reports?** Section 4.10 – Access Reports **Where**

**can I view the status of my payment?** Section 4.10 – Access Reports **How is my**

**payment calculated?** Section 4.10.2 – How the Payment is Calculated

**California Medi-Cal Health Information Technology Plan**

# 6.    **Definitions**

The following glossary terms are found within this document.

| Term/Acronym | Explanation/Expansion |
|---|---|
| American Reinvestment and Recovery Act of 2009 (ARRA) | ARRA 2009- American Recovery and Reinvestment Act of 2009 is an economic stimulus package enacted in a direct response to the economic crisis. The immediate goals were to:<br><br>create new jobs and save existing ones.<br>spur economic activity and invest in long-term growth.<br>foster unprecedented levels of accountability and transparency in government spending.<br><br>Included in the Act was funding for health information technology (HIT) investments to computerize health records to reduce medical errors and save on health-care costs.[1]. |
| CMS Certification Number (CCN) | A number assigned to hospitals by the Centers of Medicare and Medi-Cal Services, the CMS Certification Number (CCN) is the hospital's identification number that is link to its Medicare provider agreement. The CCN is used for CMS certification and also for submitted and reviewing the hospital's cost reports.[2] |
| Centers for Medicare and Medi-Cal Services (CMS) | The Centers for Medicare and Medi-Cal Services (CMS) is a United States Federal Agency which administers Medicare, Medi-Cal, and the Children's Health Insurance Program (CHIP).[3] |
| Computerized Physician Order Entry (CPOE) | Computerized Physician Order Entry (CPOE) refers to any system in which clinicians directly enter medication orders and/or tests and procedures into a computer system, which then transmits the order directly to the pharmacy.[4] |
| Electronic Health Record (EHR) | An Electronic Health Record (EHR) is an electronic version of a patient's medical history, that is maintained by the provider over time, and may include all of the key administrative clinical data relevant to that persons care under a particular provider, including demographics, progress notes, problems, medications, vital signs, past medical history, immunizations, laboratory data and radiology reports.[5] |
| Electronic Medical Record (EMR) | The EMR is the legal medical record of a patient's encounter with hospitals and ambulatory environments. This record is the source of data for the EHR.[6] |

[1] "What is the Recovery Act?" *Recovery.gov.* The Recovery Accountability and Transparency Board, March 11, 2011.
[2] "Frequently Asked Questions about Accrediting Hospitals in Accordance with their CMS' Certification Number (CCN)." *The Joint Commission.* Article date: July 15, 2010. Date accessed: November 22, 2010.
[3] "Centers for Medicare & Medi-Cal Services." *CMS: Centers for Medicare & Medi-Cal services.* United States Department of Health & Human Services. Date accessed: November 22, 2010.
[4] "Computerized Provider Order Entry." *AHRQ: Agency for Healthcare Research and Quality.* United States Department of Health & Human Services. Date accessed: November 22, 2010.
[5] "Electronic Health Records Overview." *CMS: Centers for Medicare & Medi-Cal services.* United States Department of Health & Human Services. Date accessed: November 22, 2010.
[6] Garets, Dave and Mike Davis "Electronic Medical Records vs. Electronic Health Records: Yes, There Is a Difference Updated." *HIMSS Analytics.* Healthcare Information and Management Systems. January 26, 2006. March 11, 2011.

**California Medi-Cal Health Information Technology Plan**

| Term/Acronym | Explanation/Expansion |
|---|---|
| Eligible Hospital (EH) | For the purposes of the Medi-Cal EHR Incentive Program and SLR applications documentation, an eligible hospital (EH) is defined as the following:<br><br>Acute care hospitals (including Critical Access Hospitals and cancer hospitals) with at least 10% Medi-Cal patient volume. Children's hospitals (no Medi-Cal patient volume requirements).[7] |
| Eligible Professional (EP) | For the purposes of the Medi-Cal EHR Incentive Program and SLR application documentation, an eligible professional (EP) is defined as the following:<br><br>Physicians (primarily doctors of medicine and doctors of osteopathy).<br>Nurse practitioner.<br>Certified nurse-midwife.<br>Dentist.<br>Physician assistant who furnishes services in a Federally Qualified Health Center or Rural Health Clinic that is led by a physician assistant.<br>To qualify for an incentive payment under the Medi-Cal EHR Incentive Program, an EP must meet one of the following criteria:<br><br>Have a minimum 30% Medi-Cal patient volume*.<br>Have a minimum 20% Medi-Cal patient volume, and is a pediatrician*.<br>Practice predominantly in a Federally Qualified Health Center or Rural Health Center and have a minimum 30% patient volume attributable to needy individuals.<br>*Children's Health Insurance Program (CHIP) patients do not count toward the Medi-Cal patient volume criteria.[8] |
| End User License Agreement (EULA) | The End User License Agreement (EULA) details how the software can and cannot be used.[9] |
| Health Insurance Portability and Accountability Act of 1996 (HIPAA) | The purpose of the Health Insurance Portability and Accountability Act is "to improve…the Medi-Cal program…and the efficiency and effectiveness of the health care system, by encouraging the development of a health information system through the establishment of standards and requirements for the electronic transmission of certain health information."[10] |
| Health Information Technology (HIT) | Health Information Technology (HIT) refers to the use of technology in managing health information. For example, the use of electronic health records instead of paper medical records. |

---

[7] "EHR Incentive Programs: Eligibility – Eligible Hospitals." *CMS: Centers for Medicare & Medi-Cal services.* United States Department of Health & Human Services. Date accessed: November 22, 2010.

[8] "EHR Incentive Programs: Eligibility – Eligible Professionals." *United States Department of Health & Human Services.* Date accessed: November 22, 2010.

[9] "EULA." *Webopedia.* QuinStreet Inc. Date accessed: November 22, 2010.

[10] "Health Insurance Portability and Accountability Act of 1996." *CMS: Centers for Medicare & Medi-Cal services.* Public Law 104-191. 104th Congress. Date accessed: November 22, 2010.

**DHCS**
HealthCareServices

**California Medi-Cal Health Information Technology Plan**

| Term/Acronym | Explanation/Expansion |
|---|---|
| Health Information Technology for Economic and Clinical Health Act of 2009 (HITECH) | The Health Information Technology for Economic and Clinical Health Act of 2009 (HITECH) amends the Public Health Service Act by adding a number of funding opportunities to advance health information technology.[11] |
| CMS Medicaid EHR Incentive Program Registration Website | CMS Medicaid EHR Incentive Program Registration site is a data repository that supports the administration and incentive payment disbursements of Medicare and Medi-Cal programs to medical professionals, hospitals and other organizations.[12] |
| National Provider Identifier (NPI) | The National Provider Identifier (NPI) is a Health Insurance Portability and Accountability Act (HIPAA) Administrative Simplification Standard. The NPI is a unique identification number for covered health care providers.[13] |
| Office of the National Coordinator (ONC) for Health Information Technology | The Office of the National Coordinator for Health Information Technology (ONC) is the principal federal entity charged with coordination of nationwide efforts to implement and use the most advanced health information technology and the electronic exchange of health information.[14] |
| Provider | For the purposes of the State Level Registry (SLR) application documentation, a provider refers to both EPs and EHs. |
| State Level Registry (SLR) | The State Level Registry (SLR) is an application created for the capture and maintenance of state mandated information related to the payment of provider incentive payments provided for under the ARRA. |
| Taxpayer Identification Number (TIN) | A Taxpayer Identification Number (TIN) is an identification number used by the Internal Revenue Service (IRS) in the administration of tax laws.[15] |
| Uniform Resource Locator (URL). | The global address of documents and other resources on the World Wide Web.[16] |

---

[11] "HITECH and Funding Opportunities." *The Office of the National Coordinator for Health Information Technology*. United States Department of Health & Human Services. Date accessed: November 22, 2010.

[12] "Grumman nets $34M CMS' data repository project." *CMIO Contracts and Installations*. TriMed Media Group, Inc. Article date: May 17, 2010. Data accessed: November 22, 2010.

[13] "National Provider Identifier Standard (NPI): Overview." *CMS: Centers for Medicare & Medi-Cal services*. United States Department of Health & Human Services. Date accessed: November 22, 2010.

[14] "The Office of the National Coordinator for Health Information Technology (ONC)." *The Office of the National Coordinator for Health Information Technology*. United States Department of Health & Human Services. Date accessed: November 22, 2010.

[15] "Taxpayer Identification Numbers (TIN)." IRS.gov. Internal Revenue Service. Last modified: August 20, 2010. Date accessed: November 22, 2010.

[16] "What is URL?" *Webopedia*. QuinStreet Inc., March 11, 2011.

# EXHIBIT 6







# California State Medi-Cal Health Information Technology Plan

September 9, 2011

# TABLE OF CONTENTS

1  California's "As-Is" HIT Landscape .................................................................. 4
  1.1  Overview ................................................................................................ 4
  1.2  EHR Adoption Landscape ...................................................................... 5
  1.3  EHR Adoption by Practitioners ............................................................. 7
  1.4  EHR Adoption by Hospitals ................................................................. 10
    1.4.1  California's Critical Access Hospital Landscape ...................... 12
    1.4.2  EHR Adoption by Children's Hospitals ..................................... 14
  1.5  EHR Adoption by Community Clinics ................................................... 14
  1.6  EHR Adoption by Large Medical Groups and Independent Practice Associations .... 16
  1.7  EHR Adoption by Indian Health Clinics ............................................... 17
  1.8  Regional Extension Centers ................................................................ 18
  1.9  Vulnerable Populations ....................................................................... 21
    1.9.1  Children in Foster Care in California ........................................ 21
    1.9.2  Mental Health and Substance Use Disorders ......................... 22
  1.10  Broadband Internet Access ............................................................... 24
  1.11  Health Information Exchange ............................................................. 25
    1.11.1  State HIE/HIT Coordination .................................................... 25
    1.11.2  State Designated Entity .......................................................... 30
    1.11.3  Community Health Information Exchanges .............................. 32
    1.11.4  HIE Infrastructures of Large Provider Organizations ............. 34
    1.11.5  Community-based Organizations ............................................ 34
    1.11.6  California Privacy and Security Advisory Board (CalPSAB) ..... 35
  1.12  Additional HIE Functions ................................................................... 36
    1.12.1  e-Prescribing ......................................................................... 36
    1.12.2  Medi-Cal Providers and Pharmacies ..................................... 37
    1.12.3  California's e-Prescribing Pilots ............................................. 39
    1.12.4  e-Prescribing of Controlled Substances ................................ 43
    1.12.5  Electronic Laboratory Reporting ............................................ 43
  1.13  Public Health Reporting and Surveillance ......................................... 46
    1.13.1  Laboratory and Disease Reporting ........................................ 46
    1.13.2  Immunization Registries ......................................................... 48
  1.14  IT Infrastructure and MITA ................................................................ 50
    1.14.1  MMIS ...................................................................................... 50
    1.14.2  MITA ....................................................................................... 51
  1.15  IT Workforce Development ................................................................. 52
  1.16  Interstate Exchange Activities ........................................................... 53
  1.17  The Legal Landscape ........................................................................ 54
2  California's "To-Be" HIT Landscape ............................................................. 55
  2.1  California's 5-Year Plan ....................................................................... 55
  2.2  IT Architectural Changes ..................................................................... 57

2.3       Provider Technical Assistance ................................................................. 60
2.4       Provider and Beneficiary Outreach Campaign ....................................... 62
   2.4.1     Overarching Strategic Plan ................................................................ 66
   2.4.2     Perceptions & Barriers for Providers and Beneficiaries ........................ 67
   2.4.3     Campaign Phases ............................................................................. 72
**3   Administration & Oversight of the Program ................................................ 82**
3.1       State Level Registry (SLR) ....................................................................... 82
   3.1.1     Overview ............................................................................................ 82
   3.1.2     SLR/NLR Interfaces ........................................................................... 85
3.2       Provider Eligibility ..................................................................................... 88
   3.2.1     Eligible Professional Types ................................................................ 89
   3.2.2     Eligibility Formulas for Professionals ................................................ 90
   3.2.3     Group/Clinic Eligibility ...................................................................... 91
   3.2.4     Prequalification of Providers and Clinics .......................................... 93
   3.2.5     SLR Workbook for Determining EP Eligibility .................................. 101
   3.2.6     Eligible Hospitals ............................................................................ 106
3.3       Attestation for Incentive Payments .......................................................... 107
3.4       Payments ................................................................................................ 108
   3.4.1     For Eligible Professionals ................................................................ 108
   3.4.2     For Eligible Hospitals ...................................................................... 108
   3.4.3     Payment Processing ........................................................................ 111
3.5       Verification and Validation ....................................................................... 117
   3.5.1     Prepayment Eligibility Verification for EP ......................................... 117
   3.5.2     SLR Validation Stops ...................................................................... 118
3.6       Appeals .................................................................................................. 122
3.7       Reporting ............................................................................................... 123
3.8       Help Desk .............................................................................................. 124
3.9       Assumptions .......................................................................................... 136
**4   California's Audit Strategies ...................................................................... 140**
4.1       Introduction ............................................................................................ 140
4.2       Medical Review Branch: Audits of EPs .................................................... 141
   4.2.1     MRB EP Audit Landscape and Process ........................................... 141
   4.2.2     Pre-Payment Audits ......................................................................... 142
   4.2.3     Conjunction Audits (Post-Payment) ................................................. 142
   4.2.4     Focused Audits (Post-Payment) ...................................................... 143
   4.2.5     Random Audits (Post-payment) ....................................................... 143
   4.2.6     Audit for Recovery (AFR) Audits ..................................................... 143
   4.2.7     MRB Audit Process .......................................................................... 143
   4.2.8     Fraud and Abuse ............................................................................. 144
   4.2.9     MRB Auditing Tools ......................................................................... 145
   4.2.10   Auditing Techniques and Strategies ................................................ 146
   4.2.11   MRB Overpayment Tracking ............................................................ 149
   4.2.12   MRB Continuing Development .......................................................... 149
4.3       Financial Audits Branch – Audits of EHs and Clinic Providers ................... 150
   4.3.1     EH Audit Landscape and Process .................................................... 150

4.3.2    Pre-Payment Reviews/Audits ................................................................. 152
4.3.3    Post Payment Reviews/Audits .............................................................. 153
4.3.4    Fraud and Abuse Activities .................................................................. 154
4.3.5    FAB Data Resources ........................................................................... 155
4.3.6    FAB Continuing Development............................................................... 157
**5   California's HIT Roadmap ....................................................................... 158**
5.1    2011-2012 Roadmap ............................................................................. 158
5.1.1    Enrollment/Verification/Payment.......................................................... 159
5.1.2    Outreach and Technical Assistance ..................................................... 161
5.1.3    Landscape Refinement and Evaluation ................................................ 163
5.1.4    Health Information Exchange and Public Health................................... 164
5.2    Long Term Roadmap ............................................................................. 170
5.2.1    Health Information Exchange................................................................ 173
5.2.2    HIE and Meaningful Use ...................................................................... 176
5.2.3    Conclusion ........................................................................................... 178

## 4.3    FINANCIAL AUDITS BRANCH – AUDITS OF EHS AND CLINIC PROVIDERS

### 4.3.1    EH AUDIT LANDSCAPE AND PROCESS

FAB has eight field audit sections located throughout the state. Each field audit section is responsible for conducting audits and reviews of institutional providers within their regional territory. FAB performs desk or field audits of Medi-Cal institutional providers which include; acute inpatient hospitals, children's hospitals, critical access and rural hospitals, designated public hospitals), long term care facilities, FQHCs and RHCs. To minimize the burden on the provider community and for efficiency FAB plans to integrate reviews of EH's attestation verification in conjunction with desk or field audits whenever possible as a standard audit procedure. In certain cases, based on referrals from OHIT staff, FAB may be required to initiate a separate review due to the urgency of the issues.

At this time, FAB cannot forecast EHR participation level by EHs for year one. If the volume is greater than FAB's resources can cover then analytical tools and risk assessment will be utilized to prioritize the EHs to be reviewed/audited. FAB has audited the majority of the EH community and has historical claims and audited data to determine which EHs pose a higher risk and/or have the potential for problem areas. FAB has access to the SLR and will receive reports and can make queries to review EH submissions. This information and referrals from OHIT will provide FAB with the necessary background information to determine its audit population.

If the volume of EH providers is greater than the amount FAB can review through its regular audit coverage of EHs, it will employ a sampling method targeting certain providers based on historical and audited data and some randomly selected EHs. The risk profile development for EH will be similar to the EP's but leverage a different set data sources (see **Table 31**) and emphasize the findings in past financial reviews. FAB has a long history with many EH's, so when there is no or minimal historic contact the risk may be considered higher.  The SLR submissions will be fully accessible by FAB and the primary source to define the audit universe.  Analyzing payment size and patient volume will be the primary risk factors areas in addition to submission patterns. The scoping sheets will be developed from the submitted attestation data to determine abnormal data sets.  FAB will conduct desk reviews of EHs for those with lesser audit risk, smaller EH incentive payments, or in cases where FAB is not scheduled to conduct a Medi-Cal field audit within a year. FAB's EH payment file reconciliation process is depicted in the following flow figure.

**FIGURE 29: FAB'S EH FILE RECONCILIATION PROCESS**



FAB will design audit programs and procedures to ensure that the EH has met the financial and programmatic requirements of the EHR Program. FAB will also develop training curriculum and conduct training sessions to ensure that the eight field audit section staff are properly trained to perform EH desk reviews and audits. FAB's audit objectives include, but are not limited to: verifying the eligibility/patient volume based on CMS approved calculation methods for EHs (42 CFR 495.306) comparing it to Medi-Cal claims data, cost report patient days and/or audited patient days; confirming SLR attestations; reviewing documentation submitted by EHs; validating that proper incentive payments were made. FAB's EH audit development process is depicted in the following flow figure:

FIGURE 30: FAB'S EH AUDIT DEVELOPMENT PROCESS



## 4.3.2    PRE-PAYMENT REVIEWS/AUDITS

ACS is responsible for developing and running the SLR. OHIT has the primary responsibility for the pre-payment registration screening activity. OHIT staff will manually review all EH eligibility and payment data against hospital cost reports uploaded to the SLR. OHIT has developed ranges of variance to compare to the self-reported attestation data. OHIT will refer EPs and EHs to MRB or FAB respectively based on the screening criteria to EH and EP designated email mailboxes. MRB and

FAB will utilize the mailboxes and create file folders so there is a running history and audit trail of correspondence and information that is submitted by OHIT and other DHCS offices and associates who are involved in the Medi-Cal EHR Incentive Program.

When it has been identified that an audited EP has assigned incentive payments to an FQHC/RHC, MRB and FAB will coordinate review/audit activities. The review and audit procedures described in the audit activities sections will also be performed as applicable to the FQHC/RHC.

The SLR has soft and hard stops to flag and/or stop a EH progressing through the SLR registration process (see **Table 24**). OHIT will refer EH soft stops to FAB for further review and/or audit before the EH is cleared and allowed to move to the next step in the registration process. When FAB receives the referral, it will conduct the necessary procedures to follow-up and contact the EH to review additional data or validate the information submitted by the EH. If FAB determines that the EH has provided sufficient information to resolve the issue identified through the soft stop, it will notify OHIT and a notation will be made in the EH's file and SLR so that the EH can continue and be approved to register. If FAB determines that the EH has not provided sufficient information, FAB will notify OHIT. OHIT will notify the EH of the findings and of the administrative process to appeal the finding if necessary.

## 4.3.3    POST PAYMENT REVIEWS/AUDITS

In addition to pre-payment referrals from OHIT, FAB will conduct a post-payment audit of patient volume and payment data in conjunction with scheduled Medi-Cal EHR Incentive Program audits. The post payment audit scope will include, but not be limited to:

- Validating the patient volume numbers

- Reviewing the attestation and supporting documentation (contracts, leases, invoices, receipts, hardware and software certifications/serial numbers)
- Verifying that the incentive fund calculations and payments were correct and comparing the disbursement ratios by fiscal year and actual disbursements through the SLR payment database

- Reviewing and reconciling expenditures to determine that entities promoting the adoption of EHR technology do not retain more than 5% of EHR incentive payments for costs other than those related to the implementation and certification of a qualified EHR program (CFR 495.332) if such an option is available/utilized by an EH.

- Although meaningful use is not available in 2011 and not a requirement for year one release of funds, FAB in conjunction with MRB will develop procedures to

verify the attestation of self-certified meaningful use Stage 1 criteria starting with year two payments. As CMS releases additional guidance for Stage 2 and Stage 3 MU, A&I will work with OHIT to incorporate the core set measurements and requirements into audit programs and audit tools.

Once the review/audit is completed, FAB will notify OHIT and the EH of the results and findings. The EH will be given a two-week timeframe to provide additional information and documentation to resolve the findings. FAB will review the EH's additional information and documentation and determine whether the findings are resolved. FAB will notify OHIT and the EH whether the additional information will resolve some or all of the findings. FAB will issue an audit report identifying funds or payments that will be disallowed and recovered to the EH and will transmit a copy to OHIT. In addition, FAB will enter the results in the SLR. The EH is allowed appeal rights through an administrative hearing process under Welfare and Institutions Code (W&I Code) Section 14171. Upon completion of the administrative hearing process, if the judgment is rendered in favor of the EH and funding/payments were deemed allowable, FAB will initiate administrative action to remit the monies owed to the provider.

## 4.3.4    FRAUD AND ABUSE ACTIVITIES

A&I has lead responsibility for DHCS' Medi-Cal Anti-Fraud program. FAB utilizes various data sources outlined in the table below to develop its risk assessment and develop profiles to identify providers with indicators/red flags that should be prioritized for review and audit. Examples of the criteria that would normally identify a provider as a risk for fraud or abuse includes, but is not limited to:

- Unrelated investigations of a provider due to improper billing practices, data mining claims patterns irregularities, or whistleblower complaints.

- Manual reviews of uploaded AIU documentation identify evidence of improper modification, alterations, or fabrication of submitted documents.

- Verification of self-certified patient utilization, encounters, charity care charges, or discharges has significant variances to reported numbers with no explanation.

- Review of Medi-Cal claims volume identifies a sudden drop in claim submissions after payments are remitted to the provider.

If, upon completion of a referral, pre-payment, or post payment review, FAB identifies that the EH's submissions and representations exhibit misuse/abuse and/or fraudulent activities related to the EHR program, it will make a referral to the A&I Investigation Branch (IB). IB will log the case into the Case Tracking System and assign an Investigator. The Investigator will determine whether there is reliable evidence that fraudulent activity has occurred and then refer the case to the State Department of Justice (DOJ) Bureau of Medi-Cal Fraud and Elder Abuse (BMFEA).

## 4.3.5   FAB DATA RESOURCES

The resources listed in the FAB Data Resources Table are the primary data resources for FAB in maintaining the fiscal integrity of the Medi-Cal EHR Incentive Program for EHs. FAB will utilize additional resources when available and appropriate to each audit. These resources will lessen EH's audit burden and make FAB's audit processes more efficient.

**TABLE 31: FAB DATA RESOURCES**

| Data Resource | Resource Function | Resource Benefit |
|---|---|---|
| SLR (State Level Registry) | Provider Registration | Review provider statements and submissions and compare to other data sources and audit findings |
| SURS (Surveillance and Utilization Review Subsystems) | Extensive report system of claim data for all Medi-Cal providers and beneficiaries | Claim detail reports will be run on EHs to help verify the professional's Medicaid/Medi-Cal eligibility percentages and participation |
| PETS(Provider Enrollment Tracking System) | Reviewing provider CA Medi-Cal enrollment applications | Compare SLR registration information for EHs to their PETS file to verify accuracy of information provided on the SLR (cross referenced with MRB for clinic ownership status) |
| Provider Master File (EDSNET) | Master file on all Medi-Cal providers from information submitted by the provider to the Provider Enrollment Division | Will be used to compare locations, businesses, practices, owners, tax identification numbers, NPI numbers, provider names, payment and location addresses, review Medi-Cal status, Medi-Cal payment histories, etc. |
| FATS (Financial Audits Tracking System) | Maintains the historical record of a provider's payment activity, Auditor assignments, and recoveries | Review FATS for historical payment background |
| ARAS Master File Room | Maintains complete audit files for all Hospital audits conducted in last 5 years and all filed cost reports | Full history of all previous audit findings for each EH |
| ARAS Master File Room | Maintains complete audit files for all Hospital audits conducted in last 5 years and all filed cost reports | Full history of all previous audit findings for each EH |

| Data Resource | Resource Function | Resource Benefit |
|---|---|---|
| Certified HIT Product List (CHPL) | Official database of certified EHR programs | Database of the criteria measures of EHR programs selected for certification measure. MU module audit procedures to be developed in future years |
| Office of Statewide Health Planning-- Annual Utilization Report | All licensed clinics in California submit an Annual Utilization Report | Review encounters by payer source |
| Management Information System/Decision Support System (MIS/DSS) | Database of eligibility, provider, and claims information for Medi-Cal | Review provider statements and submissions and compare to other data sources and audit findings |

**SLR (STATE LEVEL REGISTRY)**

FAB will have access to the SLR maintained by ACS. The SLR will be the primary access point for source data submitted for registration. EHR lead auditors and managers will utilize the SLR to develop internal reviews and perform desk reviews. The SLR will help minimize the impact of reviews on the providers as the initial evaluations can utilize registration documentation to build audit files and perform scoping before any provider contact.

**SURS (SURVEILLANCE AND UTILIZATION REVIEW SUBSYSTEMS)**

SURS is FABs primary source for verification of Medi-Cal payments and patient volume statistics within the program. The SURS system is critical for performing prepayment and post payment scoping and verification of attested data.

**PETS (PROVIDER ENROLLMENT TRACKING SYSTEM)**

The PETS system will be utilized in conjunction with MRB to determine the ownership status and structure to properly assign audits on referral. Within the clinical community, the organizations structure will determine if MRB or FAB is the lead audit agency. This ensures cases are developed through the proper audit agency.

**PMF (PROVIDER MASTER FILE)**

The PMF is maintained by PED. Information in which provider's attest on their enrollment application is entered into this system for claiming and payment tracking and can be utilized for FAB to identify address discrepancies, activity status, and payment tracking.

**FATS (FINANCIAL AUDITS TRACKING SYSTEM)**

FATS is a database developed by FAB to track the history of all audit types and capture relevant financial data for extraction and evaluation. Maintaining a data base system which can be accessed by all field offices centralizes the information.

**ARAS MASTER FILE ROOM (MFR)**

The MFR acts as the central keeper of records. The MFR maintains a complete history of issued audit report with supporting files and the corresponding filed cost report. The files can be utilized for scoping and verification of attested patient volume. As audit cases are developed, the file history will be maintained allowing for consistency between years.

**CERTIFIED HIT PRODUCT LIST (CHPL)**

The CHPL is the registry of data elements collected by certified EHR systems providers may elect to install. The database is a starting point to research the variety of systems available and may be used to develop MU attestation audit procedures in conjunction with CMS updates of Level 1-3 criteria.

**OSHPD ANNUAL UTILIZATION REPORT**

The OSHPD Annual Utilization Reports will be utilized in EH and FQHC/RHC audits. Information the database tracks includes encounters by payer source and procedure. All licensed clinics must file an Annual Utilization Report and the reports will supplement the claims data from the SURS system for patient volume verification.

**MIS/DSS**

The MIS/DSS is a subsystem of the California Medicaid Management Information System (CA-MMIS) and serves as the California Department of Health Care Services (DHCS)' Medi-Cal Data Warehouse.  As a current and comprehensive database of eligibility, provider, and claims information for the Medi-Cal EHR Incentive Program, the MIS/DSS is the largest Medicaid data warehouse in the nation.  It is Teradata-based, a leading-edge, hardware and software technology platform that enables the MIS/DSS to store great volumes of data and allow large numbers of users to simultaneously access the data without any deterioration in system performance.  As an integrated repository of data that offers the capability for robust queries and analyses, MIS/DSS will be used in a fashion similar to SURS.

## 4.3.6  FAB CONTINUING DEVELOPMENT

FAB will monitor the implementation of the EHR audit program and take proactive steps to refine the audit programs and procedures. FAB audit staff will develop training materials and conduct training to ensure the auditors are aware of current changes to the EHR program. Audit programs and processes will be expanded and modified when requirements are added or revised, such as the meaningful use objectives once DHCS receives additional guidance from CMS.



**Superior Court of California, County of San Francisco**
**Alternative Dispute Resolution**
**Program Information Package**



The plaintiff must serve a copy of the ADR information package
on each defendant along with the complaint.  (CRC 3.221(c))

## WHAT IS ADR?
Alternative Dispute Resolution (ADR) is the term used to describe the various options available for settling a dispute without a trial.  There are many different ADR processes, the most common forms of which are mediation, arbitration and settlement conferences.  In ADR, trained, impartial people decide disputes or help parties decide disputes themselves. They can help parties resolve disputes without having to go to court.

## WHY CHOOSE ADR?
"It is the policy of the Superior Court that every noncriminal, nonjuvenile case participate either in an early settlement conference, mediation, arbitration, early neutral evaluation or some other alternative dispute resolution process prior to trial." (Local Rule 4)

ADR can have a number of advantages over traditional litigation:

- **ADR can save time.** A dispute often can be resolved in a matter of months, even weeks, through ADR, while a lawsuit can take years.
- **ADR can save money,** including court costs, attorney fees, and expert fees.
- **ADR encourages participation.** The parties may have more opportunities to tell their story than in court and may have more control over the outcome of the case.
- **ADR is more satisfying.** For all the above reasons, many people participating in ADR have reported a high degree of satisfaction.

## HOW DO I PARTICIPATE IN ADR?
Litigants may elect to participate in ADR at any point in a case.  General civil cases may voluntarily enter into the court's ADR programs by any of the following means:

- Filing a Stipulation to ADR: Complete and file the Stipulation form (attached to this packet) at the clerk's office located at 400 McAllister Street, Room 103;
- Indicating your ADR preference on the Case Management Statement (also attached to this packet); or
- Contacting the court's ADR office (see below) or the Bar Association of San Francisco's ADR Services at 415-982-1600 or www.sfbar.org/adr for more information.

**For more information about ADR programs or dispute resolution alternatives, contact:**

Superior Court Alternative Dispute Resolution
400 McAllister Street, Room 103, San Francisco, CA  94102
415-551-3876

*Or, visit the court ADR website at www.sfsuperiorcourt.org*

The San Francisco Superior Court currently offers three ADR programs for general civil matters; each program is described below:

## 1) EARLY SETTLEMENT CONFERENCES

The goal of early settlement is to provide participants an opportunity to reach a mutually acceptable settlement that resolves all or part of a dispute.

**(A) THE BAR ASSOCIATION OF SAN FRANCISCO (BASF) EARLY SETTLEMENT PROGRAM (ESP):** This program, provided in conjunction with the court, pairs parties with a two-member volunteer attorney panel. The panels are comprised of one plaintiff and one defense attorney, each with at least 10 years of trial experience. On occasion, a panelist with extensive experience in both plaintiff and defense roles serves as a sole panelist.

**Operation:** The settlement conference typically occurs 2 to 3 months prior to the trial date. BASF informs the participants of the conference date well in advance and provides the names of the panelists and location of the conference approximately 2 weeks prior to the conference. Panelists provide at **no cost** up to 2 hours of their time at each conference, and many panelists provide additional time at no cost if a settlement is imminent. A conference typically begins with a brief meeting with all parties and their attorneys during which each side presents an initial statement. The panelists then assist the parties in understanding and candidly discussing the strengths and weaknesses of their cases, utilizing private meetings as appropriate. If a case does not settle during the first two hours, parties have the option to hire the panelists to continue the conference.

**Cost:** BASF charges an administrative fee of $250 per party. For information on fees for cases involving multiple parties, please contact BASF. Parties who meet certain eligibility requirements may request a waiver of the fee. For more information, please contact BASF's ESP Coordinator at 415-782-9000 ext. 8717 or visit www.sfbar.org/esp.

**(B) COURT SETTLEMENT CONFERENCE:** Parties may elect to apply to the Presiding Judge's department for a specially-set mandatory settlement conference. See Local Rule 5.0 for further instructions. Upon approval of the Presiding Judge, the court will schedule the conference and assign the case for a settlement conference.

## 2) MEDIATION

Mediation is a voluntary, flexible, and confidential process in which a neutral third party facilitates negotiations. The goal of mediation is to reach a mutually satisfactory agreement, before incurring the expense of going to court, that resolves all or part of a dispute after exploring the interests, needs, and priorities of the parties in light of relevant evidence and the law. A mediator strives to bring the parties to a mutually beneficial settlement of the dispute.

**(A) MEDIATION SERVICES OF THE BAR ASSOCIATION OF SAN FRANCISCO,** in cooperation with the Superior Court, is designed to help civil litigants resolve disputes before they incur substantial costs in litigation. While it is best to utilize the program at the outset of litigation, parties may use the program at any time while a case is pending.

**Operation:** A mediator provides at **no cost** one hour of preparation time and two hours of mediation time. After those three hours, if the case is not resolved, parties have the option to continue the process and pay the mediator at his or her regular hourly rate. BASF pre-screens all mediators based upon strict educational and experience requirements. Parties may select a specific mediator or BASF will help the parties make a selection. The BASF website contains photographs, biographies, and videos of the mediators as well as testimonials to assist with the selection process.

**Cost:** BASF charges an administrative fee of $250 per party. For information on fees for cases involving multiple parties, please contact BASF. The hourly mediator fee beyond the first three hours will vary depending on the mediator selected. Parties who meet certain eligibility requirements may request a waiver of the fee. For more information, please contact BASF's Mediation Coordinator at 415-782-9000 ext. 8787 or visit www.sfbar.org/mediation.

**(B) PRIVATE MEDIATION:** Although not currently a part of the court's ADR program, civil disputes may also be resolved through private mediation. Parties may elect any private mediator or mediation organization of their choice; the selection and coordination of private mediation is the responsibility of the parties. Parties may find mediators and organizations on the Internet. The cost of private mediation will very depending on the mediator selected.

## 3) ARBITRATION

An arbitrator is neutral attorney who presides at a hearing where the parties present evidence through exhibits and testimony. The arbitrator applies the law to the facts of the case and makes an award based upon the merits of the case.

**(A) JUDICIAL ARBITRATION:** When the court orders a case to arbitration it is called "judicial arbitration". The goal of arbitration is to provide parties with an adjudication that is earlier, faster, less formal, and usually less expensive than a trial.

**Operation:** Pursuant to CCP 1141.11 and Local Rule 4, all civil actions in which the amount in controversy is $50,000 or less, and no party seeks equitable relief, shall be ordered to arbitration. (Upon stipulation of all parties, other civil matters may be submitted to judicial arbitration.) A case is ordered to arbitration after the Case Management Conference. An arbitrator is chosen from the court's Arbitration Panel. Arbitrations are generally held between 7 and 9 months after a complaint has been filed. Judicial arbitration is not binding unless all parties agree to be bound by the arbitrator's decision. Any party may request a trial within 30 days after the arbitrator's award has been filed.

Local Rule 4.2 allows for mediation in lieu of judicial arbitration, so long as the parties file a stipulation to mediate after the filing of a complaint. If settlement is not reached through mediation, a case proceeds to trial as scheduled.

**Cost:** There is no cost to the parties for judicial arbitration.

**(B) PRIVATE ARBITRATION:** Although not currently a part of the court's ADR program, civil disputes may also be resolved through private arbitration. Here, the parties voluntarily consent to arbitration. If all parties agree, private arbitration may be binding and the parties give up the right to judicial review of the arbitrator's decision. In private arbitration, the parties select a private arbitrator and are responsible for paying the arbitrator's fees.

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name and address)* | *FOR COURT USE ONLY* |
|---|---|
| TELEPHONE NO.: | |
| ATTORNEY FOR *(Name)*: | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO
400 McAllister Street
San Francisco, CA 94102-4514

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION (ADR) | CASE NUMBER: <br><br> DEPARTMENT 610 |
|---|---|

1) **The parties hereby stipulate that this action shall be submitted to the following ADR process:**

☐ **Early Settlement Program of the Bar Association of San Francisco (BASF) -** Pre-screened experienced attorneys provide a minimum of 2 hours of settlement conference time for a BASF administrative fee of $250 per party. Waivers are available to those who qualify. BASF handles notification to all parties, conflict checks with the panelists, and full case management. www.sfbar.org/esp

☐ **Mediation Services of BASF -** Experienced professional mediators, screened and approved, provide one hour of preparation and the first two hours of mediation time for a BASF administrative fee of $250 per party. Mediation time beyond that is charged at the mediators's hourly rate. Waivers of the administrative fee are available to those who qualify. BASF assists parties with mediator selection, conflicts checks and full case management. www.sfbar.org/mediation

☐ **Private Mediation -** Mediators and ADR provider organizations charge by the hour or by the day, current market rates. ADR organizations may also charge an administrative fee. Parties may find experienced mediators and organizations on the Internet.

☐ **Judicial Arbitration -** Non-binding arbitration is available to cases in which the amount in controversy is $50,000 or less and no equitable relief is sought. The court appoints a pre-screened arbitrator who will issue an award. There is no fee for this program. www.sfsuperiorcourt.org

☐ Other ADR process (describe) _____

2) **The parties agree that the ADR Process shall be completed by (date):** _____

3) **Plaintiff(s) and Defendant(s) further agree as follows:**

_____

_____

_____

_____          _____
Name of Party Stipulating                                            Name of Party Stipulating

_____          _____
Name of Party or Attorney Executing Stipulation            Name of Party or Attorney Executing Stipulation

_____          _____
Signature of Party or Attorney                                    Signature of Party or Attorney

☐ Plaintiff  ☐ Defendant  ☐ Cross-defendant          ☐ Plaintiff  ☐ Defendant  ☐ Cross-defendant

Dated: _____          Dated: _____

☐ *Additional signature(s) attached*

ADR-2  07/12          STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION

CM-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO.:    FAX NO. *(Optional):* <br> E-MAIL ADDRESS *(Optional):* <br> ATTORNEY FOR *(Name):* | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF
  STREET ADDRESS:
  MAILING ADDRESS:
  CITY AND ZIP CODE:
  BRANCH NAME:

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| CASE MANAGEMENT STATEMENT <br> *(Check one):* ☐ UNLIMITED CASE   ☐ LIMITED CASE <br> (Amount demanded    (Amount demanded is $25,000 <br> exceeds $25,000)    or less) | CASE NUMBER: |
|---|---|

A CASE MANAGEMENT CONFERENCE is scheduled as follows:

Date:                Time:            Dept.:        Div.:          Room:

Address of court *(if different from the address above):*

☐ Notice of Intent to Appear by Telephone,  by *(name):*

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

1. **Party or parties** *(answer one):*
   a. ☐  This statement is submitted by party *(name):*
   b. ☐  This statement is submitted jointly by parties *(names):*


2. **Complaint and cross-complaint** *(to be answered by plaintiffs and cross-complainants only)*
   a.  The complaint was filed on *(date):*
   b. ☐  The cross-complaint, if any, was filed on *(date):*

3. **Service** *(to be answered by plaintiffs and cross-complainants only)*
   a. ☐  All parties named in the complaint and cross-complaint have been served, have appeared, or have been dismissed.
   b. ☐  The following parties named in the complaint or cross-complaint
      (1) ☐   have not been served *(specify names and explain why not):*

      (2) ☐   have been served but have not appeared and have not been dismissed *(specify names):*

      (3) ☐   have had a default entered against them *(specify names):*

   c. ☐  The following additional parties may be added *(specify names, nature of involvement in case, and date by which they may be served):*


4. **Description of case**
   a.  Type of case in  ☐ complaint    ☐ cross-complaint      *(Describe, including causes of action):*

Page 1 of 5

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

4. b. Provide a brief statement of the case, including any damages. *(If personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date [indicate source and amount], estimated future medical expenses, lost earnings to date, and estimated future lost earnings. If equitable relief is sought, describe the nature of the relief.)*

☐ *(If more space is needed, check this box and attach a page designated as Attachment 4b.)*

5. **Jury or nonjury trial**
The party or parties request ☐ a jury trial ☐ a nonjury trial. *(If more than one party, provide the name of each party requesting a jury trial):*

6. **Trial date**
a. ☐ The trial has been set for *(date):*
b. ☐ No trial date has been set. This case will be ready for trial within 12 months of the date of the filing of the complaint *(if not, explain):*

c. Dates on which parties or attorneys will not be available for trial *(specify dates and explain reasons for unavailability):*

7. **Estimated length of trial**
The party or parties estimate that the trial will take *(check one):*
a. ☐ days *(specify number):*
b. ☐ hours (short causes) *(specify):*

8. **Trial representation** *(to be answered for each party)*
The party or parties will be represented at trial ☐ by the attorney or party listed in the caption ☐ by the following:
a. Attorney:
b. Firm:
c. Address:
d. Telephone number:
e. E-mail address:
f. Fax number:
g. Party represented:
☐ Additional representation is described in Attachment 8.

9. **Preference**
☐ This case is entitled to preference *(specify code section):*

10. **Alternative dispute resolution (ADR)**
a. ADR information package. Please note that different ADR processes are available in different courts and communities; read the ADR information package provided by the court under rule 3.221 for information about the processes available through the court and community programs in this case.

(1) For parties represented by counsel: Counsel ☐ has ☐ has not provided the ADR information package identified in rule 3.221 to the client and reviewed ADR options with the client.

(2) For self-represented parties: Party ☐ has ☐ has not reviewed the ADR information package identified in rule 3.221.

b. Referral to judicial arbitration or civil action mediation (if available).

(1) ☐ This matter is subject to mandatory judicial arbitration under Code of Civil Procedure section 1141.11 or to civil action mediation under Code of Civil Procedure section 1775.3 because the amount in controversy does not exceed the statutory limit.

(2) ☐ Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.

(3) ☐ This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court or from civil action mediation under Code of Civil Procedure section 1775 et seq. *(specify exemption):*

**CASE MANAGEMENT STATEMENT**

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**10. c.** Indicate the ADR process or processes that the party or parties are willing to participate in, have agreed to participate in, or have already participated in *(check all that apply and provide the specified information)*:

| | The party or parties completing this form are willing to participate in the following ADR processes *(check all that apply)*: | If the party or parties completing this form in the case have agreed to participate in or have already completed an ADR process or processes, indicate the status of the processes *(attach a copy of the parties' ADR stipulation)*: |
|---|---|---|
| (1) Mediation | ☐ | ☐ Mediation session not yet scheduled<br>☐ Mediation session scheduled for *(date)*:<br>☐ Agreed to complete mediation by *(date)*:<br>☐ Mediation completed on *(date)*: |
| (2) Settlement conference | ☐ | ☐ Settlement conference not yet scheduled<br>☐ Settlement conference scheduled for *(date)*:<br>☐ Agreed to complete settlement conference by *(date)*:<br>☐ Settlement conference completed on *(date)*: |
| (3) Neutral evaluation | ☐ | ☐ Neutral evaluation not yet scheduled<br>☐ Neutral evaluation scheduled for *(date)*:<br>☐ Agreed to complete neutral evaluation by *(date)*:<br>☐ Neutral evaluation completed on *(date)*: |
| (4) Nonbinding judicial arbitration | ☐ | ☐ Judicial arbitration not yet scheduled<br>☐ Judicial arbitration scheduled for *(date)*:<br>☐ Agreed to complete judicial arbitration by *(date)*:<br>☐ Judicial arbitration completed on *(date)*: |
| (5) Binding private arbitration | ☐ | ☐ Private arbitration not yet scheduled<br>☐ Private arbitration scheduled for *(date)*:<br>☐ Agreed to complete private arbitration by *(date)*:<br>☐ Private arbitration completed on *(date)*: |
| (6) Other *(specify)*: | ☐ | ☐ ADR session not yet scheduled<br>☐ ADR session scheduled for *(date)*:<br>☐ Agreed to complete ADR session by *(date)*:<br>☐ ADR completed on *(date)*: |

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**11. Insurance**

a. ☐ Insurance carrier, if any, for party filing this statement *(name):*

b. Reservation of rights: ☐ Yes ☐ No

c. ☐ Coverage issues will significantly affect resolution of this case *(explain):*

**12. Jurisdiction**

Indicate any matters that may affect the court's jurisdiction or processing of this case and describe the status.

☐ Bankruptcy ☐ Other *(specify):*

Status:

**13. Related cases, consolidation, and coordination**

a. ☐ There are companion, underlying, or related cases.

(1) Name of case:

(2) Name of court:

(3) Case number:

(4) Status:

☐ Additional cases are described in Attachment 13a.

b. ☐ A motion to ☐ consolidate ☐ coordinate will be filed by *(name party):*

**14. Bifurcation**

☐ The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action *(specify moving party, type of motion, and reasons):*

**15. Other motions**

☐ The party or parties expect to file the following motions before trial *(specify moving party, type of motion, and issues):*

**16. Discovery**

a. ☐ The party or parties have completed all discovery.

b. ☐ The following discovery will be completed by the date specified *(describe all anticipated discovery):*

| Party | Description | Date |
|---|---|---|

c. ☐ The following discovery issues, including issues regarding the discovery of electronically stored information, are anticipated *(specify):*

**CASE MANAGEMENT STATEMENT**

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**17. Economic litigation**

a. ☐ This is a limited civil case (i.e., the amount demanded is $25,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90-98 will apply to this case.

b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed *(if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case):*

**18. Other issues**

☐ The party or parties request that the following additional matters be considered or determined at the case management conference *(specify):*

**19. Meet and confer**

a. ☐ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court *(if not, explain):*

b. After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following *(specify):*

**20.** Total number of pages attached *(if any):* _____

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and alternative dispute resolution, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date:

_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PARTY OR ATTORNEY)

_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PARTY OR ATTORNEY)

☐ Additional signatures are attached.

THE BAR ASSOCIATION OF
SAN FRANCISCO

# MEDIATION SERVICES

Voted one of the
"TOP ADR Providers"
In The Bay Area
by The Recorder's
"Best of" in 2011, 2012
2010, 2011

## TESTIMONIALS

"This was the third attempt to mediate this case, and the BASF mediator was far and away the best mediator. I dare say that we would not have settled today but for his efforts."

*George Yuhas, Esq.*
*Orrick, Herrington & Sutcliffe LLP*

"We had an excellent experience and, after 8½ hours of mediation, [the BASF mediator] settled a very difficult case involving claims against four clients of ours by a wealthy investor who claimed inadequate disclosure was made."

*Robert Charles Friese, Esq.*
*Shartsis Friese LLP*

"When the other side made their offer, I thought there was no way we would reach an agreement – we were too far apart, but the mediator brought us together. He saved me a lot of time and aggravation by facilitating a settlement. Thanks!"

*Leslie Caplan*
*Global Warming Campaign Manager*
*Bluewater Network*

"BASF staff was very helpful – stayed on the task and kept after a hard to reach party. The mediator was great!"

*Mark Abelson, Esq.*
*Campagnoli, Abelson & Campagnoli*

"The [BASF] mediator was excellent! He was effective with some strong, forceful personalities."

*Denise A. Leadbetter, Esq.*
*Zacks, Utrecht & Leadbetter*

PROCEDURES, PODCASTS,
FORMS, MEDIATOR BIOGRAPHIES
AND PHOTOGRAPHS:
**www.sfbar.org/mediation**

**adr@sfbar.org or 415-982-1600**

## EXPERIENCED MEDIATORS ARE AVAILABLE IN THE FOLLOWING AREAS

**Business**
**Civil Rights**
**Commercial**
**Construction**
**Contracts**
**Disability**
**Discrimination**
**Education**
**Employment/Workplace**
**Environmental**
**Family**
**Family-Certified Specialists**
**Fee Disputes**
**Financial**
**Government**
**Insurance**
**Intellectual Property**
**Intra-Organizational**
**Labor**
**Landlord/Tenant**
**Land Use**
**LGBT Issues**
**Malpractice: Legal-Medical-Professional**
**Partnership Dissolutions**
**Personal Injury**
**Probate/Trust**
**Products Liability**
**Real Estate**
**Securities**
**Taxation**
**Uninsured Motorist**
**Women's Issues**
**And more...**

## QUALITY • EXPERIENCE • TRUST

### WHAT IS BASF'S MEDIATION SERVICE?

The Bar Association of San Francisco's Mediation Services is a private mediation service which will assist you with almost any type of dispute, from simple contract disputes to complex commercial matters.

❧

### WHO ARE THE MEDIATORS?

They are established mediators who have private mediation practices and have met our extensive experience requirements. By going through BASF you receive the services of these highly qualified mediators at a great value.

❧

### HOW DO I LEARN MORE ABOUT THE MEDIATORS?

BASF's website (www.sfbar.org/mediation) provides bios, photos and hourly rates of mediators. You can search by name or by area of law needed for your case. BASF staff is also always available to assist you with selection or to answer questions.

❧

### HOW MUCH DOES THE SERVICE COST?

A $250 per party administrative fee is paid to BASF at the time the Consent to Mediate form is filed. This fee covers the first hour of mediator preparation time and the first two hours of session time. Time beyond that is paid at the mediator's normal hourly rate.

### HOW IS THE MEDIATOR CHOSEN?

You may request a specific mediator from our website (www.sfbar.org/mediation) and indicate your choice on the BASF Consent to Mediate form, or you may indicate on the form that you would like BASF staff to assist with the selection.

❧

### WHY SHOULD I GO THROUGH BASF? CAN'T I JUST CALL THE MEDIATOR DIRECTLY?

BASF mediators have agreed to provide three free hours as a service to BASF. If you go directly to one of our mediators, you do not qualify for the free hours unless you notify us. Once you have filed with us, you will talk directly to the mediator to ask questions and to set a convenient mediation date and time.

❧

### HOW LONG IS THE MEDIATION SESSION?

The time spent in mediation will vary depending on your dispute. BASF mediators are dedicated to reaching a settlement, whether you need a few hours or several days.

❧

### WHO CAN USE THE SERVICE?

BASF mediation can be utilized by anyone and is NOT limited to San Francisco residents or issues. Also, the service may be used before a court action is filed or at any time during a court action.

### OUR CASE IS FILED IN COURT, HOW DO WE USE BASF'S MEDIATION SERVICES?

When you file the San Francisco Superior Court's Stipulation to ADR form, check the box indicating "Mediation Services of BASF." Then complete BASF's Consent to Mediate form found on our website and file it with us. (If the matter was filed in a different county, please check with that court for the appropriate process.)

❧

### WE ARE ON A DEADLINE; HOW QUICKLY CAN WE MEDIATE?

Once all parties have filed all the paperwork, BASF can normally have you in touch with the mediator within a day or two. If there is a deadline, BASF staff will give the matter top priority.

❧

### WHAT TYPES OF DISPUTES CAN I MEDIATE?

BASF mediators are trained in 30+ areas of law. If you don't see the area you need on our website or in this brochure, contact us; it is very likely we can match your need with one of our panelists.

❧

### MORE INFORMATION

Visit our website (www.sfbar.org/mediation) where you can search by name or by area of law. For personal assistance, please call 415-982-1600.

## WWW.SFBAR.ORG/MEDIATION • ADR@SFBAR.ORG • 415.982.1600